## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF INTERNATIONAL MINERAL RESOURCES, B.V. FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Jan Luijkenstraat 68<br>Amsterdam, 1071CS<br>Netherlands,<br><div align="center">Applicant.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   1:14-MC-00340<br>)   JUDGE KESSLER<br>)   Assigned: April 3, 2014<br>)   Miscellaneous |

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
### TO APPLICANT'S REQUEST FOR 28 U.S.C. § 1782 DISCOVERY

SPERDUTO THOMPSON PLC

Kim Hoyt Sperduto
DC Bar No. 416127
Joshua S. Kauke
DC Bar No. 999296

1133 Twentieth Street, N.W.
Second Floor
Washington, D.C.  20036

Phone: (202) 408-8900
Fax: (202) 408-8910 (f)

Counsel for Rinat Akhmetshin

# **Table of Contents**

Preliminary Statement ................................................................................................... 1

**FACTUAL BACKGROUND OF THE APPLICATION** ............................................ 3

   A.   THE PLAYERS ..................................................................................... 3

   B.   THE UNDERLYING DISPUTES. .......................................................... 6

   C.   THE CURRENT REQUEST. ................................................................. 9

**ARGUMENT** ............................................................................................................ 10

   **POINT I**
   **THIS COURT LACKS AUTHORITY TO GRANT THE**
   **APPLICATION BECAUSE THE DISCOVERY SOUGHT IS**
   **NOT "FOR USE IN A FOREIGN PROCEEDING" BUT IS**
   **INTENDED TO VEX, HARASS, AND DELAY PROCEEDINGS.** ................................ 11

   **POINT II**
   **THIS COURT LACKS AUTHORITY TO ORDER**
   **DISCOVERY OF PRIVILEGED COMMUNICATIONS.** ................................................. 12

   **POINT III**
   **THE APPLICATION SHOULD BE DENIED**
   **ON THE BASIS OF THE *INTEL* FACTORS.** ..................................................... 14

     (i)  Mr. Akhmetshin's Role In The Foreign Proceedings. .................................... 15

     (ii) Nature of the Foreign Tribunal. ...................................................... 16

     (iii) The Foreign Tribunals Neither Need Nor Want Assistance. ......................... 16

     (iv) These Discovery Requests Are Patently Intrusive. ................................... 17

   **POINT IV**
   **DISCRETIONARY FACTORS CONSIDERED**
   **BY OTHER COURTS COMPEL DENIAL HERE** ....................................................... 17

**CONCLUSION** ........................................................................................................ 19

**Preliminary Statement**

Rinat Akhmetshin, through undersigned counsel, submits this memorandum of points and authorities in opposition to the request of International Mineral Resources BVI ("IMR") for discovery from Mr. Akhmetshin pursuant to 28 U.S.C. § 1782. That application should be dismissed because it constitutes an abuse of that statute as well as the nearly completed litigation in the Netherlands in which IMR has been tagged with a pre-judgment attachment of some $1.2 billion. Indeed, the principals behind IMR's application have such an unsavory record that their company Eurasian Natural Resources Corporation Plc ("ENRC") was delisted from the London Stock Exchange in 2013, and they are currently subject to a publicly announced investigation by London's Serious Fraud Office, or SFO, involving allegations of massive corruption in numerous countries worldwide. IMR and/or its principals are also under investigation by the UK's Financial Services Authority. These three individuals -- Alexander Machkevitch, Patokh Chodiev, and Alijan Ibragimov, or the Trio -- are billionaire oligarchs from Uzbekistan and Kyrgyzstan that made their billions extracting resources in Kazakhstan. This petition is nothing more than that Trio's midnight effort to divert attention from IMR's loss in the Netherlands, and to attempt to create some ancillary excuse for avoiding judgment day.

Even a cursory reading of the Application and supporting papers reveals the comical "smoke and mirrors" quality to the petition. The Application recycles unsubstantiated allegations that unnamed "investigators received reports" from unnamed sources that Mr. Akhmetshin "distributed" to unnamed "third parties" unidentified "materials" designed to give EuroChem Volga-Kaliy LLC ("ECVK") an ethereal and undisclosed "unfair advantage" in the European disputes. (Application, 4-6). To "corroborate" these charges, IMR announces that an "anonymous source" provided IMR's still unnamed "investigators" with a thumb drive of

1

"apparently stolen" IMR documents that IMR "believes . . . could have been obtained by hacking."  In a syllogism of theatrical dimension, IMR's still anonymous "investigators received a message to pick up an envelope from the concierge [of the Radisson Edwardian Berkshire Hotel]."  (Application at 6).  The investigator picked up the package, discovered a thumb drive of unknown provenance, and immediately "suspect[ed] that the thumb drive contained materials stolen by Mr. Akhmetshin."  (Application at 6).  Neither Woody Allen nor Peter Sellers would ever have scripted such a satire for the simple reason that, even by Hollywood standards, the audience would never have believed the premise.  Neither should this Court.  Fortunately, the federal courts are not the appropriate theatre in which to produce such a farce.

