UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF INTERNATIONAL MINERAL RESOURCES, B.V. FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Jan Luijkenstraat 68<br>Amsterdam, 1071CS<br>Netherlands,<br><br>                  Applicant. | 1:14-MC-00340<br>JUDGE KESSLER<br>Assigned: April 3, 2014<br>Miscellaneous |

## AFFIDAVIT OF RINAT AKHMETSHIN

**CITY OF WASHINGTON** )
                                     ) ss:
**DISTRICT OF COLUMBIA** )

      **RINAT AKHMETSHIN,** being first duly sworn, deposes and states:

      1.      My name is Rinat Akhmetshin and I am the individual that Applicant International Mineral Resources ("IMR") seeks to take discovery from under the pretext of this 28 U.S.C. § 1782 proceeding. I make this Affidavit to oppose IMR's application.

      2.      My only involvement with the litigation and arbitrations enumerated in the "*Ex Parte* Application For An Order Under 28 U.S.C. § 1782 . . ." dated April 3, 2014 ("Application") was as a retained consulting expert for the law firm Salisbury & Ryan LLP counsel for the litigant EuroChem Volga-Kaliy ("ECVK") in its Dutch litigation against IMR. Salisbury & Ryan is also counsel to ECVK in the Paris arbitration and Zurich arbitration against IMR's subsidiary Shaft Sinkers (Pty) Ltd, a South African company. My services were utilized with respect to all three proceedings. (A copy of my Salisbury & Ryan engagement letter is attached as Exhibit A).

3. I was hired specifically to assist Salisbury & Ryan as a consulting expert in connection with litigation brought by its client ECVK against IMR and Shaft Sinkers. Specifically, I was engaged to research and consult with respect to the unique legal, social, economic, and political issues that arise in Eurasia relevant to this litigation. That was important in these proceedings because two of the principals of IMR are nationals of Uzbekistan and one is a national of Kyrgyzstan. These three principals (the "Trio") made much of their money from aluminum extraction in Kazakhstan, a country with which I have considerable familiarity and expertise.

4. I am also Director and head of the Washington office of the International Eurasian Institute for Economic and Political Research ("IEI"). I founded IEI with others in 1998 to try to help expand democracy and the rule of law in Eurasia. One of the ways that IEI attempts to do so is through an educational program aimed at Western elites to inform them about political and economic conditions in Central Asia and Russia. It is a part of the world about which even the most educated Western citizens know very little. IEI also seeks to bring about democratization in Eurasia with a three-part program that focuses on fostering the development of an independent judiciary, safeguarding the rights of the individual, and promoting free and fair trade as a means of combating institutionalized corruption in Eurasia. There is a lot of work to do.

5. I also provide consulting services beyond IEI. My clients range from private citizens to corporate entities to sovereign governments. For example, I was retained by a national government controlling territory that formerly comprised part of the Soviet Union to assist with American military base relocations. We worked quite closely with the Defense Department, the State Department, and the Department of Justice to locate strategically

significant base locations. Other matters that my private consulting practice has worked on include issues relating to narco-trafficking, drug eradication, and terrorism in Afghanistan and surveillance of undercover agents and suspected undercover agents. I have been told that our efforts have helped save American lives, particularly in theatres such as Afghanistan, and reduced the flow of narcotics originating in Afghanistan worldwide. As a consulting expert, I have been retained by law firms involved with Russian and Central Asian disputes before, including as a consulting expert in *Egiazaryan v. Zalmayev*, a dispute venued in the Southern District of New York. In that matter, my client was seeking to prohibit political asylum in the United States for oligarch Ashot Egiazaryan, a former Duma member, and fund raiser for the Liberal Democratic Party, or LDPR, an anti-American, anti-Semitic Stalinist rump party. Mr. Egiazaryan was indicted, stripped of his legislative immunity, and fled to the United States.

6. It was in this capacity as a private consultant that I was retained by Salisbury & Ryan with respect to ECVK's issues with IMR and Shaft Sinkers. All of my involvement and activities were done at the request of attorneys at Salisbury & Ryan, led by Patrick Salisbury. In my role, I assisted the firm in doing due diligence research on IMR, Shaft Sinkers, and the Trio, and consulted with respect to legal, social, economic, and political realities in that part of the world. In the course of my engagement, I also developed and proposed to ECVK a strategic communications strategy relevant to the Dutch action. That proposal was rejected, and my engagement with Salisbury & Ryan terminated soon thereafter.

