UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF INTERNATIONAL MINERAL RESOURCES B.V. FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. | 1:14-MC-00340<br>JUDGE KESSLER<br>Assigned: April 3, 2014<br>Miscellaneous |

## DECLARATION OF PATRICK P. SALISBURY

1. I am the senior partner of Salisbury & Ryan, LLP, a law firm based in New York, New York. I make this declaration in support of Mr. Akhmetshin's opposition to the request of International Mineral Resources BV ("IMR") for discovery pursuant to 28 U.S.C. § 1782.

2. We are the primary counsel to EuroChem Volga-Kaliy LLC ("ECVK") in the on-going international arbitration proceedings against Shaft Sinkers (Pty) Ltd. and Rossal 126 (Pty) Limited (formerly named Shaft Sinkers (Pty) Ltd.) before the Swiss Chambers Arbitration Institute (Case No. 600318-2012) (the "Swiss Arbitration") and the International Chambers of Commerce (Case No. 18990/GZ/MHM) (the "ICC Arbitration").

3. Briefly, ECVK alleges in the arbitration proceedings that Shaft Sinkers fraudulently induced it to enter into a $350 million mine shaft construction contract that it knew it would not be able to complete; utterly failed to construct the shaft; committed massive procurement fraud in the process; and bribed ECVK's Chief of the Mine Construction Division.

4. The limited discovery allowed in the arbitration proceedings has been completed and closed. The hearing in the Swiss Arbitration is scheduled for June 16 of this year; the hearing in the ICC arbitration is scheduled for January 2015.

5. We are also co-counsel to ECVK in its action against IMR, a corporate parent of Shaft Sinkers, pending in the Amsterdam District Court (the "Dutch Action"), where ECVK is represented by Houthoff Buruma, a leading Dutch law firm. ECVK alleges in the Dutch Action that IMR orchestrated and directed the massive fraud committed by Shaft Sinkers and is liable to ECVK both directly and as a controlling shareholder of Shaft Sinkers.

6. ECVK commenced the Dutch Action on March 25, 2013 by filing a Writ accompanied by 72 exhibits.

7. IMR does not – as it cannot – point to a single exhibit or factual statement submitted or made in the Dutch Action of doubtful provenance, let alone to any document that could have been improperly obtained by Mr. Akhmetshin.

8. In July 2013, the Amsterdam District Court, after an extensive evidentiary hearing with numerous witnesses from both parties, granted ECVK's request for a prejudgment attachment of IMR's assets in the amount of $1.2 billion, one of the largest pre-judgment attachments in Dutch history. In its ruling, the Amsterdam District Court stated that:

- ***"The matters brought by EuroChem concerning the grounds for its claim against ShS are not disputed with sufficient reasoning by IMR"*** (Amsterdam District Court Order dated July 19, 2013, attached hereto as Exhibit A (English translation), ¶ 3.5) (emphasis added);

- "[I]t appears sufficiently plausible for the interim relief judge that ShS neglected its duties towards EuroChem" (*id.*);

- "[I]t is possible for the court to hold IMR liable in the main proceedings in its capacity as a shareholder in ShS with regards to damage suffered by

2

        EuroChem due to the unlawful conduct of ShS. **Therefore, the prima facie well-foundedness of the claim must be assumed**" (*id.* at ¶ 3.7);

- The extent of the damage was preliminary insufficiently disputed [by IMR]" (*id.*).

9. Thus, the Amsterdam District Court granted an extraordinary pre-judgment attachment of $1.2 billion having ruled that ECVK's claim is prima facie valid, and that IMR had failed to present sufficient evidence to place their liability or the extent of damages stated in the Claim in sufficient doubt.

10. IMR does not – as it cannot – point to a single exhibit or factual statement of doubtful provenance in ECVK's additional voluminous submissions for the attachment hearing, let alone to any document that could have been improperly obtained by Mr. Akhmetshin.

