**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF INTERNATIONAL MINERAL RESOURCES B.V. FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. | Case No. 1:14-MC-00340 (GK) |

**MEMORANDUM OF LAW IN SUPPORT OF INTERNATIONAL MINERAL RESOURCES B.V.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ADDITIONAL DAY OF DEPOSITION AND MOTION FOR EXPEDITED CONSIDERATION**

Pursuant to Federal Rule of Civil Procedure 37, International Mineral Resources B.V. ("IMR") respectfully requests this Court's prompt intervention to prevent Rinat Akhmetshin from improperly using grossly overbroad assertions of privilege to shield substantial amounts of non-privileged information until after the deadline for IMR's primary filing in the Dutch proceedings – proceedings in which IMR intends to use evidence gathered pursuant to its Section 1782 application in this action.

**PRELIMINARY STATEMENT**

In April 2014, IMR filed an application pursuant to 28 U.S.C. § 1782 seeking to take discovery from Mr. Akhmetshin for use in ongoing and contemplated proceedings in the Netherlands (the "Application"). IMR provided evidence showing that Mr. Akhmetshin organized the hacking of IMR's computer's systems, stole IMR's confidential information, and disseminated it to third parties with the aim of obtaining an unfair advantage for IMR's opponents in the Dutch proceedings. One critical piece of evidence submitted in support of that Application was a

declaration by an IMR investigator who recounted a conversation he witnessed and overheard in a London coffee shop where Mr. Akhmetshin admitted the allegations set forth in IMR's Application.   Mr. Akhmetshin opposed IMR's Application vigorously, referring to IMR's allegations as "a farce" and categorically denying that he told anyone that he hacked IMR's computer systems.

On February 5, 2015, IMR's Application was granted over Mr. Akhmetshin's objections. Several weeks later, he was deposed.  At his deposition,  Moreover, a review of Mr. Akhmetshin's privilege log, coupled with information that came to light at his deposition, shows that Mr. Akhmetshin has impermissibly used claims of privilege to shield from disclosure plainly discoverable information. For the reasons set forth below, the Court should not allow Mr. Akhmetshin to get away with these tactics and should grant the following relief.

*First*, the Court should order that Mr. Akhmetshin immediately turn over all documents referenced on his privilege log on the ground that the logs he has provided are plainly inadequate under the law and that, therefore, he has waived the privilege with respect to those documents. Indeed, despite repeated requests, Mr. Akhmetshin has been unwilling to describe the subject matter of the withheld documents in a manner that would enable IMR (or a Court) to assess his privilege claims.  Mr. Akhmetshin has instead produced two privilege logs (an original and a

revised version) that provide nothing more than vague, non-specific descriptions of the documents such as "Communication re: research and investigation." These descriptions are inadequate and Mr. Akhmetshin should accordingly be compelled to produce all documents described on the log. At the very least, Mr. Akhmetshin should be compelled to provide the documents to the Court for *in camera* review to determine whether his privilege claims are valid. Simply ordering Mr. Akhmetshin to produce a third privilege log is insufficient, particularly since IMR's deadline for submitting its primary filing in the appeal of the Dutch Action is June 23, 2015, and Mr. Akhmetshin has already proven himself unable or unwilling to substantiate his privilege claims appropriately by producing two deficient privilege logs.

*Second*, and in any event, the Court should compel Mr. Akhmetshin to produce the withheld documents to IMR because IMR has made a *prima facie* showing that Mr. Akhmetshin's withheld communications were made in furtherance of a crime and, therefore, are subject to the crime-fraud exception to the attorney-client, work-product, and non-testifying expert privileges. In the alternative, the Court should conduct an *in camera* review of his withheld materials to determine whether the crime-fraud exception applies.

*Third*, and even if the Court determines not to require production of all of the withheld documents, the Court should compel Mr. Akhmetshin to produce immediately three categories of documents that clearly are not privileged: (i) documents relating to Mr. Akhmetshin's "strategic communications" work on the ground that the law is clear that such work is not protected from disclosure; (ii) documents Mr. Akhmetshin shared with third parties on the ground that, under the circumstances, his sharing of documents with these persons waived any privilege that might have existed; and (iii) non-privileged, responsive documents post-dating August 31, 2013 on the ground that he has provided no justification whatsoever for withholding such documents.

*Fourth*, the Court should compel Mr. Akhmetshin to appear for an additional day of deposition testimony to answer questions about any new material produced in response to this motion, as well as questions that he refused to answer at his original deposition based on overbroad and inappropriate assertions of privilege.

*Finally*, the Court should compel Mr. Akhmetshin to respond to this motion on an expedited basis – within seven days of being served with this motion – and afford IMR four days to reply.  As noted above, IMR's primary filing in the Dutch proceedings is June 23, 2015, and IMR would be prejudiced by any delay that would allow Mr. Akhmetshin to continue using overbroad assertions of privilege to shield discoverable information from IMR past that date.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    IMR's Section 1782 Application and Evidence Submitted in Support Thereof

In April 2014, IMR filed an Application pursuant to 28 U.S.C. § 1782 to take discovery from Mr. Akhmetshin for use in ongoing and contemplated proceedings in the Netherlands (the "Dutch Action" and the "Contemplated Dutch Proceedings").  (*See* Dkt. 1.)  The Application stemmed from an alarming discovery IMR made in connection with its defense of the Dutch Action, a USD $1 billion dispute between IMR and EuroChem Volga-Kaliy ("ECVK") regarding a mining project near the Russian city of Kotelnikovo.  Namely, IMR's investigators uncovered evidence that Mr. Akhmetshin, on behalf of ECVK, its parent company EuroChem, and/or those companies' New York law firm Salisbury & Ryan, hacked into the computer systems of IMR and its officers and associates, stole confidential, personal and otherwise sensitive information, and then disseminated that information in an unlawful attempt to gain an unfair advantage in the Dutch Action.  (*See id.* at 1.)