Finally, this is not the first time that IMR has claimed, unsuccessfully, that its or its subsidiaries computers have been hacked.  As evidenced in the accompanying Declaration of Patrick Salisbury, sworn to May 15, 2014 (the "Salisbury Declaration" or "Salisbury Dec."), IMR's subsidiary Shaft Sinkers (Pty) Ltd, a respondent in two related international arbitration proceedings, alleged a year ago that its computers had been hacked.  Those applications were rejected by two separate arbitration panels in London and Zurich.  Around the same time, another IMR subsidiary, ENRC, publicly claimed the hacking of its computers in response to the unrelated SFO investigation.  That claim was mocked in the press as a "convenient excuse if material now went missing relating to alleged corruption in Kazakhstan and Africa."  (Affidavit of Rinat Akhmetshin, sworn to May 14, 2014 ("Akhmetshin Aff."), ¶ 12 and Ex. D).  In short, IMR's standard operating procedure in the face of serious and credible allegations of fraud appears to be to claim it has been hacked; this proceeding marks the fourth such claim. (Salisbury Dec. ¶ 19).

2

It should also be dispositive that rather than "assisting foreign tribunals" this Application, supported by nothing more than disingenuous smoke and mirrors, would interfere with and delay each of the European proceedings.  According to lead counsel Patrick Salisbury "On 21 January 2014, the Amsterdam District Court held a hearing in the liability phase of the case and expressly instructed the parties not to make any additional evidentiary submissions." (Salisbury Dec. ¶ 12).  And the "limited discovery allowed in the arbitration proceedings has been complete and closed."  (Salisbury Dec. ¶ 4).   Europe's legal proceedings in these matters have no room and no place for the "assistance" of American discovery.

## FACTUAL BACKGROUND OF THE APPLICATION

### A.    THE PLAYERS

*Mr. Akhmetshin And His Consulting Practice.*  Rinat Akhmetshin provides strategic communication and consulting services to clients worldwide.  He has both governmental and private clients.  He also is Director and leads the Washington office of the International Eurasian Institute for Economic and Political Research ("IEI").  Founded in 1998, IEI works to expand democracy and the rule of law in Eurasia.  To that end, IEI focuses on a three part program seeking to: (i) foster the development of an independent judiciary in the countries that formerly comprised the Soviet Union; (ii) safeguard the rights of the individual; and (iii) uphold the principle of free and fair trade as a means to combat rampant institutionalized corruption in Eurasia.  One of IEI's goals is to educate the international elite about political and economic conditions in Central Asia and Russia.  (Akhmetshin Aff. ¶ 4).

Mr. Akhmetshin also provides consulting services beyond the scope of IEI.  One governmental client's interests were directly aligned with the United States' interests and involved U.S. military base relocations within the former Soviet Union.  Mr. Akhmetshin

worked hand-in-hand with the Defense Department, Department of State, and Department of Justice.  (Akhmetshin Aff. ¶ 5).  *See also* Steve LeVine, *The Oil and the Glory: The Pursuit of Empire and Fortune on the Caspian Sea* 366 (Random House 2007) ("Dr. Akhmetshin and IEI actively help opposition politicians, independent journalists and anti-corruption activists to share their position on Kazakhstani regime with representatives of U.S. Congress, State Department and American media.")  Other Akhmetshin client matters have involved topics ranging from narco-trafficking and terrorism in Afghanistan to surveillance of undercover agents, suspected undercover agents, and their identities.  Mr. Akhmetshin's consulting services have helped save American lives in Afghanistan and other locations abroad and slowed down Afghan heroin distribution worldwide.  (Akhmetshin Aff. ¶ 5).

Mr. Akhmetshin is fluent in Russian, has extensive experience in Eurasia, and has numerous contacts throughout that part of the world.  Mr. Akhmetshin is considered by many an expert on the legal, political, social, and economic characteristics of many of the countries that formerly comprised the Soviet Union.  (*Id.*)  Given his reputation, and access to information on companies like IMR located or operating in these countries, Mr. Akhmetshin was hired by Salisbury & Ryan LLP to provide consulting expert research and related services with respect to the disputes between ECVK and IMR and its affiliates.  (Akhmetshin Aff. ¶ 2; Salisbury Dec. ¶ 20).