7. I am not sure what IMR means on page five of their Application when they alleged I was hired to give ECVK "an unfair advantage in the arbitrations and litigation." I was hired by Salisbury & Ryan. I assumed they hired me because they thought it would be helpful. I have not yet been hired to provide a client a disadvantage. Nor do I understand what

is unfair about hiring a consulting expert. That is one of the ways I make my living. Even Mr. Chodiev's Declaration admits that Salisbury & Ryan retained my services "to assist EuroChem against IMR in the Dutch action." (Chodiev Dec. at ¶ 11).

8. I am not a computer specialist and I am not capable of "hacking."

9. My own computer was stolen in the Berlin airport last year. A police report was filed. A copy of the Berlin police report regarding the theft of my computer is attached as Exhibit B.

10. The vast majority of the research that I did for Salisbury & Ryan was open source research, that is, fact-finding that was available in the public domain. For example, there is a NGO entity based in London known as Global Witness (found at www.globalwitness.org) that is financed in part by philanthropist George Soros. Global Witness publishes articles and acts as an information clearinghouse for good corporate governance and individual rights. They have made available substantial amounts of information about IMR and its public twin ENRC. There were also vast amounts of information available in the press. When the British Serious Fraud Office opened its criminal investigation of ENRC in April of 2013, it made headlines in serious newspapers such as the Guardian. ("ENRC: Serious Fraud Office launches criminal investigation," The Guardian, April 25, 2013, copy attached as Ex. C). There were volumes of information published on IMR, ENRC, the Trio, bribery, scandal, and kickbacks in Kazakhstan and Africa. This made my job relatively easy -- just reading the morning newspapers from around the world could bring me new information and insights on my research topics.

11. As noted elsewhere, ENRC was the publicly listed company of the Trio on the London Stock Exchange that became so bogged in scandal that it was delisted last year. There was even more information publicly available once the ENRC scandal became a *cause*

*celebre* in the London press. Indeed, the very nature of the Trio's "economic model" -- extraction of natural resources from the earth -- makes it a paradigm for bribery and private collusion with dictators, autocrats, and other regional strongmen that control that particular patch of earth.

12. During the investigations into ENRC in the spring of 2013, in an apparent effort to defend itself against the charges of corruption in Kazakhstan and Africa, ENRC issued a press release warning of certain electronic security issues. According to the London Telegraph, "a laptop containing staff details including bank account numbers, has mysteriously vanished in a 'domestic burglary,' while ENRC has also suffered 'an intrusion into the group's electronic systems by a third party.'" The obvious impact of the announcement was not lost on British authorities or the press: "It was enough to trigger all manner of conspiracy theories, not least that the computer hacking could be used as a convenient excuse if material now went missing relating to alleged corruption in Kazakhstan and Africa." ("Burglary And Computer Hacking Add To Woes At ENRC," The Telegraph, May 23, 2013, copy attached as Ex. D).

13. Not only were private watchdogs such as Global Witness and the London press publishing vast amounts of information about IMR and ENRC, but also once the publicly-held ENRC ship started sinking in 2012 and 2013, various directors, officers, employees, former employees, and disgruntled ENRC associates began leaking company information. The vast amount of material about ENRC that was leaked even became the butt of jokes in the press. According to the London Telegraph one ENRC insider was quoted as saying "ENRC leaks so badly why would anyone even bother to hack it." (See Exhibit D).

14. I have been in several London coffee shops in my life. It is entirely possible that I was overheard talking to a colleague or client in such a location. It is not possible

that I was overheard saying that I was turning over documents that I had hacked from an IMR or ENRC computer, because I have never done so, nor do I have the skills to do so. I have not worked on the Salisbury & Ryan matter for almost a year. Contrary to the Application at pages 7 and 8, I certainly had no conversation discussing Salisbury & Ryan matters in January of 2014. I might have mentioned to this relatively new client, an Israeli businessman, that I had done work for that firm in the past in describing to him the nature of my clientele. To the best of my recollection, all of my most recent meals in a London coffee shop were incidental to work I did for this new client, and had nothing at all to do with Salisbury & Ryan, the Dutch litigation, or the Paris or Zurich arbitrations.

15. All of the due diligence and related information that I presented to Salisbury & Ryan was publicly available or made available to me through my personal contacts in Central Asia and Russia. My services with Salisbury & Ryan were terminated on or about May 31, 2013. I am unfamiliar with events or proceedings in any of the European proceedings since that date. I have not had any substantive communications with Salisbury & Ryan since summer or early fall of 2013.