11. In or about December 2013, IMR filed a discovery request in the Dutch Action, which was denied by the Amsterdam District court. IMR did not file any other discovery requests in the Dutch Action since. IMR never claimed in the Dutch Action that ECVK had obtained, let alone used, any documents improperly obtained from MR. Akhmetshin or any other source.

12. On 21 January 2014, the Amsterdam District Court held a hearing in the liability phase of the case and expressly instructed the parties not to make any additional evidentiary submissions. Following the hearing, the Court then set the date for final judgment, which is currently expected on May 28, 2014.

13. Concurrently with the liability hearing in the Dutch Action, IMR also filed a separate writ seeking to lift the $1.2 billion prejudgment attachment, which it subsequently withdrew on the eve of the hearing.

14. None of those recent filings by IMR ever mentioned any hacking or any data theft, even though those filings were made after IMR says it learned of alleged hacking by Mr. Akhmetshin.

15. Moreover, IMR does not – as it cannot – point to a single exhibit or factual statement of doubtful provenance in ECVK's additional voluminous submissions for the liability hearing, let alone to any document that could have been improperly obtained by Mr. Akhmetshin. Moreover, IMR did not claim any hacking at the time of the Dutch evidentiary hearing on 21 January 2014, even though the allegations it now relies upon in its application were available to it then, as both the alleged "thumb drive" and the "coffee shop" events supposedly took place prior to the hearing.

16. IMR, its subsidiary Shaft Sinkers and its affiliate ENRC have a history of making unsubstantiated hacking claims. A year ago, in May 2013, Shaft Sinkers, the respondent in the arbitration proceedings, made separate applications to the two arbitration tribunals with similar vague allegations of hacking of its computers. Like IMR here, Shaft Sinkers was not able to substantiate its claims or even to point to a single document filed in the arbitrations that would have been obtained by such hacking. As a result, both the Swiss and ICC Arbitration Tribunals independently dismissed those applications as baseless.

17. Around the same time, another IMR affiliate, ENRC, also publicly claimed the hacking of its computers in response to the massive fraud investigation into ENRC's activities around the world which had been announced by the UK Serious Fraud Office. *See* The Telegraph, *Burglary and Computer Hacking Add to Woes at ENRC*, May 23, 2013.

18. ENRC's hacking claim was roundly ridiculed in the U.K. press; one ENRC insider was even quoted as saying: "ENRC leaks so badly, why would anyone ever bother to hack

it?"; others speculated that "the computer hacking could be used as a convenient excuse if material now went missing relating to alleged corruption in Kazakhstan and Africa." *Id.*

19. In short, there appears to be a pattern of raising baseless hacking claims that IMR and its affiliates are keen to interpose in response to credible allegations of fraud: this application is the fourth such hacking claim made by them.

20. Furthermore, Mr. Akhmetshin has had a very limited involvement in either the Arbitrations or the Dutch Action, and even that involvement ended at least six months prior to the events upon which IMR's application is based. This firm retained Mr. Akhmetshin as a consulting expert to assist us in providing legal advice to ECVK in July 2012, and that engagement was terminated a year later, in May 2013. Work done by Mr. Akhmetshin and communications with him are privileged and ECVK does not waive that privilege.

21. One thing is clear, the alleged "thumb drive" and "coffee shop" events happened (if they occurred at all) long after Mr. Akhmetshin's engagement by our firm was over, in December 2013 and January 2014, respectively, and, if they even occurred, have no relationship whatsoever to ECVK, the Dutch Action, or the Arbitration. By that time, Mr. Akhmetshin was not engaged in these matters for at least 6 months, did not invoice us and was not paid by us, directly or indirectly, for any services during that period. I cannot speculate as to the identity of Mr. Akhmetshin's coffee shop companion if that event even occurred, though I can firmly state that it was neither me, nor anyone else from my firm, nor anyone else acting on my behalf or at my direction.

22. Finally, buried in the affidavit by Patokh Chodiev (one of the Trio of oligarchs who beneficially own IMR) is a hearsay story about Alexander Machkevitch, another member

5

of the Trio, meeting with one of EuroChem's shareholders, Mr. Melnichenko, who allegedly gave Mr. Machkevitch "confidential IMR documents" "because he believed they showed weakness in IMR's position in the Dutch Action." Chodiev Aff. ¶¶ 6-8. This is completely untrue.