IMR supported its Application with, among other things, several declarations setting forth evidence showing that Mr. Akhmetshin was in fact hired by Salisbury & Ryan and that he organized the hacking of IMR's computer's systems, stole IMR's confidential information, and disseminated it to third parties. In particular, the declarations described the following events: (1) an IMR investigator personally witnessed and overheard a conversation at a London coffee shop during which, among other things, Mr. Akhmetshin admitted to having organized the hacking of IMR's computers systems; and (2) an anonymous source provided IMR investigators with a thumb drive containing apparently stolen IMR documents after those investigators had inquired with a number of sources about whether those sources could obtain copies of documents supposedly hacked by Mr. Akhmetshin. (*See* Ex. D, Decl. of Akis Phanartzis ("Phanartzis Decl.") ¶¶ 4-19; Ex. E, Decl. of Raphael Rahav ("Rahav Decl.") ¶¶ 5-10; Ex. F Decl. of Tadeusz Jarmolkiewicz ("Jarmolkiewicz Decl.") ¶¶ 11-15.)

The London coffee shop conversation was described at length by Akis Phanartzis, the IMR investigator who witnesses and overheard the conversation. According to Mr. Phanartzis, in mid-January 2014, IMR's investigators received information that Mr. Akhmetshin would be traveling to London later that month. (Ex. D, Phanartzis Decl. ¶ 5.) On January 29, 2014, Mr. Phanartzis located Mr. Akhmetshin at Le Meridien Piccadilly, a hotel in London. (*Id.* ¶ 6.) Mr. Phanartzis went to the site with a local surveillance team, and they identified Mr. Akhmetshin checking into the hotel at 5:30 p.m. (*Id.* ¶¶ 7-9.)

The next morning, on January 30, 2014, at approximately 11:15 a.m., Mr. Phanartzis observed Mr. Akhmetshin entering the Café Royal Coffee Shop on Regent Street. Mr. Phanartzis then took a seat nearby. (*Id.* ¶¶ 10-11.) At approximately 11:25 a.m., Mr. Akhmetshin was joined by an unidentified businessman in his forties who was carrying a laptop. (*Id.* ¶ 12.) After they

had exchanged pleasantries, Mr. Akhmetshin handed the businessman an external hard drive and explained that the drive contained numerous folders of documents that included memoranda, emails, and financial information.  (*Id.* ¶ 13.)  Mr. Akhmetshin described his process for obtaining the documents, stating that he had organized the hacking of IMR's computer systems specifically on behalf of EuroChem, which was in a dispute with IMR over a mining project near the Russian city of Kotelnikovo.  (*Id.* ¶ 14.)  Mr. Akhmetshin explained that his team targeted senior executives and individuals in key administrative positions whose computers would contain important internal documents.  (*Id.* ¶¶ 14-15.)  Mr. Akhmetshin said that his team had collected approximately 50 gigabytes worth of material, although he noted that some of the less sensitive materials were stored at his home.  (*Id.* ¶ 16.)  The businessman commented on the volume of material, and Mr. Akhmetshin responded:  "There is a lot of the stuff, so – but that's why you are paying money."  (*Id.* ¶ 17.)

Mr. Akhmetshin went on to explain that EuroChem hired him because of his expertise in disputes that require sensitive work and because of his contacts in Kazakhstan.  (*Id.* ¶ 19.)  He stated that he had met with lawyers for Andrey Melnichenko, EuroChem's owner, in New York.  (*Id.* ¶ 20.)  He identified one of these lawyers as Patrick Salisbury, a partner at Salisbury & Ryan, and said that Mr. Salisbury was representing EuroChem in the Dutch Action.  (*Id.*)  Mr. Akhmetshin added that he was hired because there were certain things that the law firm could not do.  (*Id.* ¶ 21.)  Mr. Akhmetshin noted that he had a meeting with Patrick Salisbury the following week in New York to discuss next steps for the case against IMR.  (*Id.* ¶ 22.)

### B.    Mr. Akhmetshin Vehemently Denies IMR's Allegations and Opposes the Application

On May 15, 2014, Mr. Akhmetshin filed an opposition to IMR's Application.   In his Opposition, he admitted to being retained by Salisbury & Ryan on behalf of ECVK in connection with the Dutch Action, but claimed that the purpose of his retention was solely to assist the law firm in conducting due diligence research on IMR, its ultimate owners, and a related company, Shaft Sinkers, as well as consult with respect to legal, social, economic, and political realities in Eastern Europe.  (*See* Dkt. 10-1 ¶ 6.)

With regard to IMR's Application and evidence submitted in support thereof, Mr. Akhmetshin was dismissive and derisive.   As Mr. Akhmetshin described IMR's evidence in support of its Application (including IMR's investigator's description of the London coffee shop conversation):

> Neither Woody Allen nor Peter Sellers would ever have scripted such a satire for the simple reason that, even by Hollywood standards, the audience would never have believed the premise.   Neither should this Court. Fortunately, the federal courts are not the appropriate theatre in which to produce such a farce.
>
> …
>
> [i]t is ***not possible that I was overheard saying that I was turning over documents that I had hacked from an IMR or ENRC***[1] computer, because I have never done so, nor do I have the skills to do so."  (Dkt. 10 at 2; Dkt. 10-1 ¶ 14 (emphasis added).)

### C.    This Court's Rulings on IMR's Application

On September 23, 2014, this Court denied IMR's Application without prejudice following the Dutch court's ruling in favor of IMR in the Dutch Action.  (*See* Dkt. 17.)  After ECVK appealed

---

[1]    As explained previously, "ENRC" is the acronym used to refer to Eurasian Natural Resources Corporation PLC.   The same shareholders who ultimately own IMR were former owners of ENRC, and are now minority shareholders in the delisted successor group now known as Eurasian Resources Group.  (Dkt. 1 at 7 & n.3).

the decision, IMR renewed its Application on, among others, the ground that new evidence may be submitted in the Dutch Action on appeal.  (*See* Dkt. 18.)  On February 5, 2015, the Court granted IMR's renewed Application, and IMR served its subpoena the same day.  (*See* Dkt. 22; Ex. G, Subpoena to R. Akhmetshin.)  The subpoena commanded Mr. Akhmetshin to appear for deposition and contained a single document request:  "All documents and communications concerning IMR, Shaft Sinkers, ENRC, EuroChem, ECVK, and/or Salisbury & Ryan."  (Ex. G.)