In such a capacity, his communications with Salisbury & Ryan are privileged.  Indeed, the Salisbury & Ryan engagement letter makes explicit that "You shall report to Salisbury & Ryan LLP, counsel to the Client, and all communications shall be subject to the attorney-client and attorney-work produc[t] (sic) privileges."  (Akhmetshin Aff. Ex. A.)  *See Fed. Trade Com. v. TRW, Inc.,* 628 F.2d 207, 212 (D.C. Cir. 1980)  (acknowledging that "the

attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client"); *Farahman v. Jamshidi*, Civ. Act. No. 05-542, 2005 U.S. Dist. LEXIS 2198, *7-9 (D.D.C. Feb. 11, 2005) (Bates, J.) (attorney-client privilege covered testimony and notes when interpreter was present). *See also United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (Friendly, J.) (presence of an expert, whether hired by the lawyer or the client, while the client is relating a complicated story ought not destroy the privilege any more than the presence of an interpreter interpreting communications between lawyer and client who speaks different language). The engagement letter also explicitly provides that "You confirm that all services provided by you will be made in full compliance with the laws of the U.S. and other relevant jurisdictions." (July 26, 2012 Engagement letter at 1-2).

    *The Trio.*  Applicant IMR is a private investment company wholly owned by the three individuals Alexander Machkevitch, Patokh Chodiev, and Alijan Ibragimov. Messrs. Machkevitch, Chodiev, and Ibragimov hail from Kyrgyzstan and Uzbekistan but made their money in Kazakhstan in the 1990s during the privatization of assets after the collapse of the Soviet Union. Kazakhstan is a country rich in natural resources. The Trio made their billions from privatization of the aluminum industry.

    Like other oligarchs, one of the steps the Trio took to protect their assets was to transfer them to entities in the West that were less subject to political and economic risk. Applicant IMR is one of the Trio's privately held investment vehicles. ENRC constituted another of the Trio's efforts to shelter their assets. ENRC became listed as a public company on the London Stock Exchange in late 2006 or early 2007. (LSE: ENRC). As it turned out, however, corporate governance was not ENRC's strong suit. After widely reported instances of

5

fraud, bribery, kickbacks, accounting irregularities, and destruction of electronically stored information, culminating in the resignation of all of its independent directors, ENRC was delisted in 2013.  (Akhmetshin Aff. ¶ 11).

One fascinating vignette addressing ENRC's defense of such charges was its "internal investigation" for which it retained the law firm Dechert.  Dechert attorneys commenced their investigation, and travelled to Kazakhstan where the company was based, only to discover that ENRC had sent them to a sham office, complete with fake computer systems, communications equipment, and office furniture.  Dechert filed its report with ENRC describing the "Potemkin village" of a surrogate office masquerading as headquarters.  ENRC responded by notifying Dechert that its services were no longer required.  (Akhmetshin Aff. Ex. C at 4).  Shortly thereafter, the SFO announced its criminal fraud investigation in April of 2013.  (The Guardian, April 25, 2013, "ENRC: Serious Fraud Office Launches Criminal Investigation.") (Akhmetshin Aff. Ex. C).  In response to the SFO announcement, ENRC publicly claimed that its computers had been hacked and stolen.  That claim was widely ridiculed; one ENRC insider quipped "ENRC leaks so badly, why would anybody bother to hack it?"  (Akhmetshin Aff. Ex. D:  "Burglary and computer hacking add to woes at ENRC," The Telegraph, May 23, 2013).  Others speculated that the computer hacking could be used as a convenient excuse if material now "went missing" relating to the alleged corruption in Kazakhstan and Africa.

## B.    THE UNDERLYING DISPUTES

According to the papers presented with the Application, the underlying disputes involve IMR's involvement in issuing a fraudulent guaranty from its subsidiary Shaft Sinkers of a mining process to prevent water penetration in a shaft to be constructed by Shaft Sinkers for ECVK.  (Application at 3).  This $350 million shaft was intended to be used to access a deep

6

(1100 meters) potash mine (potassium) near Kotelnikovo in southern Russia, where ECVK's $2.5 billion mining project was located.  (Exhibit A to DeBree Declaration, at ¶ 3.2) (*See also* Salisbury Dec. ¶¶ 3-8).  ECVK paid the IMR affiliate over $150,000,000 for its work there. Salisbury & Ryan requested that Mr. Akhmetshin assist with research regarding IMR as part of the law firm's investigation of the construction disaster in Kotelnikovo.  As noted above, the July 26, 2012 engagement letter specified that "all communications shall be subject to the attorney-client and attorney-work product privileges."  (Akhmetshin Aff. Ex. A).