_____
**Rinat Akhmetshin**

Sworn to before me this
14th day of May, 2014

_____
Notary Public
Chang Ho Choi
Notary Public District of Columbia
My Commission Expires 6/14/14

6

# EXHIBIT A

# SALISBURY & RYAN LLP
ATTORNEYS AT LAW

7TH FLOOR
1325 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6026
TEL: 212-977-4660
FAX: 212-977-4668

July 26, 2012

Mr. Rinat Akhmetshin
1529 Vermont Avenue, NW
Washington, DC 20005

Re:   Research and Litigation Support

Dear Mr. Akhmetshin:

Salisbury & Ryan LLP, as attorney agent for its client and not in its individual capacity (the "Client"), has engaged you to provide the services described below.

1. **Services**

   During the term of this Agreement, you will provide the Client with assistance in the Client's investigation of claims it may have against companies relating to a mining project being built by the Client in Russia which has encountered delays. You will assist in such endeavors by researching and providing information concerning the relevant parties and other requested information. You confirm that all services provided by you will be made in full compliance with all applicable laws of the U.S. and other relevant jurisdictions.

2. **Nature of Relationship**

   You will perform your services hereunder as an independent contractor and not as an agent, employee or affiliate of Client.

3. **Compensation**

   We shall transfer to you on behalf of the Client an initial payment of $45,000 and you will bill as discussed as the work progresses.

   The Client will reimburse you for all pre-approved travel and related expenses incurred by you on the Client's behalf.

   The Client shall be solely responsible for payment of your fees and expenses.

Page 1 of 2                                        Initials _RA_

4. **Confidentiality**

You shall report to Salisbury & Ryan LLP, counsel for the Client, and all communications shall be subject to the attorney-client and attorney-work produced privileges. You acknowledge your responsibility, both during and after the term of its engagement hereunder, to preserve the confidentiality of all information and data disclosed by the Client to you or provided by you to Salisbury & Ryan LLP or the Client.

5. **Miscellaneous**

This Agreement (including the attachments referred to herein) is the entire agreement between the parties with respect to its subject matter, supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter and cannot be waived, amended, otherwise modified or terminated except in writing executed by each party to be bound thereby.

This Agreement shall be governed by and construed in accordance with New York law without regard to the conflicts of laws principles thereof.

To confirm the foregoing Agreement, kindly date and sign a copy of this letter in the spaces provided below and return it to me for our records.

Sincerely yours,

Salisbury & Ryan LLP,
as Agent for the Client

By: _____
Name: _____
Title: _____

Accepted and Agreed on:

By: _____
Rinat Akhmetshin

Page 2 of 2

Initials _____

# EXHIBIT B

| | | | |
|---|---|---|---|
| Vorgangsnummer | **130217-0920-034446** | Datum | *17.02.2013* |
| Aktenzeichen | | | mit Hinweisen auf **englisch** |
| Delikt | Diebstahl eines Koffers | anzeigenaufnehmende Dienststelle | Abschnitt 11 Wache TXL |

## Mitteilung des Geschäftszeichens

Sehr geehrte Dame, sehr geehrter Herr,

Ihre mit o.a. Datum erstattete Anzeige hat die im stark umrandeten Feld angegebene Vorgangsnummer erhalten. Sie ist für die Bearbeitung aller Anfragen unbedingt erforderlich.

**Die Zentrale Auskunftsstelle der Polizei Berlin**
teilt Ihnen gerne mit, bei welcher Polizeidienststelle Ihre Anzeige bearbeitet wird und wohin Sie sich mit Hinweisen, Ergänzungen und Fragen zur Anzeige wenden können.
Sie ist nur telefonisch erreichbar unter Tel: **(030) 4664 - 955444** (Montag - Freitag von 09:00 - 15:00 Uhr)

Sollten Sie oder Ihre Versicherung das staatsanwaltschaftliche Aktenzeichen benötigen, bitten wir Sie, nach einem Monat dieses Aktenzeichen zu erfragen.