23. *First*, the meeting in question with Mr. Machkevitch took place in Florence, Italy in September 2012, seven months prior to the commencement of the Dutch Action – not after it was filed, as Mr. Chodiev claims. I attended meetings with these individuals and others in Florence that same day.

24. *Second*, the documents provided to Mr. Machkevitch had nothing to do with IMR or the Dutch Action which did not commence until much later (indeed, even the arbitrations against Shaft Sinkers had not commenced yet). Contrary to Petitioner's claim here, the documents given to Mr. Machkevitch were not IMR documents at all (which explains why they were hidden from this court and not attached to the Chodiev Affidavit). Rather, the documents showed that senior *Shaft Sinkers' executives* transferred money fraudulently diverted from ECVK during the mine construction project to their private bank accounts offshore.

25. *Third*, those documents have nothing to do with Mr. Akhmetshin or the services he provided: they were uncovered in the course of the investigation of Shaft Sinkers' massive fraud, not by Mr. Akhmetshin.

26. *Finally*, none of those documents were ever used in the Dutch Action. Indeed, voluminous incriminating documents on this same topic –fraud by Shaft Sinkers' personnel - were instead produced by Shaft Sinkers to ECVK during the arbitrations after it were ordered to do so by both Tribunals.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 15 May 2014
    New York, NY

_____
Patrick P. Salisbury

# EXHIBIT A

# COPY

[Stamp]

## Decision

AMSTERDAM DISTRICT COURT

Department of Civil Law, civil interim relief judge

Case number / application number: C/13/544695/ KG RK 13-1439 MvW/JWR

Decision of the interim relief judge of 19 July 2013

in the case of:

the company incorporated under foreign law
EUROCHEM VOLGA-KALIY LLC,
established in Kotelnikovo (Russia)
applicant,
with its attorneys Mr ME Koppenol-Laforce and Mr MBA Hetterscheidt from Rotterdam,

against

the private company with limited liability
INTERNATIONAL MINERAL RESOURCES B.V.,
established in Amsterdam,
respondent,
with its attorneys Mr K Limperg and Mr Th Elseman from Amsterdam.

The parties shall hereinafter be referred to as EuroChem and IMR.

### 1. The procedure

EuroChem has filed an application on 26 June 2013 for the pre-judgement attachment of the movable assets and shares, as well under third parties, to the detriment of IMR. The application is enclosed with this decision.
Prior to this IMR submitted a request - through letters dated 15 February and 8 May 2013 - to be heard if such a request is made by EuroChem. In its decision of 27 June 2013, the interim relief judge granted provisional leave and determined that the parties will be heard before a final decision will be made on the application. The hearing took place on 9 July 2013. IMR has filed its written defence prior to the hearing. Both parties submitted evidence prior to the hearing. At the hearing both parties explained their views in greater detail and both parties submitted pleadings.
As far as is relevant, the following parties were present during the hearing:
- on behalf of EuroChem, Mr Koppenol-Laforce and Mr Hetterscheidt;
- on behalf of IMR, Mr Limperg and Mr Elseman and their colleague Mr D Ceulen.

## 2. The facts

2.1. In the period 2007-2011, EuroChem engaged Shaft Sinkers (Pty) Ltd, a legal entity incorporated under South African law, hereinafter referred to as ShS, for designing and constructing a mine shaft in a mining project near Kotelnikovo, Russia.

2.2. EuroChem brought an arbitration procedure against ShS in Switzerland in which it claimed damages to the amount of € 805.6 million due to fraud, bribery and other unlawful acts. In brief, EuroChem accuses ShS of concealing a critical report from BASF on the possibilities and impracticalities of mining in a manner as proposed by ShS (hereinafter referred to as the BASF report), intentional provision of a (bad faith) guarantee and bribing of a staff member of EuroChem to conceal apparent difficulties which have occurred during the performance of the work.