   **D.      Mr. Akhmetshin's Deposition in This Action**

█    ████████████████████████████████
     ███████████████████████████████

   On April 7, 2015, Mr. Akhmetshin was deposed.  During the deposition, Mr. Akhmetshin was questioned extensively about the London coffee shop conversation and Mr. Phanartzis's declaration describing it. ██████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████
        ██████████████████████████████████████
███████████████████████████████████████

        ████████████████████████████
        ████████
        ██████████████████████
        ████████████████████████
        ████████
        ████████████████████████



> **2.      Mr. Akhmetshin Admits that His Strategic Communications Work
> Consists of Public Relations and Government Affairs Work**

At his deposition, Mr. Akhmetshin also testified about his "strategic communications" work.  (*See id.* at 124-25, 149-50.)  Mr. Akhmetshin explained that a strategic communications strategy is "the way people tell their story, kind of tell – tell their side of the story….in the press, in – in different forums….Legislative action as well….There are different forums, legislative and media forums."  (*Id.* at 124-25.)  He elaborated, "as we discussed with the strategic communication, it's – it's outreach, both media and legislative outreach." (*Id.* at 149-50.)  As part of his strategic communications work, Mr. Akhmetshin generally communicates with journalists and others in the press in the hope that they write favorable articles about his clients:

[Q.]  When you conduct a strategic communications campaign for a client, is it your practice to convince or attempt to persuade reporters to write favorable articles about your clients?

….

THE WITNESS: I try not to persuade anyone in doing that because I try to present story and present some facts, and I do encourage journalists to look into my client matters.

….

Q.  Is it your hope when you have these communications with reporters about your clients and the subject matter of your retention by those clients that they will write articles that are favorable to your clients?

….

THE WITNESS: It is my intention to get the story out, and favorable – yes, I would say yes.  (*Id.* at 151-52.)

In an affidavit opposing IMR's Application, Mr. Akhmetshin stated that he "developed and proposed to ECVK a strategic communications strategy relevant to the Dutch Action."  (*See* Ex. I, Decl. of Rinat Akhmetshin ("Akhmetshin Decl.") ¶ 6.)  Although Mr. Akhmetshin claims that the "proposal was rejected" (*see id.*) and that he did not actually provide strategic communications services in this case, Mr. Akhmetshin's counsel also instructed the witness not to answer any questions about the strategic communications work he performed for Salisbury & Ryan and/or ECVK:  "Q.  What was the strategic communications strategy that you developed and proposed? MR. SPERDUTO:  He's not asking for a communication.  He's asking for – let me think for a minute here …. Well, I – I think that's 26(b)(4)(D), so I'm going to direct him not to answer." (Ex. H, Tr. at 124.)

**3.**  **Mr. Akhmetshin Admits that the Individuals With Whom He Shared Allegedly Privileged Information Consisted Largely of Journalists, Researchers, and Other Non-Lawyers Who Were Not Involved in the Representation of ECVK**

With regard to his communications with third parties, Mr. Akhmetshin identified several journalists and researchers with whom he spoke about his allegedly privileged work for Salisbury & Ryan and ECVK, including Simon Goodley, Mark Hollingsworth, Scott Horton, Ken

Silverstein, Kirstin Ridley and Daniel Balint-Kurti.[2]  (*See id.* at 104-08, 164-65, 180, 224; Ex. A,

Entries 22-24, 55-56, 97·98, 131, 156, 164-165, 169,·170, 192, 201-203, 205, 247, 249, 251-253,

and 261.)



Finally, Mr. Akhmetshin identified Edward Lieberman as

someone with whom he allegedly had privileged communications.  Mr. Akhmetshin testified that

Mr. Lieberman is his "colleague" and "personal advisor."  (*Id.* at 112–13.)  Mr. Akhmetshin further

testified that Mr. Lieberman did not work on the ECVK project, and that Mr. Akhmetshin never

sought Mr. Lieberman's legal advice concerning the ECVK project, IMR, Shaft Sinkers, or ENRC.

(*See id.* at 113-14.)

---

[2]     Mr. Akhmetshin identified Simon Goodley as a reporter for the Guardian newspaper, (*see* Ex. H, Tr. at 180) and Ken Silverstein as a journalist and researcher for several publications (*see id.* at 105-06).  Mark Hollingsworth has published articles in the Guardian newspaper.  (See Ex. J.)  Scott Horton is a lawyer and author who regularly publishes articles in Harper's Magazine.  (*See* Harper's Magazine, Scott Horton Author Page (listing articles), *available at* http://harpers.org/author/scotthorton/.) Kirstin Ridley writes for Reuters.  (*See* Reuters, Kirstin Ridley Feed, *available at* http://blogs.reuters.com/kirstin-ridley/.)   And Daniel Balint-Kurti is a researcher and author who works for Global-Witness.  (*See* Ex. H, Tr. at 108; ▮▮▮▮▮▮▮▮.)

4.      **Mr. Akhmetshin Asserts Grossly Overbroad Claims of Privilege and Refuses to Answer Questions that Do Not Implicate Legitimate Privilege Claims**

Finally, throughout Mr. Akhmetshin's testimony, his counsel asserted privilege and instructed him not to answer questions about the general subject matter of several communications, the persons who were present for those communications, the locations where those communications took place or even the number of persons who were present for the communications. Attached as Exhibit C is a full listing of instructions not to answer given by counsel for Mr. Akhmetshin. Examples of such instructions include:

- "Q. Mr. Akhmetshin, with respect to your trip to Russia in 2013 in connection with this engagement, how many people did you meet with? A. I would like to invoke all these three or four or whatever rules we have. MR. SPERDUTO: And for the record, the four rules that we are applying are 26(b)(4)(d), the attorney-work-product, attorney-client privilege and the contractual provision in the engagement letter. MR. COGAN: Are you instructing him not to answer that – MR. SPERDUTO: Yes." (Ex. H, Tr. at 44.)

- "Q. Approximately, how many meetings did you have? MR. SPERDUTO: Objection on the basis of the privilege. MR. COGAN: Are you instructing him not to answer? MR. SPERDUTO: Yes. THE WITNESS: I decline to answer. BY MR. COGAN: Q. Who did you meet with? MR. SPERDUTO: Objection on the basis of 26(b)(4). MR. COGAN: Instructing him not to answer? MR. SPERDUTO: Yes. BY MR. COGAN: Q. What did you discuss at this – at these meetings? MR. SPERDUTO: Same objection." (*Id.* at 45.)