ECVK commenced the Dutch litigation against IMR on or about March 25, 2013. ECVK also commenced an arbitration proceeding concerning the mine Design Contract against IMR's subsidiary Shaft Sinkers (Pty) Ltd. in Paris before the ICC International Court of Arbitration on or about October 3, 2012.  ECVK also filed arbitration relating to fraudulent inducement/breach of the separate Building and Construction Works Contract against Shaft Sinkers in the Swiss Chambers' Arbitration Institution.  (Salisbury Dec. ¶¶ 2-4).  The gravamen of the fraud/breach of contract claims against Shaft Sinkers involves Shaft Sinkers guaranty that its "grouting" method of sealing underground water bearing layers would successfully consolidate shaft integrity to prevent flooding and collapse of the shaft.   In fact, this method failed and the shaft flooded with water and collapsed costing hundreds of millions of dollars which ECVK seeks to recover.  The fraud claims against Shaft Sinkers addresses, among other things, Shaft Sinkers' withholding from and concealment of reports received by Shaft Sinkers before the project started that advised Shaft Sinkers that the shaft was ungroutable.  The fraud claims also entail massive fraud in procurement and bribery of ECVK's Chief of the Mine Construction Division.  In the Dutch case against IMR, ECVK asserts that all of this fraud was ordered and directed by IMR, Shaft Sinkers' controlling shareholder.  (Salisbury Dec. ¶ 5).

In May 2013, Shaft Sinkers made separate applications to the two arbitration tribunals with vague allegations of hacking of its computers.  (Salisbury Dec. ¶ 16).  Like IMR here, Shaft Sinkers was not able to substantiate its claims or even to point to a single document filed in the arbitrations that would have been obtained by such hacking.  As a result, both panels dismissed those applications.  (*Id.*)

As noted above, the Dutch court has already issued a pre-judgment attachment against IMR in the amount of $ 1.2 billion after rejecting all of IMR's defenses.  (Declaration of Professor Dr. Marielle Koppenol-Laforce, sworn to May 15, 2014 ("Koppenol-Laforce Dec.") ¶¶ 9-10).  In international litigation, obtaining such a pre-judgment attachment is no easy task and speaks for itself on the merits of the dispute.  The evidentiary phase of the Dutch proceeding is now closed.  Discovery has run its course, pleadings are closed, and expert reports have been submitted.  The Dutch Court has stated that final judgment is scheduled to be issued this month.  (Salisbury Dec. ¶¶ 5-12; Koppenol-Laforce Dec. ¶¶ 4-7).  In Zurich, "discovery" has been completed, and the hearing date is scheduled for June 16, 2014, just a month away.  (Salisbury Dec. ¶ 4).  In the Paris ICC arbitration, discovery is closed, expert reports have been submitted, and the hearing date is set for early 2015.  (Salisbury Dec. ¶ 4).

Not a single document or piece of information uncovered by Mr. Akhmetshin's research on behalf of ECVK was introduced in the Dutch litigation or the French or Swiss arbitrations.  (Salisbury Dec. ¶¶ 7, 10, 15; Koppenol-Laforce Dec. ¶ 3).  Indeed, it is telling -- if not dispositive -- that nowhere in IMR's papers does IMR claim to the contrary.  Nor did IMR raise any claim in the Dutch case that any of its information was wrongly obtained, even though the main hearing in that case occurred in February 2014, just weeks or months after IMR claims

to have uncovered Mr. Akhmetshin's supposed hacking.  (Salisbury Dec. ¶ 15; Koppenol-Laforce Dec. ¶ 3).

Mr. Akhmetshin does not have the technical skill to "hack."  (Akhmetshin Aff. ¶ 8).  Mr. Akhmetshin does not employ any IT personnel with such skills.  Mr. Akhmetshin has never been accused -- in this country or anywhere else -- of any such impropriety.

## C.    THE CURRENT REQUEST

The subpoena and document request attached to the Declaration of John Scanlon is doomed under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  It suffers from two incurable and related infirmities.  First, it asks for "all documents and communications concerning IMR, Shaft Sinkers, ENRC, EuroChem, ECVK and/or Salisbury & Ryan."   Salisbury & Ryan is ECVK's counsel in the Dutch litigation and the Paris and Zurich arbitrations.  In other words, all the documents the subpoena seeks are facially protected by the attorney-client privilege and the work product doctrine.  Even if the Application is granted, Mr. Akhmetshin will not produce documents or communications protected by either privilege, and in that sense this proceeding (and any subsequent proceeding) is absolutely futile.  But it is also futile in scope.  Mr. Akhmetshin has no relationship with the matters relating to the Dutch litigation and the Paris and Zurich arbitrations but for his relationship with Salisbury & Ryan. In other words, Mr. Akhmetshin is only linked to the facts and circumstances giving rise to this dispute in his capacity as legal, political, economic, and social consulting expert on Eurasia.  He has no role in this matter other than his role as consulting expert, which gives rise to protected, privileged communications.

Again, none of the information or research Mr. Akhmetshin provided to Salisbury & Ryan was introduced in any IMR or Shaft Sinkers proceeding.  Mr. Akhmetshin has never

testified, nor will he testify, in any of the three proceedings.  (Salisbury Dec. ¶ 15; *see* Koppenol-Laforce Dec. ¶¶ 3-8).