Wichtige Hinweise bei Eigentumsdelikten

Sofern die Anzeige eine Straftat betrifft, bei der Ihnen Gegenstände entwendet, unterschlagen oder geraubt wurden, werden Sie um Beachtung folgender Punkte gebeten:

1) Für Sachfahndungszwecke lassen Sie uns bitte nach Möglichkeit eine Aufstellung mit genauer Beschreibung der abhandengekommenen Gegenstände einschließlich der Schadenshöhe zukommen.
2) Sofern der Verlust technische Geräte betrifft, die durch eine Gerätenummer identifizierbar sind, wird um Mitteilung dieser Nummer, des Fabrikates und der Typenbezeichnung gebeten.
3) Es ist nicht auszuschliessen, dass die Ihnen entwendeten Gegenstände (oder Teile davon) einige Tage nach der Tat im Fundbüro abgegeben werden. Wir empfehlen Ihnen deshalb, einige Tage zu warten und dann das Zentrale Fundbüro in 12101 Berlin, Platz der Luftbrücke 6, Block C, Tel.: (030) 90277-3101 (Fax: -3106) aufzusuchen. Die Öffnungszeiten sind: Montag, Dienstag und Freitag 09:00 - 14:00 Uhr, Donnerstag 13:00 - 18:00 Uhr. Mittwoch geschlossen.

Bitte haben Sie dafür Verständnis, dass diese Mitteilung nicht unterschrieben ist.

Es dankt Ihnen
Ihre Polizei

## Opferschutz

Für Fragen zum Opferschutz stehen Ihnen die Opferschutzbeauftragten der für *Ihren Wohnort* zuständigen Direktion von Montag bis Freitag zu den Bürodienstzeiten zur Verfügung. Bitte beachten Sie in diesem Zusammenhang das **Merkblatt Opferschutz** (Seite 2).

| Direktion 1 | Direktion 2 | Direktion 3 | Direktion 4 | Direktion 5 | Direktion 6 |
|---|---|---|---|---|---|
| Reinickendorf, Pankow, Weißensee Pankstr. 29 13357 Berlin Tel. 4664 - 104210 | Charlottenburg-Wilmersdorf, Spandau Charlottenburger Ch. 75 13597 Berlin Tel. 4664 - 204210 | Mitte, Tiergarten, Wedding Kruppstr. 2-4 10557 Berlin Tel. 4664 - 304210 | Steglitz-Zehlendorf, Tempelhof-Schöneberg Eiswaldtstr. 18 12249 Berlin Tel. 4664 - 404210 | Neukölln, Friedrichshain-Kreuzberg Friesenstr. 16 10965 Berlin Tel. 4664 - 504220 | Treptow/Köpenick, Marzahn-Hellersdorf, Lichtenberg Poschstr. 1 12681 Berlin Tel. 4664 - 604220 |

Sicherungsempfehlungen zum Schutz vor Einbruch erhalten Sie hier.

**Kriminalpolizeiliche Beratungsstelle**, Platz der Luftbrücke 5, 12101 Berlin-Tempelhof
Öffnungszeiten: Montag 10:00 - 18:30 Uhr, Dienstag bis Donnerstag 08:00 - 15:00 Uhr.
Terminservice und Beratungstelefon: (030) 4664-979 999

Fachgespräche in der Beratungsstelle bis zu 30 Minuten sind kostenfrei, für jede weitere halbe Stunde entstehen Gebühren von 40,-€.
Informationen und Hinweise zum Schutz vor Kriminalität erhalten Sie unter www.polizei-beratung.de und www.polizei.berlin.de sowie auf jeder Polizeidienststelle.

# EXHIBIT C

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# ENRC: Serious Fraud Office launches criminal investigation

FTSE 100 miner investigated over fraud, bribery and corruption claims relating to its Kazakhstan and African businesses

**Simon Goodley, Mark Hollingsworth** and **Rupert Neate**
guardian.co.uk, Thursday 25 April 2013 10.42 EDT



ENRC chairman Mehment Dalman, who had been leading the internal investigation, resigned this week. Photograph: Linda Nylind for the Guardian

The Serious Fraud Office has launched a criminal investigation into Eurasian Natural Resources Corporation (ENRC), the embattled FTSE 100 miner that has been beset by corruption allegations.

The move follows efforts by the company to conduct its own investigation into allegations made by a whistleblower relating to its Kazakhstan and African businesses, the findings of which the company had been reporting to the SFO.

The SFO said: "The director of the Serious Fraud Office has accepted ENRC for criminal investigation. The focus of the investigation will be fraud, bribery and corruption relating to the activities of the company or its subsidiaries in Kazakhstan and Africa."

The company said: "ENRC confirms that it is assisting and cooperating fully with the SFO. ENRC is committed to a full and transparent investigation of its procedures and conduct".

The SFO investigates and prosecutes the UK's biggest frauds and has been instrumental in the handing down of fines and custodial sentences.

ENRC has suffered a series of high-profile departures, including the <u>resignation this week of its chairman, Mehmet Dalman,</u> who had been leading the internal investigation.

On Monday Dalman, who had staked his reputation on clearing up the ENRC mess, admitted: "I believe I have achieved all that I can as chairman of ENRC."