2.3. EuroChem summoned IMR in this court regarding a claim for damages to the amount of € 660 million as the fraud was committed by ShS under the supervision of (a manager of) IMR.

## 3. The assessment

3.1. In the application filed on 26 June 2013, EuroChem requested leave for the prejudgement attachment of shares that IMR holds in two companies (including Cunico Resources NV, hereinafter Cunico) and movable property that is located at the offices of IMR, and for a garnishee order to the detriment of IMR under three banks and under Cunico. The purpose is to secure payment to the amount of € 886,490,000.00 (including interest and costs) that EuroChem claims from IMR.

3.2. The basic principle is that leave may be granted if it can be proven that the claim for which (assurance) the attachment is requested appears prima facie to be founded. Based on HR 30 June 2006, NJ 2007, 483 a balancing of interests must thereby be undertaken in which all the circumstances of the case are brought together, including conditions that do not concern the validity of the claim, such as the extent to which the attachment is inconvenient for the attachee.

3.3. EuroChem argues – in short – that IMR in the period 2007-2010, which is during the main part of the period in which the alleged unlawful acts of ShS were committed (see 2.2) held a majority interest. Also, directors of ShS were appointed by IMR, according to EuroChem. In particular, EuroChem refers to the position of Mr. A. Davidov (hereinafter: Davidov) who exercised supervision on ShS on behalf of IMR and was directly involved in the alleged fraud and bribery. Furthermore, EuroChem points out that ShS, in acquiring the commission, itself indicated that it used operating assets and the expertise of IMR. EuroChem therefore holds IMR liable for unlawful acts, or at least vicariously liable for unlawful acts committed by Davidov and/or ShS.

3.4. IMR deems the claim *prima facie* to be unfounded. For this purpose it argues that it is/ was not involved in the daily affairs of ShS. The BASF report that was concealed, was never in the possession of IMR. ShS has to be considered an independent company, which takes its own policy decisions. In this context IMR also argues that Davidov was never employed by it. Since there were no circumstances (present) which constituted intensive influence/ steering or knowledge of prejudice IMR deems there is no ground for attribution of possible unlawful acts on the part of ShS to it. In addition IMR questions the admissibility of the claim of EuroChem towards ShS. For these reasons IMR considers the claim *prima facie* to be unfounded. Furthermore according to IMR the attachment was unnecessary. The main object of attachment is the interest (the shares) in Cunico. These shares have, however, already been pledged and as a result it is not possible to

the generate revenues from these shares. There is no fear of embezzlement of those shares either, according to IMR. Highly relevant is, furthermore, that the pledgee in case of an attachment – *inter alia* – is entitled to demand the financing with immediate effect. This would have major implications for IMR and the companies which cooperate with it, which would outweigh the interest of EuroChem, according to IMR. The request should therefore be rejected according to IMR. Finally, IMR refers to the risk that it suffers damage due to the attachment. Under the circumstances that the claim of EuroChem would be rejected in the main proceedings, EuroChem, a Russian company, does not provide recourse in respect of the claim (of IMR), thus IMR alternatively requests that the leave is granted only on the condition that a guarantee can be provided.

3.5. The Preliminary Relief Judge rules as follows. The matters brought by EuroChem concerning the grounds for its claim against ShS are not disputed with sufficient reasoning by IMR. Although IMR argued that the conclusions of the BASF report are refuted by another report, it has not been established that ShS was not obliged to bring the BASF report (and possibly the other report) to the attention of EuroChem. At present it appears sufficiently plausible for the interim relief judge that ShS neglected its duties towards EuroChem. The relevant question is, however, if the additional claim of EuroChem against IMR is *prima facie* well-founded. In this connection the Preliminary Relief Judge assumes on the basis of the arguments of parties that this legal relationship is governed by the law of the Netherlands.