- "Q. When, approximately, did you have a communication with Mr. Salisbury after this engagement ended? A. Maybe half a year later. Q. Half a year after the conclusion of the engagement? A. To the best of my recollection….[Q.] Was anyone else on the telephone call? A. I'm afraid I cannot answer this without – Q. How about just yes or no? Can you answer yes or no whether anyone else was on the call? A. Yes. Q. Okay. Who was on the call? A. I'm afraid that will violate this Rule 26 -- MR. SPERDUTO: We'll invoke 26(b)(4)(D) and direct the witness not to answer. MR. COGAN: I just want to be clear, Mr. Sperduto, about your instruction. You're – you're instructing the witness not to answer a question about who was on a call with him and Mr. Salisbury? MR. SPERDUTO: Yes…." (*Id.* at 49-50.)

- "Q. A few questions about the log. On the first page, in the first entry, do you see under the Author or Custodian field -- A. Uh-huh. Q. -- it says, 2703tarazuisun@gmail.com? A. I do see that, yes. Q Whose email address is that?

A.  I believe it's an email associated somehow with the former prime minister of Kazakhstan or with his office, his people.  Q.  Which former prime minister are you referring to? …. A.  His name is Akezhan.  It's A-K-E-Z-H-A-N, Akezhan. Kazhegeldin.  Q.  Do you recall that you had communications with him regarding the work that you were doing for Salisbury & Ryan?  MR. SPERDUTO:  To the extent that that invokes Rule 26(b)(4)(D), I'll direct the client not to answer.  MR. COGAN: But the actual pending question is "do you recall that you had communications," which is a yes or no.  MR. SPERDUTO:  I understand that.  But the sources of his information, the research he did leads to the facts and opinions held, so I think it's covered by 26(b)(4)(D)….MR. COGAN: So you're instructing him not to answer?   MR. SPERDUTO: Yes." (*Id.* at 103-04.)

E.     **Additional Evidence Corroborating that Mr. Akhmetshin Was in Possession of IMR's Internal Information and Was Distributing It to Third Parties**

A subsequent review of the metadata on the thumb drive provided to IMR's investigators in response to their request for copies of documents hacked by Mr. Akhmetshin revealed that certain files on the drive were last accessed by a user who identifies himself as "RA" while others were last accessed by an individual named "Scott Horton."  At his deposition, Mr. Akhmetshin identified Mr. Horton as someone with whom he spoke about his work for Salisbury & Ryan.  Mr. Horton also appears on Mr. Akhmetshin's privilege log.  (*See* Ex. L, Decl. of Melanie Maugeri ("Maugeri Decl."), May 18, 2015 ¶¶ 7-8; Ex. H, Tr. at 164-79; Ex. A, Entries 247, 249, 251-53.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

████████████████████████████████████  ██

████████████████████████████████████████████████████

██████████████████████████████████  Mr. Akhmetshin explained

at his deposition that Herbert Smith – a law firm – represented a company associated with IMR.

(*See* Ex. H Tr. at 180-82.) ██████████████████████

███████████████████████████████████████████

███████████████████████

### F.     Mr. Akhmetshin's Privilege Logs

On March 27, counsel for Mr. Akhmetshin provided IMR with a privilege log containing

descriptions of 263 withheld documents.  The log provided the names of authors and recipients,

but it contained only the vaguest descriptions of the documents themselves.  Indeed, the log

described 111 documents as "research and investigation" and 92 as "Communication re: meeting

with counsel."  (*See* Ex. A.)  On April 20, IMR requested that Mr. Akhmetshin revise the log

entries to provide the specific, individualized descriptions that are necessary to allow IMR to assess

his privilege claims.  (*See* Ex. O, Ltr. from J. Cogan to K. Sperduto, Apr. 20, 2015 at 4.)  On May

4, 2015, counsel for Mr. Akhmetshin provided IMR with a revised log.  The revised log added

only a few words to several entries.  A blackline showing differences between Mr. Akhmetshin's

original log and his revised log is attached here as Exhibit A.  A spreadsheet showing all revised

descriptions for the 263 withheld documents is attached as Exhibit B.

### ARGUMENT

### A.     The Court Should Compel Mr. Akhmetshin to Produce All Documents He Has Withheld Because He Has Failed to Satisfy His Burden of Demonstrating that They Are Subject to Any Valid Claim of Privilege.

Because the jurisdictional basis for this action rests on a federal statute – 28 U.S.C. § 1782

– federal common law governs any assertions of privilege.  *In re Veiga*, 746 F.Supp.2d 27, 32

(D.D.C. 2010).   Under  federal  law,  the  proponent  bears  the  burden  of  demonstrating  the

applicability of any asserted privilege. *Fed. Trade Comm'n v. TRW, Inc.*, 628 F.2d 207, 213 (D.C.

Cir.1980).   To do so, "the proponent must establish the claimed privilege with 'reasonable certainty.'"   *In re Veiga*, 746 F.Supp. 2d 27, 33 (D.D.C. 2010) (quoting *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750–51 (D.C. Cir. 2006). That showing must extend to "each of the essential elements necessary to sustain a claim of privilege."   *Alexander v. Fed. Bureau of Investigation*, 192 F.R.D. 42, 45 (D.D.C. 2000).   The proponent may not assert blanket or categorical claims of privilege; "rather, the law 'requires a showing that the privilege applies to each communication for which it is asserted.'"   *Veiga*, 746 F. Supp. 2d at 33 (quoting *United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1082 (D.C. Cir. 2001).

As courts in this Circuit have noted, a privilege log is "the universally accepted means of asserting privileges in discovery in the federal courts."   *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1 (D.D.C. 1999).   Where, however, "resort to [a party's] Privilege Log is of little assistance [because] 'the descriptions of the documents are so brief and of such a general nature that they fail to give the court any basis for determining whether the privilege was properly invoked,'" courts have compelled disclosure of the documents described on the log.   *See Veiga*, 746 F.Supp.2d at 40 (quoting *Alexander*, 192 F.R.D. at 45); *see also Zelaya v. UNICCO Serv. Co.*, 682 F. Supp. 2d 28, 38 (D.D.C. 2010) (proponents' failure to provide sufficient information to sustain their burden of proof compelled disclosure of documents listed on privilege log).   Courts have been particularly apt to order disclosure where, as here, the proponent of the privilege has had the opportunity to cure deficiencies in his or her log but has failed to do so.   *See, e.g., Zelaya*, 682 F.Supp. 2d at 38 ("Any allowance of leave for defendants to amend their privilege log to offer more specificity is unwarranted.   It will only add delay to these proceedings and likely require another round of motions to compel based on the new Third Supplemental Privilege Log."); *Walker v. Ctr. For*

*Food & Safety*, 667 F. Supp. 2d 133, 138 (D.D.C. 2009) (noting that a party waived his right to assert privileges where he "had numerous opportunities to assert [his] claims of privileges and produce an adequate privilege log…[but] failed to do so").