## **ARGUMENT**

The Application should be denied because it constitutes an abuse of 28 U.S.C. § 1782.  Congress intended the statute to facilitate and assist in international dispute resolution, not to be used as a tool for harassment and delay.  Even assuming this Court has authority to grant the Application, this Court also possesses more than sufficient discretion to deny such a patently improper use of the statute.  Discovery is closed in each European proceeding.  (Salisbury Dec. ¶¶ 4, 12; Koppenol-Laforce Dec. ¶¶ 4-8).  There is neither need nor room for this Court's "assistance."

As in most courts, in this Circuit the "relevant enquiry proceeds in two stages: at the first stage, the district court considers whether it has the authority to grant the application; thereafter, the court considers whether it should exercise its discretion to do so."  *In re Veiga,* 746 F. Supp. 2d 8, 16-17 (D.D.C. 2010) (Kollar-Kotelly, J.).  In this case, the Application should be denied for any one of four separate reasons: (1) this Court lacks authority to grant the Application (see Point I, below); (2) 28 U.S.C. § 1782 on its face prohibits discovery of privileged materials, which are all that is sought here (see Point II, below); (3) even if this Court has authority, the Court should exercise its abundant discretion and deny the Application based upon the *Intel* factors (see Point III, below); and  (4) even if this Court has authority, the Court should exercise its considerable discretion and deny the Application based upon additional factors that other courts have considered apposite (see Point IV, below).

## POINT I

**THIS COURT LACKS AUTHORITY TO GRANT THE
APPLICATION BECAUSE THE DISCOVERY SOUGHT IS
NOT "FOR USE IN A FOREIGN PROCEEDING" BUT IS
INTENDED TO VEX, HARASS, AND DELAY PROCEEDINGS.**

There are three statutory prerequisites to determine whether this Court has

authority to grant the § 1782 request:  (1) is the subject of the discovery request "found" within

the district; (2) is the discovery "for use in a proceeding in a foreign or international tribunal;"

and (3) are the Applicants "interested persons" within the meaning of § 1782?  *In re Caratube

Int'l Oil Co., LLP,* 730 F. Supp.2d 101, 104 (D.D.C. 2010) (Bates, J).  Mr. Akhmetshin concedes

the first factor that he is "found" within the District of Columbia.  Mr. Akhmetshin also concedes

the third element that the Trio controls not only IMR, but also its subsidiary Shaft Sinkers, as

well as the formerly publicly held London Stock Exchange company ENRC.  As such, both the

Trio and IMR are "interested persons" within the meaning of the statute.

That leaves the second factor.  The discovery requested here is not "for use" in an

international tribunal or proceeding because the record is closed in the Dutch litigation and final

judgment is currently scheduled to be issued in weeks.  Not only is the evidentiary component of

the Dutch case closed, but the entire liability phase of that action has been completed.  (Salisbury

Dec. ¶¶ 4, 12; Koppenol-Laforce Dec. ¶¶ 4-8)).   Final judgment is all that awaits, with the result

that IMR's assets have been frozen to the extent of $1.2 billion. (*See* Koppenol-Laforce Dec. ¶¶

4-5)

To the extent the discovery is sought for the pending arbitrations, discovery --

such as it is -- was closed in the ICC proceeding on December 30 last year.  (ICC Procedural

Directions Order No. 1, dated 29 April 2013, Salisbury Dec. ¶ 4).  The Zurich arbitration hearing

is scheduled to commence next month on June 16.  Discovery is closed in that matter as well. (Salisbury Dec. ¶ 4).

What the discovery is really for is either (i) a dilatory tactic to forestall final judgment or (ii) a fishing expedition to determine what information has been provided by Mr. Akhmetshin that may be used to enforce the expected Dutch judgment against IMR so IMR can hide assets.  Neither tactic is a proper purpose.

Finally, with respect to this Court's authority, there is also the anomaly that, other than privileged documents, IMR is essentially seeking discovery to recover its own materials. Again, Mr. Akhmetshin's only relationship to this Application is through his work as a consulting expert assisting counsel.  The only documents and communications he has with Salisbury & Ryan, EuroChem, or ECKV are privileged.  The only other entities for whom this subpoena seeks documents are entities controlled by the Trio, that is "communications concerning IMR, Shaft Sinkers, ENRC . . . ." (*See* Subpoena, Document Request at 7, attached to the Scanlon Dec. as Exhibit A).  There is no need for this Court to provide IMR access to its own documents.

## POINT II

### THIS COURT LACKS AUTHORITY TO ORDER DISCOVERY OF PRIVILEGED COMMUNICATIONS.

The Application should be denied because the statute itself precludes disclosure of statements, testimony, or documents "in violation of any legally applicable privilege." Accordingly, this Court lacks authority to compel production of attorney client communications or attorney work product.  Because Mr. Akhmetshin's only connection with this matter is through his privileged role as consulting research expert, assisting counsel for purposes of providing legal advice to the client, all substantive communications -- written or verbal -- would

be barred from disclosure as privileged.  In that sense, this § 1782 proceeding is an exercise in

futility.  No legitimate legal purpose would be served by granting the Application.