The company's law firm, Dechert, which had been hired by the company to conduct its investigation, has also parted company with the <u>mining</u> group, a move that prompted the SFO to demand that the law firm hand over documents relating to the case.

The company's failed efforts to get to the bottom of corruption allegations contributed to the shares being the worst performer in the FTSE 100 last year. The controversies also come after the ousting of former chairman Sir Richard Sykes and independent director Ken Olisa in a 2011 boardroom coup backed by the founding directors, when Olisa memorably described ENRC'S behaviour as "more Soviet than City".

The so-called "Trio" of founders – Alexander Machkevitch, Patokh Chodiev and Alijan Ibragimov – still own 44% of the company and said last week they were considering a bid to take the company private again. The possible takeover is thought to have persuaded the SFO to launch an inquiry while the company is still listed in London.

When ENRC floated in 2007, its prospectus outlined areas of potential concern for future investors, including the existence of a complex structure called the Russian Trading System (RTS). The document stated that the system involved sales made by ENRC to third parties and resulted in cash payments to ENRC's founders. Their representatives declined to comment.

Meanwhile, a presentation given to the SFO last year by Dechert, seen by the Guardian, states that its efforts were hampered by staff forging documents, supplying the "wrong computer to the investigations team" and setting up a "false office".

It also outlines allegations concerning the purchase of a farm in Kazakhstan by a director of the ENRC subsidiary SSGPO, claiming that the acquisition and running costs of the farm were "paid from SSGPO funds" and that the farm was owned through a "nominee shareholding on behalf of SSGPO president and major shareholder, Alijan Ibragimov".

Representatives of Ibragimov declined invitations to comment on the document, although it is not yet clear what, if any, action the SFO may take.

Meanwhile, in Africa the company has faced questions over its former partner in the Democratic Republic of Congo, Dan Gertler. The Israeli tycoon has been dogged by accusations that a close relationship with the DRC's president, Joseph Kabila, allowed him to buy interests in the country's mining assets on the cheap – accusations he has always denied.

### More from the Guardian [What's this?](#)

Online porn: the facts and the fantasy 25 May 2013

My boyfriend talks constantly during sex 27 May 2013

Nick Ross: 'Rape isn't always rape' 27 May 2013

Jaguar Land Rover looks like deal of century for Tata 29 May 2013

High streets shrink in 10 out of 12 towns on Mary Portas scheme 29 May 2013

### More from around the web [What's this?](#)

9 Worst Recession Ghost Towns in America (The Fiscal Times)

French Open fashion misses (Sports Illustrated)

British police arrest two men on diverted Pakistan flight (South China Morning Post)

10 Great Small Cities for Retirement (AARP)

What Ever Happened To Rachel Leigh Cook? (Zimbio)

# EXHIBIT D

## Burglary and computer hacking add to woes at ENRC

A Serious Fraud Office probe into alleged bribery and corruption, the resignation of the chairman and both of the company's brokers and a low-ball bid from a trio of Kazakh oligarchs.



By Alistair Osborne, Business Editor

6:26PM BST 23 May 2013

Things have been lively enough at ENRC in recent weeks. But now the scandal-ridden FTSE-100 miner has come up with two more troubling issues: a laptop containing staff details, including bank account numbers, has mysteriously vanished in a "domestic burglary", while ENRC has also suffered "an intrusion into the group's electronic systems by a third party".

The fresh problems were relayed to the market in an announcement, headlined "potential loss of company data", with ENRC stressing that "the Information Commissioner's Office has been informed".

It was enough to trigger all manner of conspiracy theories, not least that the computer hacking could be used as a convenient excuse if material now went missing relating to alleged corruption in Kazakhstan and Africa.

One City wag suggested the affair had been arranged by the oligarchs to drive down the shares,

so their rejection of a 260p-a-share indicative offer for a company floated at 540p in 2007 would not look so bad. But, as it turned out, the shares only fell 0.7 to 265.5p.

The burgled laptop belonged to a member of the human resources team – an office in the thick of the action lately given the resignations of chairman Mehmet Dalman and two non-execs.

In a message to staff, ENRC said it was "evaluating two information security events... the theft of a laptop" and "a sophisticated hacker attack".

"In both instances ENRC found a risk that personal data relating to ENRC London based staff may have been compromised", it said, adding staff should "to take precautionary steps to protect against possible identity theft."

One insider seem unconcerned, saying: "ENRC leaks so badly, why would anyone ever bother to hack it?"

© Copyright of Telegraph Media Group Limited 2013