3.6. In the opinion of the Preliminary Relief Judge IMR could not sufficiently prove that ShS operated independently from it. With regard to several persons, including Davidov, IMR did argue that they have never been employees of IMR, but the argument of EuroChem that these persons were affiliated to IMR, regardless of the contractual form through which they acted, was not disputed (by IMR). It has been established that Davidov is one of the three (of a total of six) directors of ShS appointed by IMR and had previously already acted as representative of IMR. Furthermore, EuroChem, on the basis of passages from the prospectus relating to the listing of ShS, which took place in 2010, demonstrated that there was a controlling influence of IMR on the management of ShS. IMR did not sufficiently substantiate its argument that the contents of that prospectus are not for its account nor made it plausible that contents thereof were not in accordance with the facts.

3.7. Based on the foregoing, it is therefore decided that it is possible for the court to hold IMR liable in the main proceedings in its capacity as a shareholder in ShS with regards to damage suffered by EuroChem due to the unlawful conduct of ShS. Therefore, the prima facie well-foundedness of the claim must be assumed. The extent of the damage was preliminary insufficiently disputed. Furthermore, the interim relief judge is of the opinion that shares within a group can relatively easily be transferred, so that it cannot be argued that the fear of embezzlement is so imaginary that the leave for attachment should be refused on that ground. Movable property and bank balances are inherently easy to dispose of, so the same principle applies here. The defence of IMR that EuroChem, based on the pledge, has no interest in the levying of an attachment of the shares Cunico is also rejected. The question regarding the enforceability of the attachment will only be discussed after judgement has been rendered in the main proceedings (in favour of EuroChem). It is not yet clear at this time whether the right of pledge will prevent the carrying out of the attachment. Therefore the leave can be granted, except in the case that a weighing of interests should lead to a different judgment.

3.8. In that context IMR argues that the attachment of the shares Cunico may have serious implications for it. These shares were pledged and IMR is bound to report the attachment to the pledgee within twenty working days. Such notification will cause the

---

pledgee to acquire the right to immediately demand full (re)payment of the loan for which the pledge was provided. IMR pointed out that it would have a major impact on its business, as well as companies that it cooperates with. It cannot be excluded that the pledged shares Cunico are sold in a forced sale, which also has effects for the other participant in Cunico (which was set up as a joint venture), for Cunico itself and for another company, whose shares are also pledged in favour of the credit facilities. The interest that is prejudiced in this way does not outweigh the interest of EuroChem in the attachment, according to IMR.

3.9. IMR notes further in this regard that, should EuroChem lose the main proceedings, EuroChem will be liable for what would then be unjust attachment. Given the fact that EuroChem possesses limited credit worthiness, recovery does not seem to be possible. IMR therefore requests alternatively to only grant leave for attachment if guarantees can be provided.

3.10. The interim relief judge considers the disadvantage, as stated by IMR, in the event that leave for attachment should be granted, currently to be to speculative. The fact that the pledgee has the right to demand repayment of the loan in the event of attachment of the pledge does not automatically mean that this right will be enforced. It is likely that the pledgee will make an assessment of its own interests when deciding whether full payment of the loan should be required or not. It cannot be predicted how this assessment will be made as it is not known at present which factors are considered to be important by the pledgee.

3.11. The preliminary leave granted will therefore be definitively granted. The Preliminary Relief Judge notes in this regard that, should the pledgee proceed to demand the loan and the implications as outlined by IMR would indeed threaten to occur, IMR can demand that the attachment be lifted either in interlocutory proceedings or as ancillary claim in the main action. The question if security must be furnished for the then impending damage can also be addressed in said proceedings.

3.12. Since the main proceedings are already pending it is not necessary to establish a term (for instituting these proceedings).

## 4. The decision

The Preliminary Relief Judge

4.1. grants EuroChem definitive leave for levying the requested attachments, while fixing the amount for which the leave is granted, including interest and cost at € 886,490,000 (in words: eight hundred and eighty-six million four hundred and ninety thousand euros);

4.2. declares this decision provisionally enforceable.

This decision

ype: JWR
coll: CB

Signature

C/13/544695 I KG RK 13-1439 5
19 July 2013

---

[STAMP]
Signature