Mr. Akhmetshin has submitted two privilege logs – an original and a revised version, which was submitted after IMR complained about deficiencies in the original. Neither satisfies the essential elements of any of the three privileges Mr. Akhmetshin has asserted over documents described on his logs: the attorney-client privilege; the work-product doctrine; and the non-testifying expert privilege. The descriptions on his revised log instead contain only the vague descriptions of the subject-matter of the communications such as "Communication re: arranging meeting with counsel," "Communication re: arranging Akhmetshin meeting with counsel," "Communication re: arranging meeting with counsel concerning research and investigation," or "Communication re: research and investigation." (*See* Ex. A.)

None of these or any other descriptions contained on Mr. Akhmetshin's privilege log are sufficient to establish the essential elements of a claim for the attorney-client privilege. "[T]he proponent [of the attorney-client privilege] must establish each of the following essential elements: (1) The holder of the privilege is, or sought to be, a client; (2) The person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) The communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) The privilege has been claimed by the client." *Veiga*, 746 F. Supp. 2d at 34. In addition, the proponent must show that withheld communications contain confidential information and were maintained in confidence. *Id.* Here, none of Mr. Akhmetshin's descriptions indicates whether Mr. Akhmetshin's communications were for the purpose of seeking

legal advice, whether the individuals with whom he was communicating were acting in their capacities as lawyers (or whether they were lawyers at all), or whether the communications contained confidential information and were maintained in confidence.   Mr. Akhmetshin has accordingly failed to establish that the attorney-client privilege applies.

Mr. Akhmetshin has likewise failed to establish the essential elements of a claim for work-product protection.   The proponent of a work-product claim must show that the withheld materials were "prepared in anticipation of litigation or for trial by or for [a] party or its representative." Fed. R. Civ. P. 26(b)(3)(A)).   In assessing whether the proponent has carried its burden, a court inquires into "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."   *Equal Emp't Opportunity Comm'n v. Lutheran Social Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (internal quotation marks omitted).   The proponent bears the burden of "showing that the documents were prepared for the purpose of assisting an attorney in preparing for litigation, and not some other reason."   *Alexander*, 192 F.R.D. at 46.   Here, the hopelessly vague descriptions on Mr. Akhmetshin's privilege log fail to demonstrate that each individual document can fairly be said to have been prepared or obtained because of the prospect of litigation. Indeed, it is impossible to tell for what purpose the withheld documents were generated.   Mr. Akhmetshin has accordingly failed to satisfy his burden.

Finally, Mr. Akhmetshin has failed to establish the essential elements of the non-testifying expert privilege.   Similar to the work-product doctrine, the non-testifying expert privilege requires a proponent to show that the withheld material was prepared by an expert who "has been *retained or specifically employed* by another party *in anticipation of litigation*" and while he was acting in that capacity.   *Goldstein v. Fed'l Deposit Ins. Corp.*, 494 B.R. 82, 89 (D.D.C. 2013) (quoting Fed.

R. Civ. P. 26(b)(4)(D)) (emphasis added).   The vague and non-specific descriptions on Mr. Akhmetshin's privilege log – which consist of descriptions such as "Communication re: arranging meeting with counsel" and "Communication re: research and investigation" – in no way establish that each withheld document was prepared by Mr. Akhmetshin in anticipation of litigation or while he acted in his capacity as an expert retained or specifically employed in anticipation of litigation. As such, Mr. Akhmetshin has failed to meet his burden with regard to his assertions of the non-testifying expert privilege.

Mr. Akhmetshin's failure to establish the essential elements of any of his privilege claims – despite repeated requests by IMR to do so – warrants an order from this Court compelling Mr. Akhmetshin to produce all documents described on his log.  *See Zelaya*, 682 F.Supp. 2d at 38; *Walker*, 667 F. Supp. 2d at 138.  Indeed, the perfunctory way in which Mr. Akhmetshin purported to "revise" his privilege log in response to IMR's complaints demonstrates his unwillingness or inability to substantiate his claims.  Rather than provide the requisite information to establish his privilege claims, Mr. Akhmetshin's revised log merely added a few words to several entries.  For example, many entries that had previously read "Communication re: meeting with counsel," were changed to read "Communication re: *arranging* meeting with counsel," "Communication re: *arranging Akhmetshin* meeting with counsel" or "Communication re: *arranging* meeting with counsel *concerning research and investigation*."  A review of the redline showing differences between Mr. Akhmetshin's original privilege log and his revised privilege log (attached as Exhibit A) shows the cavalier attitude Mr. Akhmetshin took to curing the deficiencies in his privilege assertions.  Mr. Akhmetshin should not be given yet another chance to revise his log and thus drag this dispute out even longer.  *See Walker*, 667 F. Supp. 2d at 138.  Indeed, any further extension or reprieve for Mr. Akhmetshin would be prejudicial given IMR's upcoming filing deadline in the

Dutch Action is June 23. (*See* Ex. P, Fourth Decl. of Robbert de Bree ("de Bree Decl."), May 15, 2015 ¶¶ 4-9.) Mr. Akhmetshin should accordingly be compelled to produce the documents listed on his privilege log immediately.

At the very least, the Court should order Mr. Akhmetshin to submit for *in camera* review the documents he withheld so that the Court may evaluate his privilege claims. *See, e.g.*, *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 2, 5 (D.D.C. 1999) (ordering *in camera* review because "counsel rarely provides more than minimal information in the logs they submit which usually tell me the date of the document, its author and recipient, and the briefest possible description of its contents").