> The plain words of the statute are controlling.  28 U.S. C. § 1782 provides:

> The district court of the district in which a person resides or is
> found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal, including criminal investigations
> conducted before formal accusation.
>
> \*     \*     \*     \*     \*     \*     \*
>
> To the extent that the order does not prescribe otherwise, the
> testimony or statement shall be taken, and the document or other
> thing produced, in accordance with the Federal Rules of Civil
> Procedure.  *A person cannot be compelled to give his testimony or
> statement or to produce a document or other thing in violation of
> any legally applicable privilege.*

(emphasis added).  As one commentator explained, "If an applicant establishes the three

requirements necessary to invoke Section 1782, the statute mandates that the court nonetheless

deny the application if the discovery would violate 'any legally applicable privilege.'"  Edward

A. Klein, *Discovering America*, 26 Los Angeles Lawyer 24, 26 (April 2003).  The privilege issue

alone is sufficient grounds on which to deny the current Application.   *See In re Sarrio S.A.*, Case

No. M 9-372, 1995 U.S. Dist. LEXIS 14822, \*9-10 (S.D.N.Y. October 11, 1995) (denying

application that sought only privileged documents) *remanded on other grounds by Kuwait Inv.

Auth. v. Sarrio S.A. (In re Sarrio, S.A.)*, 119 F.3d 143 (2d Cir. 1997).

In this Circuit there is absolutely no doubt that Mr. Akhmetshin's services as

consulting research expert on Eurasia are privileged.  Our Circuit removed any doubt in its

opinion in *FTC v. GlaxoSmithKline,* 294 F.3d 141, 148 (D.C. Cir. 2002):  the "attorney-client

privilege extends also to those communications that GSK shared with its public relations and

government affairs consultants. . . . there is no reason to distinguish between a person on the

corporation's payroll and a consultant hired by the corporation if each acts for the corporation

and possesses the information needed by attorneys in rendering legal advice." (*See* Akhmetshin

Aff. ¶ 6).  Beyond *GlaxoSmithKline,* Rule 26(b)(3)(A) places materials produced by a consultant

beyond the reach of discovery if they are "prepared in anticipation of litigation."  Indeed, Rule

26(b)(4)(D) makes clear that consulting experts are not subject to discovery.  According to the

Rule, "Ordinarily, a party may not, by interrogatories or deposition, discover facts known or

opinions held by an expert who has been retained or specially employed by another party in

anticipation of litigation or to prepare for trial and who is not expect to be called as a witness at

trial."  That language describes Mr. Akhmetshin's role with precision.  His work product is

protected pursuant to both provisions of Rule 26(b).

## POINT III

## THE APPLICATION SHOULD BE DENIED
## ON THE BASIS OF THE *INTEL* FACTORS.

Even if this Court were to decide that it has the authority to grant the § 1782

Application, it possesses "broad discretion" in determining whether it should do so.  *See Veiga,*

746 F. Supp. 2d at 17 ("Congress gave the federal district courts broad discretion . . ."); *see also*

*Lazaridas v. Int'l Ctr. For Missing And Exploited Children,* 473 F. App'x 2, 4 (D.C. Cir. 2012).

The Supreme Court and lower courts have long emphasized the district court's discretion in

evaluating a § 1782 petition.  "As earlier emphasized, . . . a district court is not required to grant

a § 1782 (a) discovery application simply because it has the authority to do so."  *Intel v.*

*Advanced Micro Devices,* 542 U.S. 241, 264 (2004).  The *Intel* Court set out the factors the

district court should consider in the exercise of its sound discretion.  *See Intel,* 542 U.S. at 264.

The *Intel* factors are:

> (1) Whether the material sought is within the foreign tribunal's
> jurisdictional reach and thus accessible absent Section 1782 aid;
> (2) the nature of the foreign tribunal, the character of the

proceedings underway abroad, and the receptivity of the foreign
government or the court or agency abroad to U.S. federal court
jurisdictional assistance; (3) whether the Section 1782 request
conceals an attempt to circumvent foreign proof-gathering
restrictions or other policies of a foreign country or the United
States; and (4) whether the subpoena contains unduly intrusive
and burdensome requests.

*In re Chevron Corp.*, 749 F. Supp. 2d 141, 160 (S.D.N.Y. 2010) (citing *Intel,* 542 U.S. at 264-
65)*.* The four *Intel* factors analyzed together illustrate the abuse this § 1782 Application
comprises and demonstrate why the petition should be denied.