**B.      The Court Should Compel Mr. Akhmetshin to Produce All Documents He Has Withheld Based on the Crime-Fraud Exception or, at the Very Least, Order Mr. Akhmetshin To Submit for *In Camera* Review All Such Documents to Determine Whether the Crime-Fraud Exception Applies.**

It is well-established that communications made in furtherance of a crime or fraud are not entitled to be withheld as privileged. *See Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 132-34 (D.D.C. 2005). The tests for determining whether the crime-fraud exception applies are slightly different depending on whether the proponent asserts the attorney-client privilege or the work-product doctrine. *Id.* at 132. In the context of the attorney-client privilege, "the court must consider whether the client made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act, and establish that the client actually carried out the crime or fraud." *Id.* at 132-33 (citations and quotations omitted). With regard to the work-product doctrine, "courts focus on the client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication." *Id.* at 133.

In determining whether the crime-fraud exception applies, "courts do not require proof beyond a reasonable doubt that someone has committed a crime or fraud. Rather, they undertake

a simplified two-step inquiry." *In re Sealed Case*, 676 F.2d 793, 814-15 (D.C. Cir. 1982).  First, there must be a *prima facie* showing of a violation sufficiently serious to defeat the attorney-client or work-product privilege.  Second, the court must find some valid relationship between the material at issue and the *prima facie* violation.  *Id.*

IMR has met both of these requirements.  IMR submitted along with its Application substantial evidence that Mr. Akhmetshin was hired by Salisbury & Ryan on behalf of ECVK to hack into IMR's computer systems, steal IMR's confidential information, and disseminate it to third parties.  (*See supra* at Facts § A.)  This conduct constitutes a crime under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701, which outlaw the unauthorized accessing of computer systems.

As noted above, in opposing IMR's Application, Mr. Akhmetshin responded to this evidence by deriding IMR's allegations as farcical and categorically denying that he ever said that he organized the hacking of IMR's computer systems.  (Dkt. 10 at 2; Dkt. 10-1 ¶ 14.)  After the Court granted IMR's Application and IMR was allowed to examine Mr. Akhmetshin under oath,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████  there is ample evidence submitted by IMR that Mr. Akhmetshin was hired by Salisbury & Ryan on behalf of ECVK to hack into IMR's computer systems, steal IMR's confidential information, and

disseminate it to third parties.[3]   Indeed, as set forth in the declaration of Melanie Maugeri, a forensic review of the thumb drive of documents provided to IMR's investigators reveals that certain files were last accessed by a user who identifies himself as "RA" (presumably, "Rinat Akhmetshin") and others were last accessed by a user identified as "Scott Horton" (who, as noted above, Mr. Akhmetshin has now admitted he was corresponding with concerning his work for Salisbury & Ryan).  (*See* Ex. L, Maugeri Decl. ¶¶ 7-8; Ex. H, Tr. at 164-79; Ex. A, Entries 247, 249, 251-53.)  This evidence is sufficient to make a *prima facie* showing that the crime-fraud exception applies.  *See In re Sealed Case*, 676 F.2d at 814-15.  Mr. Akhmetshin should accordingly be compelled to produce the withheld material on his privilege log.

At the very least, the Court should compel Mr. Akhmetshin to submit his withheld material for *in camera* review to determine whether the crime-fraud exception applies.  To obtain *in camera* review, IMR simply must establish "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *United States v. Zolin*, 491 U.S. 554, 570-72 (1989).  The evidence submitted by IMR with its Application and Mr. Akhmetshin's own testimony easily satisfy this burden.

**C.    The Court Should Compel Mr. Akhmetshin to Produce Immediately All Material Related to His Strategic Communications Work.**

---

[3] 

Mr. Akhmetshin has admitted to withholding a "strategic communications proposal" he developed on behalf of Salisbury & Ryan and/or ECVK regarding the Dutch Action but has denied engaging in any actual strategic communication work on behalf of those entities – allegedly because his proposal was rejected.  (*See* Ex. R, Ltr. from K. Sperduto to J. Cogan, Apr. 27, 2015 at 1-2.)  A review of Mr. Akhmetshin's privilege log and the documents he has produced, however, reveals that Mr. Akhmetshin did, in fact, apparently engage in a strategic communications campaign on behalf of Salisbury & Ryan and/or ECVK with regard to the Dutch Action.  Mr. Akhmetshin should be compelled to produce all such material.

### 1. Mr. Akhmetshin's Strategic Communications Work Is Not Privileged

Although Mr. Akhmetshin denies having done "strategic communications" work in this case, Mr. Akhmetshin admitted during his deposition that he does sometimes engage in strategic communications work on behalf of clients.  As he explained it, such work consists of helping clients "tell their side of the story….in the press" and in Legislative forums.  (Ex. H, Tr. at 124-25.)  He elaborated that "it's outreach, both media and legislative outreach." (*Id.* at 149-50.)  As part of his strategic communications work, Mr. Akhmetshin often communicates with journalists and others in the press in the hope that they will write favorable articles about his clients.  (*Id.* at 151-52.)

In other words, Mr. Akhmetshin's strategic communications work consists of public relations and government affairs efforts.  The law is clear, however, that such work does not involve legal advice, is not done in anticipation of litigation, and therefore is not privileged.  *See, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[A]dvice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure.").  Mr. Akhmetshin should accordingly be compelled to produce the strategic communications proposal.

2.      **Mr. Akhmetshin Did Engage in a Strategic Communications Campaign Regarding the Dutch Action on Behalf of Salisbury & Ryan and/or ECVK, and He Has Improperly Withheld Documents Relating to It**

Contrary to his claims, a review of documents produced by Mr. Akhmetshin shows that he did spend a significant amount of time communicating with journalists in order to encourage them to publish negative articles as part of a smear campaign against IMR to assist ECVK in the Dutch Proceedings. ████████████████████



In short, despite his claims, Mr. Akhmetshin was clearly engaged in strategic communications work regarding the Dutch Action on behalf of Salisbury & Ryan and ECVK, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Court should accordingly order Mr. Akhmetshin to immediately produce all material that relates to Mr. Akhmetshin's strategic communications work, including but not limited to all communications with the following journalists that have been withheld:  Mr. Goodley, Mr. Hollingsworth, Scott Horton, Daniel Balint-Kurti, Ken Silverstein, and Kristin

---

[4]      Mr. Akhmetshin testified at his deposition that the "Trio" is a group of three individuals who owned ENRC.  (Ex. H, Tr. at 121-22.)  As noted above and explained previously, the same shareholders who ultimately own IMR were former owners of ENRC, and are now minority shareholders in the delisted successor group now known as Eurasian Resources Group.  (*See* supra at n.1; Dkt. 1 at 7 & n.3.)