<div align="center">

(i)      **Mr. Akhmetshin's Role In The Foreign Proceedings.**

</div>

Mr. Akhmetshin is not a party in any of the foreign proceedings, but he was a
consulting expert in all of them.  That status renders his communications privileged, and beyond
the reach of any application, petition, or subpoena.

But application of this *Intel* factor favors denial of the application for another
reason.  The Supreme Court's reasoning is that if the target of discovery is a participant in the
foreign proceeding, no assistance is needed pursuant to § 1782 because the discovery can be
ordered in the foreign proceeding.  *See Intel,* 542 U.S. at 264 ("A foreign tribunal has jurisdiction
over those appearing before it, and can itself order them to produce evidence.").   Applying that
rationale here to the discovery request of the Applicant militates in favor of denying the
Application.  The only topics requested in the subpoena are those "concerning IMR, Shaft
Sinkers, ENRC, EuroChem, ECVK, and/or Salisbury & Ryan."  (See draft subpoena attached to
the Scanlon Declaration as Exhibit A).

Taking them one at a time, IMR is the defendant in the Dutch litigation and any
documents relating to IMR could have been obtained there through Dutch law.  The Dutch court
does not need this Court's help with respect to IMR  (*See* Koppenol-Laforce Dec. ¶¶ 4-8).  Shaft
Sinkers is the Respondent in both the Paris and Zurich arbitrations.  Similarly, neither the ICC

<div align="center">

15

</div>

nor the Swiss Chambers Arbitration Institution needs "help" from this Court to compel production of documents relating to Shaft Sinkers. They have jurisdiction and authority over the parties before them. ECVK is a wholly-owned subsidiary of EuroChem, and the Plaintiff/Claimant in the European proceedings. Again none of those tribunals wants or needs "assistance" from American discovery procedures. Similarly, Salisbury & Ryan has appeared in all three proceedings. If the European tribunals wanted or needed the parties to produce such materials they had every right to demand them. Again, for the record, not a single document of piece of information that Mr. Akhmetshin's research produced was introduced or otherwise used in any of those proceedings. (Salisbury Dec. ¶¶ 10, 11, 15; Koppenol-Laforce Dec. ¶ 3). Mr. Akhmetshin has not testified and will not testify before any of those tribunals.

### (ii)     Nature of the Foreign Tribunal.

Justice Ginsburg's *Intel* opinion admonishes that "a district court should consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of the foreign country or the United States." 542 U.S. at 265. As noted in the previous paragraphs, the Dutch court and the French and Swiss arbitration panels all have established procedural protocols. All three fora are well past "discovery" or document exchange. Accordingly, this Application is a prototype of nothing more than "an attempt to circumvent foreign proof-gathering restrictions."

### (iii)     The Foreign Tribunals Neither Need Nor Want Assistance.

The third *Intel* factor is the nature of the foreign tribunal and whether they need or want American assistance. 524 U.S. at 264-65. All of the tribunals involved in the IMR dispute are sophisticated, respected juridical bodies that do not need American assistance. Nor have they sought it here through the Hague Convention or otherwise. The Dutch court is on the cusp

of issuing final judgment, and has already issued a $1.2 billion pre-judgment attachment.  The Swiss hearing is set for just next month.  Discovery is closed in the French ICC proceeding as well.  For this Court to believe that it could provide "assistance" by delaying those matters to open up American discovery procedures would be both patronizing and condescending.

<p style="text-align: center;">(iv)     <strong>These Discovery Requests Are Patently Intrusive.</strong></p>

The final *Intel* factor considers the nature of the discovery requested.  Here, because the draft subpoena seeks in an untimely manner privileged information and communications from parties already before the foreign tribunals the Application should be denied.  The remainder of this brief addresses exactly why the discovery requested is intrusive and burdensome.

<p style="text-align: center;"><strong><u>POINT IV</u></strong></p>

<p style="text-align: center;"><strong>DISCRETIONARY FACTORS CONSIDERED<br><u>BY OTHER COURTS COMPEL DENIAL HERE.</u></strong></p>

In addition to the *Intel* factors, Judge Posner and other courts have identified some of the mischief to which § 1728 could -- but should not -- be subjected.  "[D]istrict courts must be alert for potential abuses that would warrant a denial of an application to be allowed to take such discovery.  One abuse would be for a party to seek discovery in a federal district court that it could obtain in the foreign jurisdiction, thus gratuitously forcing his opponent to proceed in two separate court systems; the inference would be that the party seeking U.S. discovery was trying to harass his opponent."  *Heraeus Kulzer, GmbH v. Biomet, Inc.,* 633 F.3d 591, 594 (7th Cir. 2011).   There are other obvious forms where U.S. discovery is invoked "trying to harass one's opponent."  One such is presented here: three Eurasian oligarchs attempting to harass an expert to chill his efforts.  That is particularly abusive of Congressional intent where that same

<p style="text-align: center;">17</p>

expert is seeking to encourage an independent judiciary, create a free and inquisitive press, and foster political opposition parties.  This Court should not countenance any such abuse.