Ridley, (*see* Ex. A, Entries 22-24, 55-56, 97·98, 131, 156, 164-165, 169·170,192,201-203,205,247,249,251-253, and 261).  At the very least, the Court should compel Mr. Akhmetshin to submit all such material for *in camera* review to determine whether his privilege claims have any validity.  *See Avery Dennison Corp.*, 190 F.R.D. at 2, 5.

> **D.      The Court Should Compel Mr. Akhmetshin to Produce Immediately All Material He Shared With Third Parties.**

Mr. Akhmetshin's privilege logs show that he seeks to withhold numerous documents he shared with third parties.  These third parties include journalists and researchers as well as two individuals, ███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████  The Court should compel Mr. Akhmetshin to produce all documents shared with these third parties because (i) Mr. Akhmetshin's communications with these individuals are not subject to any valid claim of privilege and/or (ii) Mr. Akhmetshin waived any otherwise applicable privilege claim by sharing the material with the third parties.  At a minimum, the Court should compel Mr. Akhmetshin to submit all such material for *in camera* review so that the Court may evaluate his privilege assertions.  *See Avery Dennison Corp.*, 190 F.R.D. at 2, 5.

> **1.      Mr. Akhmetshin Has Improperly Withheld Communications He Had with Journalists and Researchers**

As discussed above, Mr. Akhmetshin has improperly withheld the documents he shared with journalists and researchers because such communications were made in the context of Mr. Akhmetshin's strategic communications work, not his work as a non-testifying expert (if Mr. Akhmetshin did any such work at all).  *See supra* at Argument § C.2.  Mr. Akhmetshin should accordingly be compelled to produce these non-privileged documents.

In addition, Mr. Akhmetshin should be compelled to produce the documents he shared with journalists and researchers because such disclosure waived his ability to assert work-product or non-testifying expert protections over the material. Both the work-product doctrine and the non-testifying expert privilege are subject to waiver. *See Veiga*, 746 F. Supp. 2d at 35 ("voluntary disclosure may waive the protections of the work-product doctrine"); *White v. Electrolux Comm'ns*, 2014 WL 1365424, at *2 (N.D. Ill. Apr. 7, 2014) (explaining that "the concept of waiver is applicable to Rule 26(b)(4)(D)" because Rule 26(b)(4)(D) "is simply an application of the work product rule"). The relevant inquiry to determine whether the privilege has been waived is whether the proponent "had a reasonable basis for believing that the recipient would keep the disclosed material confidential." *United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010). In the present case, Mr. Akhmetshin could not possibly have believed that information he shared with journalists and researchers would be kept confidential. Their very occupation involves gathering information and bringing it to the attention of the public. Indeed, when discussing his communications with the press, Mr. Akhmetshin admitted that he did so in an attempt to have favorable articles written about his clients. (Ex. H, Tr. at 151-52.) Mr. Akhmetshin should accordingly be compelled to produce all his communications with journalists and researchers, including the documents described in privilege log entries 22-24, 55-56, 97·98, 131, 156, 164-165, 169·170, 192, 201-203, 205, 247, 249, 251-253, and 261.

### 2.   Mr. Akhmetshin Has Improperly Withheld Communications He Had with Akezhan Kazhegeldin

Mr. Akhmetshin's privilege log shows that he has withheld several documents he either sent to or received from the email address 2703tarazuisun@gmail.com, which Mr. Akhmetshin identified at his deposition as belonging to the former prime minister of Kazakhstan, Akezhan Kazhegeldin. (*See* Ex. H, Tr. at 103; Ex. A, Entries 1,·3, 92, 99, 105-106, 109-113, 150·151, 157,

167, 175, 177, 179, 181-182, 191,214, 228, 230, and 250.) ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████  ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ As

with his communications with journalists and researchers, Mr. Akhmetshin could not possibly

have believed that information he shared with Mr. Kazhegeldin would be kept confidential, and

therefore all such material must be produced.  *See Deloitte LLP*, 610 F.3d at 141.  ██████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████  Mr. Akhmetshin should accordingly be compelled to produce

all material shared with Mr. Kazhegeldin, including the documents described in privilege log

entries 1·3, 92, 99, 105-106, 109-113, 150,·151, 157, 167, 175, 177, 179, 181-182, 191, 214, 228,

230, and 250.

### 3.  Mr. Akhmetshin Has Improperly Withheld Communications He Had with Edward Lieberman

Mr. Akhmetshin's privilege log shows that he has withheld several documents he either

sent to or received from Edward Lieberman, who Mr. Akhmetshin described at his deposition as

his "colleague" and "personal advisor."  (*See* Ex. H, Tr. at 112-14; Ex. A, Entries 207, 217-222,

224-229, and 231-232.)  Mr. Akhmetshin testified that Mr. Lieberman did not work on the ECVK

project, and that Mr. Akhmetshin never sought Mr. Lieberman's legal advice concerning the

ECVK project, IMR, Shaft Sinkers, or ENRC.  (*See* Ex. H, Tr. at 113-14.)  In an errata sheet

submitted by Mr. Akmetshin's counsel 23 days after his deposition, Mr. Akhmetshin attempted to

change two of his answers about Mr. Lieberman providing legal advice from "no" to "yes." (*See*

Ex. Y, Ltr. from J. Kauke to U.S. Legal Support, Apr. 30, 2015 at 2 (errata for page 115).)  Such

a blatant attempt to reverse testimony given under oath via an errata sheet is improper under Rule

30(e) and should be rejected out of hand.  *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,

397 F.3d 1217, 1225-26 (9th Cir. 2005) (holding that "Rule 30(e) is to be used for corrective, and

not contradictory, changes").  Mr. Lieberman was not providing legal advice to Mr. Akhmetshin

regarding the ECVK project, IMR, Shaft Sinkers, or ENRC, and Mr. Akhmetshin's

communications with him are not privileged.  They should be produced.