One of the fundamental purposes of 28 U.S.C. § 1782 is to "provide efficient means of assistance to participants in international litigation . . . ."  *Euromepa v. R. Esmerian,* 154 F.3d 24, 28, (2d Cir. 1998).   This Application is neither efficient nor would it "provide assistance."  Indeed, granting this Application would interfere with the efficient administration of justice in Holland, in France, and in Switzerland.

As noted above, the time for "discovery" has expired in each forum in each of the jurisdictions where proceedings are pending.  (Salisbury Dec. ¶¶ 4, 12; Koppenol-Laforce Dec. ¶¶ 4-8).  This Court can take judicial notice of the fact that American discovery is broader than in European fora.  If there be any doubt, Judge Posner has muttered out loud that American discovery is the broadest on earth.  *Heraeus Kulzer,* 633 F.3d at 594 ("Discovery in the federal court system is far broader than in most (maybe all) foreign countries. . . .")  The Dutch, French, and Swiss systems have all run their course, and delaying or disturbing them further for a flimsy § 1782 request premised on anonymous cloak and dagger intrigue would hardly be considered "assistance."

Nor would it be efficient.  Respected English newspapers, including The Guardian, reported that ENRC, the Trio's former public London Stock Exchange company, was the subject of the SFO criminal investigation more than a year ago, in April of 2013.  According to one London newspaper:

> Things have been lively enough at ENRC in recent weeks.  But now the scandal-ridden FTSE-100 miner has come up with two more troubling issues: a laptop containing staff details, including bank account numbers, has mysteriously disappeared in a "domestic burglary," while ENRC has also suffered an "intrusion into the group's electronic systems by a third party."

18

> The fresh problems were relayed to the market in an
> announcement, headlined "potential loss of company data," with
> ENRC stressing that "the Information Commissioner's Office has
> been informed."
>
> It was enough to trigger all manner of conspiracy theories, not least
> that the computer hacking could be used as a convenient excuse if
> material now went missing relating to alleged corruption in
> Kazakhstan and Africa.

(Akhmetshin Aff. Ex. D, Alistair Osborn, Business Editor, The Telegraph. May 23, 2013).

This Court need not form an opinion on the veracity of ENRC's claim of a "domestic burglary" or corruption in Kazakhstan or Africa. All this Court needs do is take notice that the computer hacking claim is over a year old. ENRC, IRM, and the Trio all sat on that claim for over a year, and more than a year after the European proceedings were commenced. IMR cannot now come running into an American court after sitting on its so-called "rights" in Europe for over a year. Whether this Court deems it laches or waiver, granting this Application would only delay each of the European proceedings and would more likely be viewed as condescending interference than as "efficient assistance."

## CONCLUSION

The Application should be denied. It is premised on nothing more than anonymous allegations of so-called "investigators" receiving from unnamed "third parties" unidentified "materials" from anonymous "sources" transmitting "apparently stolen" ESl that the Applicant "believes" "could have been obtained" by improper means and "suspects" could be linked to Mr. Akhmetshin. In contrast, three respected European tribunals have evaluated the evidence, closed discovery, and are all either on the verge of trial or even final judgment. Even if this Court were to somehow credit the script composed by the Applicant, granting this

Application would interfere with rather than assist those Tribunals, and all of Mr. Akhmetshin's

communications are beyond the scope of § 1782 as privileged communications.

        Mr. Akhmetshin would be more than happy to provide oral argument if this Court

believes such argument would assist in making its determination.

Dated:        Washington, D.C.
              May 15, 2014

                                        Respectfully submitted,

                                            /s/
                            Kim Hoyt Sperduto
                            D.C. Bar No. 416127

                            Joshua S. Kauke
                            D.C. Bar No. 999296

                            SPERDUTO THOMPSON PLC
                            1133 Twentieth Street, N.W.
                            Second Floor
                            Washington, D.C.  20036
                            202.408.8900
                            202.408.8910 (f)

                            ksperduto@sperdutothompson.com

                            Counsel for Rinat Akhmetshin

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 15th day of May, 2014, that I caused copies of Rinat

Akhmetshin's Memorandum Of Points And Authorities In Opposition To Applicant's Request

For 28 U.S.C. § 1782 Discovery, along with copies of the Affidavit Of Rinat Akhmetshin,

Declaration Of Patrick Salisbury, and Declaration of Professor Dr. Marielle Koppenol-Laforce,

to be served using the Court's Electronic Case Filing System pursuant to Local Rule 5.4, on

counsel for Applicant, S. Nathan Park, KOBRE & KIM LLP, 1919 M Street, NW, Washington,

D.C. 20036, Nathan.park@kobrekim.com.


<div align="right">

                /s/             

Kim Hoyt Sperduto

</div>