### E.     The Court Should Compel Mr. Akhmetshin to Produce All Responsive, Non-Privileged Documents Post-Dating August 31, 2013.

Mr. Akhmetshin has arbitrarily decided not to produce any documents post-dating August

31, 2013 on the ground that such material is not relevant.  Mr. Akhmetshin has recently confirmed

that he is in possession of such non-privileged material and that such material is responsive to

IMR's subpoena, but he has refused to produce it.  (*See* Ex. Z, Email from J. Kauke to F. Scanlon,

May 15, 2015.)  Mr. Akhmetshin's arbitrary cut-off date is not legitimate, and he should be

compelled to produce all responsive, non-privileged documents, regardless of date.

As a preliminary matter, the correct test for the scope of discoverability is not "relevance,"

it is whether the material sought is "reasonably calculated to lead to the discovery of admissible

evidence."  Fed. R. Civ. P. 26(b)(1).  Documents post-dating August 31, 2013 most certainly fall

within this scope.  Indeed, any documents – regardless of date – that discuss or relate to (a) Mr.

Akhmetshin's work on behalf of ECVK or Salisbury & Ryan, (b) material he collected during that

work, or (c) individuals or entities that are related to or affiliated with IMR are discoverable and

should be produced.  This arbitrary cut-off is particularly troubling, given that the London coffee shop conversation occurred in January 2014.  (See Ex. D, Phanartzis Decl. ¶ 6.)

Mr. Akhmetshin should accordingly be compelled to produce all responsive, non-privileged documents post-dating August 31, 2013, as well as a log describing those documents, if any, he withholds as privileged.

**F.    The Court Should Compel Mr. Akhmetshin to Sit for Another Day of Deposition.**

At Mr. Akhmetshin's deposition, his counsel asserted vastly overbroad privilege claims and instructed Mr. Akhmetshin not to answer questions that did not, in any way, attempt to delve into privileged material.  These instructions prevented counsel for IMR from eliciting testimony from Mr. Akhmetshin about the general subject matter of several communications, the persons who were present for those communications, or even the number of persons who were present for the communications.  (*See, e.g.*, Ex. H, Tr. at 44, 45, 50.)  Attached as Exhibit C is a full listing of instructions not to answer given by counsel for Mr. Akhmetshin.

These assertions of privilege and instructions are not proper.  Courts in this Circuit have repeatedly recognized that the general subject matter of a communication and the persons who were present for them are not privileged; indeed, such information is a staple of privilege logs, which have become the "almost universal method of asserting privilege under the Federal Rules." *Caudle v. District of Columbia*, 263 F.R.D. 29, 35 (D.D.C. 2009); *see Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. 2009) (finding privilege log insufficient where the descriptions did not reveal the general subject matter of a communication and did not list all recipients).  Mr. Akhmetshin should accordingly be ordered to sit for another day of questioning, so that IMR may get answers to the questions it is entitled to ask.

In addition, Mr. Akhmetshin should be compelled to sit for an additional day of deposition so that he may be examined on any information that is produced in response to this motion to compel.  IMR was wrongly precluded from examining Mr. Akhmetshin on this material based on Mr. Akhmetshin's illegitimate privilege assertions.  IMR should accordingly have the opportunity to examine Mr. Akhmetshin on the newly produced information at an additional day of deposition testimony.

**G.      The Court Should Set an Expedited Briefing Schedule and Promptly Resolve All Issues in this Motion.**

It is well settled that district courts enjoy broad discretion when deciding case management and scheduling matters.  *See Florida v. United States*, 820 F.Supp.2d 85, 89 (D.D.C. 2011) (citing cases).  This discretion extends to "determining how and in what order cases should be heard and determined." *Id.*  The Court should use this discretion to compel Mr. Akhmetshin to submit any opposition to this motion within seven days of being served and afford IMR four days for reply.  Expedited briefing is warranted in this case because IMR's primary filing in the Dutch Action is due on June 23, 2015. [5]  The Court should prevent Mr. Akhmetshin from dragging these proceedings out and prejudicing IMR in this manner.  The Court should instead set the expedited briefing schedule above so that it has the opportunity to promptly address Mr. Akhmetshin's grossly overbroad privilege assertions.

<u>**CONCLUSION**</u>

---

[5]      Although IMR may be able to submit additional evidence in the Dutch Action after June 23, allowing Mr. Akhmetshin to withhold evidence until after that date would prejudice IMR by depriving it of the ability to incorporate that evidence into the filing due on that date.  (Ex. P, de Bree Decl. ¶¶ 4-9.)  As IMR explained previously, after ECVK files its Statement of Claim in the appeal of the Dutch Action, IMR must respond with a Statement of Defense, in which IMR is supposed to set forth its argument in opposition to the statement of claim and incorporate any new evidence it wishes the court to consider.  *See id.*; Dkt. 21 at 1.

Based on the foregoing, IMR respectfully moves the Court to issue an Order compelling Mr. Akhmetshin:

(i)     to file any opposition to this motion within seven days of being served;

(ii)    to produce all documents described on his privilege log or, in the alternative, submit all such documents to the Court for *in camera* inspection to determine whether they are privileged;

(iii)   to produce immediately all documents relating to Mr. Akhmetshin's strategic communications work and all documents shared with third parties or, in the alternative, submit all such documents to the Court for *in camera* inspection to determine whether they are privileged;

(iv)    to produce immediately all responsive, non-privileged documents post-dating August 31, 2013; and

(v)     to sit for an additional day of deposition.

Dated:          Washington, D.C.
                May 18, 2015

                                        Respectfully submitted,

                                        /s/ Sangyoon Nathan Park
                                        S. Nathan Park (D.C. Bar No. 1000365)
                                        KOBRE & KIM LLP
                                        1919 M Street NW
                                        Washington, D.C. 20036
                                        Tel:  +1 202 664 1900
                                        Fax: +1 202 664 1920
                                        nathan.park@kobrekim.com

                                        Jonathan D. Cogan (admitted *pro hac vice*)
                                        KOBRE & KIM LLP
                                        800 Third Avenue
                                        New York, New York 10022

Tel:  +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan@kobrekim.com

*Attorneys for Applicant International*
*Mineral Resources B.V.*