# EXHIBIT H

1      Q      Okay.  Anyone else that you recall?

2      A      There was another partner, Andy Ryan,

3   who was -- I -- I'm not sure he was involved that

4   much.  His issues were different, but he was

5   present some meetings.

6      Q      To your knowledge, were all three of

7   the attorneys that you just mentioned all based in

8   New York?

9      A      To the best of my knowledge, yes.

10      Q      Okay.  This consulting agreement that

11   you entered into with them, do you recall where

12   you were when you executed it?

13      A      Probably in this -- I don't remember,

14   but most likely it was at Salisbury & Ryan's

15   offices.

16      Q      Okay.  Did you have meetings in New

17   York with Salisbury & Ryan related to this

18   engagement?

19      A      I did.

20      Q      Approximately how many?

21      A      Two, three, I guess.

22      Q      Did those all take place at

23   Salisbury & Ryan's offices in New York?

24      A      Yes.

25      Q      Did you travel anywhere else for this

[Page 36]

1    project?

2        A      I traveled to Moscow.

3        Q      When?

4        A      Sometimes in 2013.

5        Q      For what purpose?

6               MR. SPERDUTO:  Hold on.  I object to

7    the extent that that calls for privileged

8    information under Rule 26(b)(4)(D) or the work

9    product privilege.

10              If you can answer the question without

11   divulging that, you can answer.  Otherwise, you're

12   not -- you're directed not to answer.

13              THE WITNESS:  Yeah, I think that's when

14   I was engaged by Salisbury & Ryan.  They were very

15   clear about describing what my tasks will be, and

16   also they instructed me on the sensitivity of this

17   issue.  And I signed this confidentiality

18   agreement with them, or this agreement, in fact,

19   has a confidentiality clause, so . . .

20       BY MR. COGAN:

21       Q    Okay.  I'm going to put two and two

22   together here and assume that what you're saying

23   is that you don't believe that you can answer the

24   question of for what purpose did you travel to

25   Moscow without violating your counsel's

1    as best as you can?

2         A     Joffe.  It's probably J-O-F-F-E.

3         Q     Okay.  And you -- you pronounce it

4    Joffe?

5         A     Joffe.

6         Q     Okay.  Mr. Joffe is one of the lawyers

7    from Salisbury Ryan?

8         A     Correct.

9         Q     Other than Mr. Joffe, did you meet with

10   anybody else in Russia in connection with this

11   engagement in --

12               MR. SPERDUTO:  Same --

13         BY MR. COGAN:

14         Q     -- 2013?

15               MR. SPERDUTO:  Same objection.  You can

16   answer that only to the extent that it does not

17   divulge information that you were purposed to do

18   by Salisbury & Ryan.  And, again, the rule that

19   I'm trying to say is 26(b)(4)(d).

20               MR. COGAN:  Okay.  Let me just caveat

21   this.  I think the -- the pending question is a

22   yes or no, did you meet with anyone else?  Will

23   you allow him to answer that?

24               MR. SPERDUTO:  Sure.

25               MR. COGAN:  Okay.

[Page 39]

1        BY MR. COGAN:

2        Q     So, yes or no, other than Mr. Joffe,

3    did you meet with anybody else in Russia with

4    respect to this engagement?

5        A     Yes.

6        Q     Okay.  Approximately how many people?

7        A     This will violate my agreement with

8    Salisbury & Ryan.

9        Q     Even -- even just the number of how

10   many people?

11       A     If it's relevant, it will be --

12             MR. COGAN:  Why don't we do this:  Do

13   you want to take a quick break and you guys can

14   consult, or -- or is that not necessary?

15             MR. SPERDUTO:  Well, maybe if -- if he

16   thinks it does, perhaps we should.  It will

17   expedite the rest of these questions and

18   objections.

19             MR. COGAN:  Well, I don't think it's

20   going to take that much longer.  I need to make my

21   record so --

22             MR. SPERDUTO:  Yeah, okay.

23             MR. COGAN:  So --

24             MR. SPERDUTO:  If you think it's

25   privileged information, don't answer the question.

1          THE WITNESS:  It -- it would be

2    privileged information.

3       BY MR. COGAN:

4       Q    Okay.  How many meetings were there?

5          MR. SPERDUTO:  Same objection.

6          THE WITNESS:  Same objection.

7       BY MR. COGAN:

8       Q    Okay.  So you're -- you're declining to

9    answer on privilege grounds?

10      A    Correct.

11      Q    Is there anything else that you can

12   tell me about the meeting or meetings in Russia

13   related to this engagement, or are you asserting

14   attorney-client privilege or work product over

15   everything else?

16          MR. SPERDUTO:  I'll object to the

17   extent he's asking the witness for a legal

18   conclusion, and it needs to be a particularized

19   question for us to understand because the

20   application of the consulting expert privilege

21   under 26(b)(4)(d) is particularized to the facts

22   and circumstances of the direction of the

23   question.

24      BY MR. COGAN:

25      Q    Is there anything else that you can

[Page 44]

1          THE VIDEOGRAPHER:  Okay.  We are back

2    on the record at 10:24 a.m.

3          MR. COGAN:  Okay.  I conferred with

4    counsel for the witness off the record.  We're

5    going to try this line again.  Hopefully it will

6    go more smoothly.

7       BY MR. COGAN:

8       Q    Mr. Akhmetshin, with respect to your

9    trip to Russia in 2013 in connection with this

10   engagement, how many people did you meet with?

11      A    I would like to invoke all these three

12   or four or whatever rules we have.

13          MR. SPERDUTO:  And for the record, the

14   four rules that we are applying are 26(b)(4)(d),

15   the attorney-work-product, attorney-client

16   privilege and the contractual provision in the

17   engagement letter.

18          MR. COGAN:  Are you instructing him not

19   to answer that --

20          MR. SPERDUTO:  Yes.

21          MR. COGAN:  -- question?

22          MR. SPERDUTO:  Yes.

23      BY MR. COGAN:

24      Q    Did you have more than one meeting in

25   Russia in connection with your engagement?

[Page 45]

1              MR. SPERDUTO:  Asked and answered;

2     form.

3         BY MR. COGAN:

4         Q     You can answer.

5         A     I might have had more than one meeting.

6         Q     Approximately, how many meetings did

7     you have?

8              MR. SPERDUTO:  Objection on the basis

9     of the privilege.

10             MR. COGAN:  Are you instructing him not

11    to answer?

12             MR. SPERDUTO:  Yes.

13             THE WITNESS:  I decline to answer.

14        BY MR. COGAN:

15        Q     Who did you meet with?

16             MR. SPERDUTO:  Objection on the basis

17    of 26(b)(4).

18             MR. COGAN:  Instructing him not to

19    answer?

20             MR. SPERDUTO:  Yes.

21        BY MR. COGAN:

22        Q     What did you discuss at this -- at

23    these meetings?

24             MR. SPERDUTO:  Same objection.

25        BY MR. COGAN:

[Page 49]

1      A      Yes --

2      Q      -- again.

3      A      -- please.

4      Q      When, approximately, did you have a

5   communication with Mr. Salisbury after this

6   engagement ended?

7      A      Maybe half a year later.

8      Q      Half a year after the conclusion of the

9   engagement?

10     A      To the best of my recollection.

11     Q      So approximately end of 2013, beginning

12   of 2014?

13     A      Probably.

14     Q      Was anyone else -- was this a -- you

15   said it was a meeting?

16     A      It was a phone call.

17     Q      A phone call.

18            Was anyone else on the telephone call?

19     A      I'm afraid I cannot answer this

20   without --

21     Q      How about just yes or no?  Can you

22   answer yes or no whether anyone else was on the

23   call?

24     A      Yes.

25     Q      Okay.  Who was on the call?

[Page 50]

1      A      I'm afraid that will violate this

2   Rule 26 --

3              MR. SPERDUTO:  We'll invoke 26(b)(4)(D)

4   and direct the witness not to answer.

5              MR. COGAN:  I just want to be clear,

6   Mr. Sperduto, about your instruction.  You're --

7   you're instructing the witness not to answer a

8   question about who was on a call with him and

9   Mr. Salisbury?

10             MR. SPERDUTO:  Yes, because his

11  reaction to your question indicated he thought

12  that that would resolve -- that would reveal facts

13  and circumstances -- facts or opinions on the

14  research he was doing or the identity of the

15  research he was doing by identifying the other

16  person on the telephone.  And then on -- on that

17  basis, I'll invoke 26(b)(4)(D).

18       BY MR. COGAN:

19       Q      Was it more than one person on this

20  call besides you and Mr. Salisbury?

21       A      I do not remember, actually.

22       Q      What did you discuss on the call?

23             MR. SPERDUTO:  26(b)(4)(D) exception.

24  You're directed not to answer.  Attorney-client as

25  well, work product as well, contractual agreement

[Page 51]

1    as well.

2          BY MR. COGAN:

3          Q      How long did the call last?

4          A      I do not remember.

5          Q      Other than this conversation that you

6    had on the telephone with Mr. Salisbury after this

7    engagement had concluded, do you recall any other

8    communications that you had with Mr. Salisbury

9    after the end of this engagement?

10         A      Not that I could remember.

11         Q      How about anybody else from

12   Salisbury & Ryan?  Have you had any

13   communications, yes or no, with anyone from

14   Salisbury & Ryan after this engagement concluded?

15         A      No, not -- not from Salisbury & Ryan.

16         Q      What about Mr. Ryan?

17         A      He has left the firm.

18         Q      Yes.

19                Have you had any communications with

20   Mr. Ryan since this engagement concluded?

21         A      I have.

22         Q      Approximately how many?

23         A      One or two.

24         Q      In person or by telephone?

25         A      In person.

[Page 52]

1      Q      Or -- or email or any other --

2      A      In person.

3      Q      -- form of communication?

4      A      In person.

5      Q      Okay.  Were they social interactions or

6   business meetings?

7      A      Social interactions.

8      Q      During those social interactions with

9   Mr. Ryan -- first of all, when did they take

10  place?

11     A      I believe within the last year.  After

12  he left the firm.

13     Q      Okay.  Did they occur before or after

14  you became aware that IMR was seeking to take

15  discovery from you in these proceedings?

16            MR. SPERDUTO:  Objection to the form.

17            You can answer.

18            THE WITNESS:  I do not remember.

19  Probably before.  I haven't seen him in a long

20  time.

21      BY MR. COGAN:

22     Q      Did you discuss in the -- in those

23  communications -- withdrawn.

24            Did you discuss in either of those

25  interactions you had with Mr. Ryan anything having

[Page 53]

1    to do with either EuroChem or IMR?

2            MR. SPERDUTO:  To the extent that that

3    asks for the content of communications, you're

4    directed not to answer to the extent it would

5    divulge legal communications or communications for

6    the purposes of providing legal advice.

7            Otherwise, you can answer that.

8            THE WITNESS:  We -- we -- he was not

9    involved in this matter, so we did not discuss

10   this matter.

11       BY MR. COGAN:

12       Q    Since you first were engaged on a

13   matter with either Mr. Ryan or Salisbury & Ryan in

14   2004, 2005, can you give me a rough approximation

15   of what percentage of your income has been derived

16   from the consulting work that you've done for

17   either Mr. Ryan or Patrick Salisbury or the

18   Salisbury & Ryan firm, rough approximation?

19       A    A very small part.

20       Q    Prior to the engagement that's

21   memorialized in Akhmetshin Exhibit 1, had you ever

22   done any work for EuroChem?

23       A    No.

24       Q    And same answer if I said ECVK?

25       A    No.

[Page 55]

1        BY MR. COGAN:

2        Q    Mr. Akhmetshin, I wanted to go back and

3    clarify.  When you said that you traveled to

4    Russia for this engagement, I wanted to make sure,

5    other than traveling to Russia, did you travel

6    anywhere else for this engagement?

7        A    I'm afraid that will violate --

8             MR. SPERDUTO:  That -- that's a yes or

9    no.  Don't -- don't --

10            THE WITNESS:  Oh, okay.  Yes.

11       BY MR. COGAN:

12       Q    Okay.  Where did you travel?

13            MR. SPERDUTO:  That one is -- reveals

14   research and opinions and facts held, so we're

15   going to invoke 26 -- Rule 26.

16            MR. COGAN:  And you're going to

17   instruct not to answer?

18            MR. SPERDUTO:  Yes.  I'm sorry.

19       BY MR. COGAN:

20       Q    Okay.  So other than Russia and this

21   other place that you can't tell me about, did you

22   travel anywhere else for the engagement?

23            MR. SPERDUTO:  Again, that's a yes or a

24   no.

25            THE WITNESS:  Yes.

[Page 56]

1        BY MR. COGAN:

2        Q     Can you tell me -- well, let's do it

3    this way:  How many different places,

4    approximately, did you travel for this engagement?

5        A     About three or four.

6        Q     Okay.  Three or four.

7              So we have Russia, and then we have two

8    or three others?

9        A     Correct.

10       Q     Okay.  And are you able to tell me the

11   location of any of those two or three other

12   places?

13             MR. SPERDUTO:  No.

14             THE WITNESS:  No.  I'm afraid it will

15   violate --

16             MR. SPERDUTO:  I'm directing him not to

17   answer.

18       BY MR. COGAN:

19       Q     Did you meet with people concerning

20   this engagement in any of these two or three other

21   locations that you traveled?

22       A     I did.

23       Q     Who did you meet with?

24             MR. SPERDUTO:  Objection: direct him

25   not to answer under Rule 26(b)(4)(D).

1          BY MR. COGAN:

2          Q      Did you meet with people at each

3    location to which you traveled on this engagement?

4          A      I did, yes.

5          Q      Okay.  So with respect to these two or

6    three other locations to which you traveled,

7    approximately how many meetings total did you

8    have?

9               MR. SPERDUTO:  Objection.

10              THE WITNESS:  I --

11              THE COURT REPORTER:  I can't hear you.

12              THE WITNESS:  I respectfully decline to

13   answer this on the basis of -- what -- the

14   Rule 26 --

15         BY MR. COGAN:

16         Q      Let's just -- let's just make sure the

17   record is clear.

18              MR. COGAN:  Mr. Sperduto, are you

19   instructing him not to answer the question,

20   approximately how many different meetings did he

21   have in these two or three different locations?

22              MR. SPERDUTO:  That's not exactly the

23   question I heard, but the -- the answer is yes

24   because it reveals the scope -- the scope of the

25   privilege under 26(b)(4)(D) is so broad that some

1    courts have said witnesses are immune from

2    discovery.

3              I -- I -- I'm trying to be more

4    discriminating than that.  But that one, I think,

5    crossed the line.

6              MR. COGAN:  Okay.

7         BY MR. COGAN:

8         Q    If you could turn back to Exhibit 1

9    and, in particular, the engagement letter at

10   Exhibit A to Exhibit 1.

11             Okay.  You can actually put that

12   exhibit aside for now.  I'll come back to it

13   later.

14             You mentioned a -- a matter on which

15   you previously worked with attorneys from

16   Salisbury & Ryan in 2004, 2005.

17             What matter were you referring to?

18        A    I worked on two or three matters --

19             THE COURT REPORTER:  I'm sorry.  I just

20   can't hear you.

21             THE WITNESS:  I'm sorry.

22             THE COURT REPORTER:  That's okay.

23             THE WITNESS:  I'm sorry.

24             I worked on two or three matters.

25        BY MR. COGAN:

1    delays.

2              Do you see that?

3        A    Yes.

4        Q    Now, focusing your attention on the

5    "claims it may have" language, does that refresh

6    your recollection that you were engaged prior to

7    the start of litigation between IMR and EuroChem?

8        A    To be honest, I do not remember when

9    they filed, but I -- I -- I do not know --

10       Q    Okay.

11       A    -- because I was not involved in the

12   litigation.

13       Q    You write, You will assist in such --

14   I'm sorry.  You don't write this.

15             They wrote, You will assist in such

16   endeavors by researching and providing information

17   concerning the relevant parties and other

18   requested information.

19             What research were you asked to

20   conduct?

21             MR. SPERDUTO:  Same objection.  That --

22   that's attorney-client; that's work product; and

23   that's 26(b)(4)(D).

24             MR. COGAN:  And you're instructing not

25   to answer?

1          MR. SPERDUTO:  Yes.

2      BY MR. COGAN:

3      Q     The -- the language "and other

4  requested information," do you see that at the end

5  of that sentence?

6      A     I do see that.

7      Q     What is that a reference to?

8      A     Other requested information.

9      Q     Was there specific other information

10  that they asked you to provide in July of 2012?

11          MR. SPERDUTO:  That's a yes-or-no

12  question.  Don't reveal the communication, but you

13  can answer that question.

14          THE WITNESS:  I would say, no.  I just

15  don't remember it was -- if it was just general

16  statement.  I don't remember was -- anything else

17  which was asked from me.

18      BY MR. COGAN:

19      Q     Sitting here today, you don't have

20  anything specific in mind that you think the "and

21  other requested information" relates to?

22      A     No, probably not.  I don't remember.

23      Q     Okay.  Moving down to, Compensation,

24  the letter says, We shall transfer to you on

25  behalf of the client an initial payment of

1    $45,000, and you will bill as discussed as the

2    work progresses.

3              Do you see that?

4        A    I do see that.

5        Q    What was discussed about the billing

6    arrangements?

7              MR. SPERDUTO:  Now, to the extent that

8    he's asking for communications on substantive

9    issues, you're directed not to answer.

10             To the extent that you can answer that

11   without revealing legal communications, if you

12   can, you can answer.

13             THE WITNESS:  I'm afraid that will

14   violate my -- whatever it is, those four rules.

15       BY MR. COGAN:

16       Q    Let -- let's come at it in a slightly

17   different way.

18             Were you billing on an hourly basis?

19       A    No.

20       Q    Okay.  So how did you and

21   Salisbury & Ryan determine how much money they

22   owed you?

23       A    On a timing basis, I think that a

24   weekly, monthly base.

25       Q    Was there --

[Page 64]

1   agreement.  You know, I just said, okay, I would

2   like to get this amount of money, and they agreed.

3        BY MR. COGAN:

4        Q    How much time did you spend on this

5   engagement, approximately?

6        A    A lot of time, actually.  I

7   researched --

8             MR. SPERDUTO:  No, don't talk about

9   your research.

10             THE WITNESS:  I'm sorry.

11             MR. SPERDUTO:  The 26(b)(4)(D) directed

12   not to go there.

13        BY MR. COGAN:

14        Q    I'm not even asking about what -- the

15   substance of what you did.  I'm just asking

16   approximately -- and I know that you're

17   approximating.  I'm asking you to approximate.

18             How much time did you spend working on

19   this engagement?

20        A    It was a fraction of my other work.

21        Q    What percentage, approximately, of your

22   work in 2012 and 2013 -- withdrawn.

23             From the beginning of this engagement

24   in 2012 until the end of the engagement,

25   approximately how much of your work time was

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17          (THIS CONCLUDES THE CONFIDENTIAL -

18    ATTORNEYS' EYES ONLY PORTION.)

19      BY MR. COGAN:

20      Q    Other than what you've already told us

21    about your engagement by Salisbury & Ryan, is

22    there anything else that you are able to share

23    about the instructions that Salisbury & Ryan gave

24    to you concerning this engagement?

25              MR. SPERDUTO:  Objection to the form,

1    first of all.

2              And to the extent you can answer that

3    without revealing -- I -- no, I don't think you

4    can.

5              I'll instruct him not to answer that,

6    attorney-client privilege, 26(b)(4)(D), work

7    product.

8         BY MR. COGAN:

9         Q    You mentioned early in your testimony

10   that one of the things you were engaged to do was

11   research social, economic, legal and financial

12   issues.

13             Do you recall testimony along those

14   lines?

15        A    I do remember mentioning something

16   along those lines.

17        Q    What were the social, economic, legal

18   and financial issues you researched?

19             MR. SPERDUTO:  Hold on a minute.

20             No, he can't answer that.  26(b)(4)(D).

21   That's asking for the facts -- that's asking for

22   exactly what the rule prohibits from being

23   disclosed.

24             You're directed not to answer.

25        BY MR. COGAN:

1      Q     Yes or no, did anyone explain to you

2   why you were being asked to research those issues?

3            MR. SPERDUTO:  Yes or no.

4            THE WITNESS:  Yes.

5      BY MR. COGAN:

6      Q     Who explained?

7      A     The client.

8      Q     Salisbury & Ryan?

9      A     Correct.

10     Q     What did they tell you?

11           MR. SPERDUTO:  Objection:

12   attorney-client privilege; 26(b)(4)(D); work

13   product.

14           I direct you not to answer.

15           MR. COGAN:  Mark this as 2.

16           (Akhmetshin Deposition Exhibit 2 was

17   marked for identification and attached to the

18   transcript.)

19           MR. SPERDUTO:  Dana, are you going to

20   keep the originals?

21           Are we going to come back to this?

22           MR. COGAN:  I think we'll come back to

23   this.

24           Mark this as 3.

25           (Akhmetshin Deposition Exhibit 3 was

1    privilege log which was produced by my attorney.

2         BY MR. COGAN:

3         Q     A few questions about the log.

4               On the first page, in the first entry,

5    do you see under the Author or Custodian field --

6         A     Uh-huh.

7         Q     -- it says, 2703tarazuisun@gmail.com?

8         A     I do see that, yes.

9         Q     Whose email address is that?

10        A     I believe it's an email associated

11   somehow with the former prime minister of

12   Kazakhstan or with his office, his people.

13        Q     Which former prime minister are you

14   referring to?

15        A     I talk about the prime minister of

16   Kazakhstan in, I think, '94, '98 or '93, '97.

17   Mid-'90s.

18        Q     What's his name?

19        A     His name is Akezhan.  It's

20   A-K-E-Z-H-A-N, Akezhan.  Kazhegeldin.  It's

21   K-A-Z-H-E-D-I-L -- I'm sorry, Kazhegel- -- D-I-N,

22   yes -- L-D-I-N.

23        Q     Do you recall that you had

24   communications with him regarding the work that

25   you were doing for Salisbury & Ryan?

[Page 104]

1            MR. SPERDUTO:  To the extent that that

2      invokes Rule 26(b)(4)(D), I'll direct the client

3      not to answer.

4            MR. COGAN:  But the actual pending

5      question is "do you recall that you had

6      communications," which is a yes or no.

7            MR. SPERDUTO:  I understand that.  But

8      the sources of his information, the research he

9      did leads to the facts and opinions held, so I

10     think it's covered by 26(b)(4)(D).

11            MR. COGAN:  Okay.

12            MR. SPERDUTO:  That's my best legal

13     judgment.

14            MR. COGAN:  So you're instructing him

15     not to answer?

16            MR. SPERDUTO:  Yes.

17        BY MR. COGAN:

18        Q    Could you give me the pronunciation of

19     his last name?

20        A    Kazhegeldin.

21        Q    Kazhegeldin?

22        A    Kazhegeldin.

23        Q    Kazhegeldin.

24            What did you discuss with

25     Mr. Kazhegeldin related to either IMR, ENRC or

1    Shaft Sinkers, if anything?

2            MR. SPERDUTO:  First of all, I'll

3    object to the form; and then, second, I'll object

4    on the grounds of Rule 26(b)(4)(D) and direct the

5    witness not to answer.

6            BY MR. COGAN:

7        Q    Where does Mr. Kazhegeldin live now?

8        A    He lives in Europe.

9        Q    Where did he live during the 2012-2013

10   time period?

11       A    He has several residences.

12       Q    In Europe?

13       A    In Europe, yes.

14       Q    Okay.  If you turn to page 3, item 22.

15            Are you there?

16       A    Yes.

17       Q    Who's Ken Silverstein?

18       A    He's a journalist and a researcher.

19       Q    And same questions:  Do you recall

20   having communications with him regarding the work

21   that you were doing for Salisbury & Ryan?

22            MR. SPERDUTO:  And same objection.  And

23   not to be repetitive, but these questions are

24   asking for his specific or may be asking for his

25   specific research undertaken as a consulting

1    expert, which we believe to be immune from

2    discovery under our reading of the cases

3    construe -- construing that rule.  And he's

4    directed not to answer.

5         BY MR. COGAN:

6         Q    Is Mr. Silverstein associated with any

7    particular publication to your knowledge?

8         A    He changes publication every once in a

9    while.

10        Q    Was he associated with any particular

11   publication during the 2012-2013 time period?

12        A    I do not remember.

13             He -- he was, I'm sure, with some

14   publication.

15        Q    Did he publish any articles related to

16   IMR, ENRC or Shaft Sinkers to your knowledge?

17        A    I do not know.

18        Q    Items 55 and 56 on page 7 reflect

19   communications with a Kirstin Ridley.

20             Who is that?

21             MR. SPERDUTO:  Objection.

22             THE WITNESS:  Page --

23             MR. SPERDUTO:  Objection.

24             THE WITNESS:  -- 7; right?

25             MR. SPERDUTO:  You may have misspoke,

[Page 107]

1    or else we have different copies.

2              MR. COGAN:  Page 7, items 55 and 56.

3              MR. SPERDUTO:  I'm sorry.  I'm with you

4    now.  Sorry.

5         BY MR. COGAN:

6         Q    I'm sorry.  Mr. Akhmetshin, are you on

7    page 7, and do you see items 55 and 56?

8         A    I do see items 55 and 56, yes.

9         Q    And you see the reference to a Kirstin

10   Ridley and then to a K. Ridley in the following

11   entry?

12        A    I do see it.

13        Q    That's the same person by the way;

14   right?

15        A    I believe so, yes.

16        Q    Okay.  And who is that person?

17        A    It's a journalist.

18             MR. COGAN:  And, Mr. Sperduto, if I ask

19   the witness the same series of questions about

20   Kirstin Ridley, would you give the same

21   instruction not to answer?

22             MR. SPERDUTO:  Yes, sir, Mr. Cogan,

23   because I believe that goes directly into his

24   research and facts and opinions held regarding the

25   dispute.

[Page 108]

```
 1          BY MR. COGAN:

 2          Q     Page 13, entry 103a.

 3                Do you know who Matthew Feser is?

 4          A     I believe it's a -- a lawyer at

 5     Salisbury & Ryan.

 6          Q     Do you know how -- I'm just looking at

 7     the -- the log, and it indicates that the parties

 8     to this communication were Mr. Feser and

 9     Mr. Salisbury.

10                Do you have any idea how you had this

11     document?

12          A     I do not remember, to be honest.

13          Q     Page 16, entry 131, involves a

14     communication with Daniel Balint-Kurti.

15                Do you know who that is?

16          A     He is a researcher --

17          Q     Is he a journalist?

18          A     -- and a -- no, he's a researcher and

19     activist.

20          Q     What kind of activist is he?

21          A     Transparency activist.

22                THE COURT REPORTER:  I'm sorry?

23                THE WITNESS:  Transparency.  He's a

24     transparency, anti-corruption activist.

25                MR. COGAN:  And just for the record,
```

1    same -- if I ask him the same series of questions,

2    I assume I would get the same objections and

3    instructions not to answer with respect to

4    Mr. Balint-Kurti.

5              MR. SPERDUTO:  Yes, sir.

6         BY MR. COGAN:

7         Q    Page 15- -- excuse me, page 19, item

8    156, Nikos -- how do you pronounce his last name?

9         A    Asimakopoulos.

10        Q    Okay.  Do you know this person?

11        A    Yes, I believe I do.

12        Q    Who is it?

13        A    He's also researcher.

14        Q    A journalist, too?

15        A    I don't believe he's a journalist.

16        Q    When you say a researcher, what does

17   that mean?

18        A    He's one of those, you know, people who

19   research for living, you know, like an analyst.

20        Q    Is he employed somewhere?

21        A    He's also --

22             MR. SPERDUTO:  Form; capacity.

23             Go ahead.

24             THE WITNESS:  I -- I think he also kind

25   of have different assignments or worked with

[Page 112]

1      A      No.

2      Q      No?

3      A      No, it was not a practice.

4      Q      Okay.  How about with respect to any of

5  the work you did in your engagement with

6  Salisbury & Ryan in communications with others?

7  Did you use text message to communicate?

8             MR. SPERDUTO:  Could you rephrase that?

9  You lost me.

10            MR. COGAN:  Sure.

11            MR. SPERDUTO:  I'm sorry.

12     BY MR. COGAN:

13     Q      With respect to the work that you did

14  for Salisbury & Ryan in the engagement that we've

15  been discussing, did you ever use text messages to

16  communicate with anyone?

17     A      I use text messages search engine.

18     Q      Including with respect to the work that

19  you did for Salisbury & Ryan?

20     A      There may or may not have been stuff.

21  I just cannot remember specifics.

22     Q      Page 25, item 207, there's a reference

23  to an attorney named Edward Lieberman.

24            Who is that?

25     A      He is colleague and in many ways my

[Page 113]

1    personal advisor.

2         Q    Okay.  He's a -- when you say he is a

3    colleague, what do you mean by that?

4         A    He and I work on a number of consulting

5    projects together.

6         Q    Did he work on this consulting project

7    with you?

8         A    No.

9         Q    Did you seek advice -- legal advice

10   from him in connection with any of the work that

11   you did for Salisbury & Ryan?

12        A    No.

13             MR. SPERDUTO:  That's a yes -- that's a

14   yes or no -- okay.

15        BY MR. COGAN:

16        Q    It was a "no"?

17        A    "No."

18        Q    Item 207 appears to reflect an email

19   communication dated April 25, 2013, between you

20   and Mr. Lieberman regarding the subject matter of

21   a communication with personal counsel, re, news

22   report.

23             Do you see that?

24        A    Yes, I do see it.

25        Q    And by "personal counsel," is that a

1    reference to the fact that Mr. Lieberman sometimes

2    serves as your personal counsel?

3        A     On some matters, but an advisor mostly.

4        Q     Well, what news report is being

5    referred to here?

6        A     I do not remember specifically.  It

7    must have been some news article.

8        Q     Did it relate to IMR, ENRC or Shaft

9    Sinkers?

10       A     I cannot tell without looking at the

11   email, to be honest.

12       Q     Do you recall ever seeking advice from

13   Mr. Lieberman concerning anything related to IMR,

14   Shaft Sinkers or ENRC?

15           MR. SPERDUTO:  Objection to the form.

16           THE WITNESS:  No.

17       BY MR. COGAN:

18       Q     What about with respect to any of the

19   work that you had been doing for Salisbury & Ryan?

20       A     No.

21       Q     If I could direct your attention to the

22   next page, item 220.

23           Do you see the description of a

24   communication you had with Mr. Lieberman on

25   May 2nd, 2013 related to ENRC shareholders?

1    And, so, there are numerous kind of issues with

2    this labor regulations, with this corruption.

3           ENRC also was active politically

4    because they were carrying favorites with the

5    regime, and they created this numerous --

6    actually, not numerous.  They -- they did create

7    at one point -- actually, so then it goes even

8    further in 2005 -- political party which they kind

9    of sponsored and created and supported for some

10   time in Kazakhstan.

11          So I remember kind of being involved in

12   the issues around that political party.

13          They also were engaged in lobbying

14   campaigns here in the United States and in

15   numerous other -- maybe not ENRC but principal

16   owners of the ENRC were engaged in kind of -- they

17   were trying to carry favorites, as far as I could

18   assume.  And, so, there's numerous lobbying

19   political campaigns here in United States and

20   abroad as well.

21       Q    During the 2012 through current --

22   through present -- from 2012 until present, did

23   any of the work that you did for International

24   Eurasian Institute involve either IMR, ENRC, Shaft

25   Sinkers or ENRC's principals?

[Page 122]

1        A      Could you repeat that again, please?

2        Q      Sure.  Let me actually define what I

3    mean --

4        A      Yes.

5        Q      -- by "principals."

6               I think you -- you mentioned -- and I

7    may be paraphrasing, but the owners of ENRC.

8        A      Yes.

9        Q      Who are you referring to there?

10       A      It's a group which is known as Trio,

11   Troika, a trio.

12       Q      Because there's three of them?

13       A      Three of them, yes.

14       Q      And what are their names?

15       A      Two of them are Uzbek nationals, and

16   one is former Kyrgyz national.  And it's

17   Ibragimov, Shodiyev and Mashkevich.

18       Q      From 2012 until present day, did any of

19   the work that you did for International Eurasian

20   Institute relate to IMR, ENRC, Shaft Sinkers or

21   The Trio?

22       A      Some of it must have been, yes.

23              THE COURT REPORTER:  I'm sorry.  What?

24              THE WITNESS:  Some of the work -- there

25   might have been.  I don't remember specifics.  But

[Page 124]

1      A    Yes.

2      Q    What was the strategic communications

3  strategy that you developed and proposed?

4           MR. SPERDUTO:  He's not asking for a

5  communication.  He's asking for -- let me think

6  for a minute here.

7           This is the last sentence of

8  paragraph 6, Jon?

9           MR. COGAN:  Yes.

10          MR. SPERDUTO:  Or next to the last

11  sentence.

12          MR. COGAN:  Yes.  Sorry.

13          MR. SPERDUTO:  Well, I -- I think

14  that's 26(b)(4)(D), so I'm going to direct him not

15  to answer.

16      BY MR. COGAN:

17      Q    When -- what did you mean in this

18  affidavit by strategic communications strategy?

19          What does that mean just generally?

20  What is a commun- -- what is a strategic

21  communications strategy?

22      A    I think it's the way people tell their

23  story, kind of tell -- tell their side of the

24  story.

25      Q    In the press?

1      A      In the press, in -- in different

2  forums, yes.

3      Q      Well, besides the press, what other

4  forums would the term "strategic communications

5  strategy" involve, as you use it?

6      A      Legislative action as well.

7      Q      In the United States or elsewhere?

8      A      We're talking -- you ask in general

9  so --

10     Q      In general.

11     A      In general, everywhere.

12     Q      Okay.

13     A      That's just the nature of general

14  questions.  There are different forums,

15  legislative and media forums.

16     Q      In this affidavit you say, In the

17  course of my engagement, I also developed and

18  proposed to ECVK a strategic communications

19  strategy.

20          Are you intending here to draw a

21  distinction between something that you proposed to

22  Salisbury & Ryan versus ECVK or -- or are you not

23  intending to draw a distinction there?

24     A      I was engaged by Salisbury & Ryan as a

25  consulting expert, so that's -- I would assume

[Page 126]

1    that was for Salisbury & Ryan's kind of

2    consumption and --

3         Q    Right.

4              So what I'm basically getting at is

5    the -- the proposal you made was directed to

6    Salisbury & Ryan; is that right?

7         A    Yes.

8         Q    Why was it rejected?

9         A    I do not know.

10             MR. SPERDUTO:  The -- okay.

11             THE WITNESS:  Sorry.

12             MR. SPERDUTO:  Give me a shot, okay.

13             THE WITNESS:  Sorry.

14        BY MR. COGAN:

15        Q    Did you have any communications with

16   Salisbury & Ryan in which they told you why it was

17   being rejected?

18             MR. SPERDUTO:  That's a yes or a no.

19   You can --

20             THE WITNESS:  Yes.

21        BY MR. COGAN:

22        Q    What did they tell you?

23             MR. SPERDUTO:  That's not --

24   attorney-client privilege, 26(b)(4)(D).

25             Direct you not to answer.

[Page 149]

1          THE WITNESS:  -- do not -- to be

2    honest, I do not know to what the author referred

3    here.

4          BY MR. COGAN:

5          Q     Okay.  The author writes that you

6    burrowed in with Washington reporters.

7                Do you see that?

8          A     Yes.

9          Q     Do you have close relationships with

10   Washington reporters?

11         A     I have some.

12         Q     What about with reporters in places

13   other than Washington, D.C.?  Do you have close

14   relations with a number of different reporters?

15         A     I know some reporters.

16         Q     And strategic -- you -- we discussed

17   earlier a reference in your affidavit to a

18   strategic communications campaign.

19         A     Uh-huh.

20         Q     Would it be fair to characterize the

21   work that you were doing for Mr. Kazhegeldin in

22   your lobbying effort to be a strategic

23   communications campaign?

24         A     It could be described as strategic

25   communications effort, yes.

[Page 150]

1       Q       Would you describe it that way?

2       A       I would describe it, yes.  It has

3   all -- as we discussed with the strategic

4   communication, it's -- it's outreach, both media

5   and legislative outreach, which was done in this

6   case.  Both of those requirements were fulfilled.

7       Q       Now, when you burrow in with reporters

8   in connection with the strategic communications

9   campaign, is your goal to persuade them to write

10  articles?

11              MR. SPERDUTO:  Form.

12              THE WITNESS:  This is -- exactly goes

13  to the point of notice because I never studied

14  English formally.  And "burrowing," it's a -- it's

15  a term that kind of I would understand it in the

16  context, so I would -- in the context of this

17  sentence, I would understand what it means.

18              But, literally, I don't know.

19  Burrowing, that's what animals do; right?  Just --

20  just -- right?

21      BY MR. COGAN:

22      Q       Let me --

23      A       When you go -- when you go -- could you

24  define the word, actually?

25      Q       Sure.  Let -- I'll -- let me ask it a

[Page 151]

1    different way.

2              When you conduct a strategic

3    communications campaign for a client, is it your

4    practice to convince or attempt to persuade

5    reporters to write favorable articles about your

6    clients?

7              MR. SPERDUTO:   Form.

8              You can answer.

9              THE WITNESS:   I try not to persuade

10   anyone in doing that because I try to present

11   story and present some facts, and I do encourage

12   journalists to look into my client matters.

13             But it's really up to reporter and his

14   editor to do that.   And I think that in

15   Washington, D.C., there's this whole practice of

16   kind of -- it's very common.   And I'm sure even it

17   might be -- I don't know if your firm does

18   lobbying, but a lot of law firms here are enrolled

19   in this work here.

20             And I think that -- and I've sat

21   through enough pitch meetings where people say,

22   okay, we're so close; we have, like, editorial

23   board and journal and just we'll get you done.

24   And usually at these dictatorships they engage

25   firms like that.   But, in my experience, I think

1    that it's -- it never works like that.

2              So I think that respectable

3    publications, they do try to hear or research both

4    sides of the stories.  And sometimes it's helpful

5    to read the stories, but some stories could be

6    obscure and people don't know them.

7              But, in general, I -- I don't believe I

8    ever tried to persuade people to do that.  I

9    inform them, and I kind of gave them an option to

10   research it and provide some assistance in that

11   research.  That's probably would be -- "persuade"

12   would not be an accurate term.

13        BY MR. COGAN:

14        Q    Is it your hope when you have these

15   communications with reporters about your clients

16   and the subject matter of your retention by those

17   clients that they will write articles that are

18   favorable to your clients?

19              MR. SPERDUTO:  Form.

20              THE WITNESS:  It is my intention to get

21   the story out, and favorable -- yes, I would say

22   yes.

23        BY MR. COGAN:

24        Q    And unfavorable to your clients'

25   adversaries --

[Page 160]

1      Q      Any reason to believe it's not an

2  accurate reflection of that email communication?

3      A      No, I don't have reasons to believe.

4      Q      Did Mr. Balint-Kurti ever meet with

5  Patrick Salisbury?

6             MR. SPERDUTO:  Objection: form;

7  capacity.

8             THE WITNESS:  I do not know, actually.

9      BY MR. COGAN:

10     Q      Do you recall ever attending a meeting

11 where both of them were present?

12     A      I never attend such meeting.

13     Q      Did Mr. Salisbury or Mr. Balint-Kurti

14 report to you that they had met?

15     A      I do not remember them reporting --

16 either of them reporting to me.

17     Q      Did you have any discussions with

18 Mr. Balint-Kurti about IMR, The Trio, ENRC or

19 Shaft Sinkers?

20             MR. SPERDUTO:  That question can be

21 answered yes or no.  I just would alert the

22 witness again that to the extent any further

23 answer would implicate the 26(b)(4)(D) privilege,

24 be cognizant of that and steer clear.

25             THE WITNESS:  Okay.

[Page 161]

1              Yes, I have discussion with

2     Mr. Balint-Kurti.

3         BY MR. COGAN:

4         Q      Okay.  What did you discuss?

5              MR. SPERDUTO:  Objection.  Direct the

6     client not to witness [sic] on the basis of

7     26(b)(4)(D).

8              MR. COGAN:  Could you mark this,

9     please?

10             (Akhmetshin Deposition Exhibit 7 was

11    marked for identification and attached to the

12    transcript.)

13        BY MR. COGAN:

14        Q      Mr. Akhmetshin, I'm showing you a

15    document Bates stamped AKH819 through -821.  This

16    is an email that you wrote to somebody; correct?

17        A      Correct.

18        Q      And who is this email to?

19        A      It's an acquaintance of mine.

20             THE COURT REPORTER:  I'm sorry?

21             THE WITNESS:  I'm sorry.  It's an

22    acquaintance of mine.

23        BY MR. SPERDUTO:

24        Q      And does this acquaintance have a name?

25        A      His name is Sergie Minaev.

[Page 164]

1    just to inform Minaev about changes in this

2    procedure -- listing procedures on the stock

3    exchange --

4        Q     Did you have --

5        A     -- upcoming -- I'm sorry.  About

6    upcoming, I think, or maybe -- so something

7    just -- it has nothing to do with Salisbury & Ryan

8    matter.

9        Q     Did you have any discussions with

10   Mr. Minaev about the work that you had done for

11   Salisbury & Ryan?

12       A     I did not -- I generally do not discuss

13   my work with other people for our clients.

14       Q     So is that a, "no," that you didn't

15   have --

16       A     Normally I might have mentioned that

17   I've been involved in a matter, but without giving

18   specifics.

19       Q     So you don't recall any conversations

20   you had where you had specific discussions with

21   him about the specifics of what you did for

22   Salisbury & Ryan?

23       A     I did not do -- I do not remember such

24   conversation with Mr. Minaev.

25       Q     Do you know Scott Horton?

[Page 165]

1        A        I do know Scott Horton.

2        Q        Who is Scott Horton?

3        A        He's an attorney and an author.

4        Q        I'm sorry.  He's an attorney -- oh, and

5   an author, okay.

6        A        An author.

7        Q        Where does he practice law?

8        A        New York and in Europe, I guess, as

9   well.

10       Q        Has he ever engaged you as a consulting

11   expert or otherwise?

12       A        No.

13       Q        Has he ever represented you?

14       A        No.

15       Q        Have you ever had any communications

16   with Mr. Horton, yes or no, about the work that

17   you were doing for Salisbury & Ryan?

18       A        Yes.

19       Q        Okay.  Approximately how many?

20       A        One or two, maybe.

21       Q        What did you discuss?

22       A        I don't think I could share without

23   divulging --

24                MR. SPERDUTO:  Okay.  That's my cue.

25   I'm sorry.  To the extent this requires a response

[Page 166]

1    that invokes the privilege under Rule 26(b)(4)(D),

2    the client -- the witness is directed not to

3    answer.

4              MR. COGAN:  Will you mark this, please?

5              (Akhmetshin Deposition Exhibit 8 was

6    marked for identification and attached to the

7    transcript.)

8        BY MR. COGAN:

9        Q    Mr. Akhmetshin, I'm showing you a

10   document that's been marked Akhmetshin Exhibit 8.

11   It is a four-page document Bates stamped AKH000871

12   through -874.

13             Do you recognize this?

14       A    It looks familiar, yes.

15       Q    Okay.  Is this an email exchange that

16   you had with Mr. Horton?

17       A    It is.

18       Q    And is this a true and correct copy of

19   that email exchange?

20       A    On the first review, it does appear

21   correct.

22       Q    I'll direct your attention to the

23   email -- the second to top email in the chain from

24   Scott Horton to you sent on May 28th, 2013, at, it

25   looks like, 3:20 p.m.

1                     Do you see that?

2         A     May 20 what --

3         Q     Sorry.  Go on the first page, page 71.

4         A     All right.

5         Q     And do you see -- not the top email

6    that says, Got it, but rather the email below

7    that?

8         A     I do see it, yes.

9         Q     Okay.  So this appears to be an email

10   from Mr. Horton to you sent on May 28th, 2013.

11   And, at least according to the time stamp, it was

12   sent at -- I'll call that 3:20 p.m., okay?

13        A     Okay.

14        Q     The subject line is Mashkevich.  Is he

15   one of the members of The Trio?

16        A     He is a member of The Trio, Mashkevich,

17   yes.

18        Q     In this email Mr. Horton provides you a

19   list of terms.

20                    Do you see that?

21        A     Yes.

22        Q     What was your understanding about why

23   he was providing these to you?

24                    MR. SPERDUTO:  Form; capacity.

25                    If you know.

[Page 168]

1          THE WITNESS:  He described it in his

2    previous email from May 21st stamped at 7:53 a.m.,

3    the next page, bottom.

4          BY MR. COGAN:

5          Q     Right.

6                So the email that you're referring to

7    is an email that Scott Horton sends to you with

8    the subject line ENRC, that says, Rinat, I am

9    studying connections between ENRC -- ENRC and Beny

10   Steinmetz and have recently heard a good bit about

11   dealings between Mash- -- Mashkevich and Steinmetz

12   related to Guinea.  Any chance you know about

13   this?  Love to catch up.

14               That's the email you're referring to?

15         A     Yes.

16         Q     Okay.  So just going back now to the

17   email that I was asking you about, you see how

18   there's a list of -- well, it's about eight names,

19   and then a list of five entities in that email?

20         A     Uh-huh.  Yes.

21         Q     Did you have an understanding as to why

22   he was sending you these names?

23         A     I think this was a part that's already

24   gotten to the point of my research which I was

25   doing for Salisbury & Ryan.

1      Q     I don't understand.  Could you please

2  explain that a little bit more?

3      A     You know, this email has -- it

4  refers -- you know, just as a part of my research

5  I was doing for Salisbury & Ryan.

6      Q     Okay.

7      A     Sorry.

8      Q     And did you --

9            THE WITNESS:  Is it --

10  BY MR. COGAN:

11      Q     Sorry.  Go ahead.

12            THE WITNESS:  Do you think it's all

13  right to discuss it?

14            MR. SPERDUTO:  I was under the

15  misimpression, apparently, that this was Scott

16  Horton's research for an article about Beny

17  Steinmetz and ENRC.  If it's Mr. Horton's

18  research, I think you can discuss it.  If it

19  involves your research or what you're doing on

20  behalf of Salisbury & Ryan, then you cannot

21  discuss it.

22            THE WITNESS:  This --

23            MR. SPERDUTO:  And I can't tell what

24  the hell this is about, so you're going to have to

25  make that judgment on your own.

1          BY MR. COGAN:

2      Q     So here let -- let me withdraw the

3   question and ask it again just so there's clarity

4   about what I'm asking you.

5              Why was he sending you a list of search

6   terms, if you know?

7              MR. SPERDUTO:  Excuse me.  Objection to

8   the form, "search terms."

9              THE WITNESS:  I don't think this has

10  search terms.

11         BY MR. COGAN:

12     Q     Why was he sending you a list of terms,

13  if you know?

14     A     This has something to do with the

15  research I was doing on behalf of

16  Salisbury & Ryan.

17     Q     What does this have to do with the

18  research you were doing?

19             MR. SPERDUTO:  Well, that's -- that's a

20  26(b)(4) objection.

21             MR. COGAN:  And instruction not to

22  answer?

23             MR. SPERDUTO:  Yes, based on his prior

24  answer.  He said it had to do with his research.

25         BY MR. COGAN:

1      Q     The next -- the email at the -- at the

2   top of the chain, the -- do you see that you

3   acknowledge receipt seven minutes later?

4      A     Correct.

5      Q     Okay.

6            (Akhmetshin Deposition Exhibit 9 was

7   marked for identification and attached to the

8   transcript.)

9            BY MR. COGAN:

10     Q     Okay.  Mr. Akhmetshin, I'm showing you

11   a document that's been marked Akhmetshin

12   Exhibit 9, a one-page email Bates marked

13   AKH000877.

14            Do you see that the bottom email in the

15   chain is sent about two and a half hours after --

16   appears, at least, as though it --

17     A     Uh-huh.

18     Q     -- was sent about two and a half hours

19   after you acknowledged receipt of Mr. Horton's --

20     A     Uh-huh.

21     Q     -- list of terms --

22     A     Uh-huh.

23     Q     -- from the prior exhibit.

24     A     Uh-huh.

25     Q     Yes?

[Page 172]

1      A     Yes.

2      Q     Okay.  And what did you send Mr. Horton

3   along with this email?

4      A     I don't believe I send anything to

5   Mr. Horton along with this email.  If you read the

6   email very carefully, it says, The first document

7   is very interesting and matches the information we

8   had previously collected.

9      Q     Let me -- let me just stop you for one

10   moment.  I'm looking at the bottom email --

11      A     Uh-huh.

12      Q     -- from you to Scott Horton sent

13   Tuesday, May 28th, at 5:50 p.m.

14      A     Uh-huh.

15      Q     Do you see that?

16      A     Yes.

17      Q     And I'll represent to you that nothing

18   in -- nothing was attached to this email in the

19   production that we received from you --

20      A     There's nothing --

21      Q     -- through your counsel.

22            So what I'm trying to understand is

23   what was this email?  Did you really -- did you

24   have something attached to it?  Were you sending

25   him something?

[Page 173]

1      A     I don't remember there was

2   something that might of -- you know, sometimes

3   stuff just goes off.  I -- I'm not sure whether

4   there was anything attached to this, because if

5   there's attachment, it would indicate there was an

6   attachment.

7      Q     Okay.  Could you turn back to the

8   privilege log for a moment, please?  Sir, the

9   privilege log.

10     A     I'm sorry.

11           MR. SPERDUTO:  Four, Exhibit 4.

12   BY MR. COGAN:

13     Q     Sorry.  Exhibit 4.  Sorry.

14     A     Yep.

15     Q     I'll direct your attention on the

16   privilege log to page 29, entry 247.

17           Does this entry reflect -- refresh your

18   recollection that you, in fact, sent Mr. Horton an

19   email and attachments on that day?

20     A     I do not remember specific exchange of

21   emails.  I remember general discussion, which I

22   was doing research because Mr. Horton was also

23   doing some research, and this has something to do

24   with me gathering information for the

25   Salisbury & Ryan litigation.

[Page 174]

1      Q     Right.  And if you look now back to

2   Exhibit 9 --

3      A     Uh-huh.

4      Q     -- Mr. Horton writes -- in response to

5   your email from 5:50 p.m. on the 28th, he writes

6   on the 29th at 3:19 p.m., The first item is very

7   interesting.

8            Do you see that?

9      A     Uh-huh.

10     Q     What item is he referring to here?

11     A     I do not remember.

12     Q     Is it a fair assumption that he's

13   referring to what you had just sent him in the

14   previous email?

15     A     I cannot tell.  We had a discussion.

16   I've known him for a long time, so we had a

17   discussion about -- I was gathering research for

18   Salisbury & Ryan on behalf of Salisbury & Ryan

19   about these matters related to their litigation.

20     Q     Mr. Horton writes, The first item is

21   very interesting and matches the information we

22   had previously collected.

23            Do you see that?

24     A     Uh-huh.

25     Q     What information that had been

1   previously collected was Mr. Horton referring to

2   to your knowledge?

3           MR. SPERDUTO:  Objection to the form.

4           THE WITNESS:  To be honest, I do not

5   remember exactly what he had in mind.  We had

6   conversations about my research, and I was

7   contacting him about this research.

8       BY MR. COGAN:

9       Q    Even if you don't remember exactly what

10  this was referring to, do you have a general

11  understanding about what Mr. Horton was referring

12  to in this email?

13          MR. SPERDUTO:  Objection: capacity.

14          THE WITNESS:  I do not know.

15      BY MR. COGAN:

16      Q    Do you recall sending research to

17  Mr. Horton?

18      A    Not Salisbury & Ryan's research.

19      Q    Do you -- okay.  Do you recall sending

20  other research to Mr. Horton?

21      A    I don't remember.

22      Q    At no time -- to the best of your

23  recollection, at no time did you send Mr. Horton

24  the research that you had been doing for

25  Salisbury & Ryan?

1      A      To the best of my recollection, I have

2   not shared my research.

3      Q      And, to the best of your recollection,

4   is it also correct that you did not speak to

5   Mr. Horton in furtherance of the research you were

6   doing for Salisbury & Ryan?

7      A      That would be the discussion of my

8   forms and methods of obtaining research.

9      Q      But that's -- what I'm asking you is,

10  did you obtain research from Mr. Horton in

11  connection with the work that you were doing for

12  Salisbury & Ryan?

13             MR. SPERDUTO:  That gets to 26(b)(4)(D)

14  and direct him not to answer.

15             MR. COGAN:  The -- the question of

16  simply did he obtain it --

17             MR. SPERDUTO:  Yeah.

18             MR. COGAN:  -- without divorce from

19  what --

20             MR. SPERDUTO:  That reveals the source.

21  We're not going to reveal sources for his research

22  and things like that from -- depending on the

23  answer.

24             THE WITNESS:  I've been engaged with

25  him forever.  I've known Mr. Horton for years, and

[Page 177]

1    I often help him with -- kind of compare notes.

2    He's also a human rights lawyer, and he is doing

3    work against corruption.

4              MR. SPERDUTO:  Rinat, can you do me a

5    favor and wait for a question next time?

6              THE WITNESS:  Okay.

7              MR. COGAN:  Can you mark this, please?

8              (Akhmetshin Deposition Exhibit 10 was

9    marked for identification and attached to the

10   transcript.)

11        BY MR. COGAN:

12        Q    Sir, I'm showing you Akhmetshin

13   Exhibit 10, which is AKH000879 through 880.

14             Do you see that in several of these

15   emails the word "privileged" appears?

16        A    Yes, I notice that.

17        Q    Okay.  And is it correct that these

18   emails actually contained text that had been

19   redacted from this email that was produced to us?

20             MR. SPERDUTO:  I'm not sure he knows

21   how to answer that since he didn't do the

22   redaction.  The redaction would have done by --

23   been done by folks in my office, and that's what

24   it appears like to me as well.

25             MR. COGAN:  Okay.

1      BY MR. COGAN:

2      Q     In your preparation for this

3   deposition, did you review an unredacted version

4   of this email?

5      A     I don't remember reviewing this email.

6      Q     Yes or no, do you recall what was being

7   discussed in this email?

8      A     I don't remember.

9            MR. SPERDUTO:  I'm sorry.  This was 10,

10   correct, Jonathan?

11           MR. COGAN:  Yes.

12      BY MR. COGAN:

13      Q     Are you familiar with the law firm

14   Herbert Smith?

15      A     I heard the name.

16      Q     Okay.  Do you have any knowledge as to

17   whether that -- well, what do you know about them?

18      A     It's a law firm in London, I think.

19      Q     Okay.  Do you have any knowledge as to

20   what role, if any, Herbert Smith played in

21   representing any of the entities that we've been

22   discussed today?

23      A     I think they would have been involved

24   with some entities.

25      Q     Do you remember on which side they were

1   involved?

2        A     I think on the side of The Trio.

3        Q     Okay.

4              THE COURT REPORTER:  On the side?

5              THE WITNESS:  On the side of The Trio.

6   BY MR. COGAN:

7        Q     Okay.  And, to be clear, when you say

8   "The Trio," I take it what you mean is that it's

9   your understanding that Herbert Smith was involved

10  in one of the companies -- representing one of the

11  companies associated with The Trio?

12       A     It was my understanding, yes.

13       Q     And was that your understanding back in

14  2012 and 2013 when you were working on this

15  matter?

16       A     I don't remember, but I think that was

17  probably knew to me before.

18              MR. SPERDUTO:  I'm sorry.  Probably

19  what?

20              THE WITNESS:  I might have known it

21  before then.

22              MR. SPERDUTO:  Before 2012.

23              MR. COGAN:  Will you mark this, please?

24              (Akhmetshin Deposition Exhibit 11 was

25  marked for identification and attached to the

1    transcript.)

2         BY MR. COGAN:

3         Q     Okay.  I'm showing you a document

4    that's been marked Akhmetshin Exhibit 11, Bates

5    stamped AKH000832 through -833.

6               Do you see that?

7         A     Yes.

8         Q     This is an email exchange that you had

9    with a Simon Goodley; is that correct?

10        A     Correct.

11        Q     Who is Simon Goodley?

12        A     He's a reporter in Guardian newspaper.

13              THE COURT REPORTER:  He's an importer

14    what?

15              THE WITNESS:  He's an reporter for the

16    newspaper called Guardian.

17        BY MR. COGAN:

18        Q     Okay.  Mr. Goodley writes to you on

19    May 3rd, 2013, Hi Rinat.  Do you have any Herbert

20    Smith emails?  Somebody is telling me I should

21    have a look.

22              Do you see that?

23        A     I do see it.

24        Q     What's your understanding as to why

25    Mr. Goodley was asking you if you had Herbert

1    Smith emails?

2              MR. SPERDUTO:  Form; capacity.

3              THE WITNESS:  I know that Mr. --

4              I could answer; right?

5              MR. SPERDUTO:  Yeah.

6              THE WITNESS:  I know that Simon Goodley

7    was covering ENRC and The Troika in -- in their

8    dealings in London, and I know that he has written

9    extensively about them.  And he was just reaching

10   out for information.

11        BY MR. COGAN:

12        Q    What ever would have given Mr. Goodley

13   the impression that you might have emails of

14   Herbert Smith?

15             MR. SPERDUTO:  Form.

16             THE WITNESS:  I -- I really don't know.

17   He -- you know, people often ask me for

18   information, and there's thing called London

19   information bazaar, almost, like, you know,

20   exchange bazaar, where people -- people kind of

21   exchange information.

22             So it might be -- you know, people

23   reach out to a lot of different people.

24        BY MR. COGAN:

25        Q    Okay.  The London information bazaar,

[Page 182]

1    is that a formal --

2         A     It's in- --

3         Q     -- title?

4         A     -- -formal.

5         Q     And do you participate in the London

6    information bazaar?

7         A     From time to time.

8         Q     And -- the -- at the time you received

9    this email, you understood that Herbert Smith

10   represented a company associated with the

11   adversary of your client; is that right?

12        A     Yes.  Probably, yes.

13        Q     Okay.  And did you have any Herbert

14   Smith emails during that time period?

15        A     Not to my recollection.

16        Q     Did you have during that time period

17   any internal documents belonging to IMR?

18        A     I have no recollection of that.

19        Q     Did you have any documents belonging to

20   ENRC?

21        A     I don't have recollection of that.

22        Q     How about Shaft Sinkers?

23        A     I don't have recollection of that.

24        Q     You respond, Let me research and get

25   back.

[Page 183]

1              Do you see that?

2    A     Correct.

3    Q     What were you going to research?

4    A     See whether --

5              MR. SPERDUTO:  I don't know -- just

6    a -- this -- is this unrelated to the research

7    you're doing for Salisbury & Ryan?

8              THE WITNESS:  It may or may not be

9    related to research because I've been --

10             MR. SPERDUTO:  Well, to the extent it's

11   not --

12             THE WITNESS:  I would say --

13             MR. SPERDUTO:  -- related, you can

14   answer.  To the extent it is related to your

15   research, you are directed not to answer under

16   26(b)(4).  I can't tell what this research is.

17             THE WITNESS:  I would say, you know,

18   just I was still engaged, and I think that there

19   was this was part of reaching out to some people

20   in this information exchange bazaar, so I said I

21   might research it.

22   BY MR. COGAN:

23   Q     So did you reach out to people in the

24   information exchange bazaar to see if they could

25   obtain copies of Herbert Smith emails?

[Page 184]

1        A        I do not remember that.

2        Q        Did you do anything else to research

3    whether you could obtain Herbert Smith emails?

4        A        I don't remember that.

5        Q        Did you check your own files to see if

6    you had in your possession Herbert Smith emails?

7        A        I didn't need to check it.  I didn't

8    have it.

9        Q        At any point -- can you tell me all the

10   people who you know who participate in the

11   information exchange bazaar?

12       A        There's probably hundreds, if not

13   thousands people.

14       Q        How many people do you know?  Hundreds?

15       A        Not hundreds, no.

16       Q        Okay.

17       A        A handful.

18       Q        Who do you know that participates in

19   the information exchange bazaar?

20       A        I know Mr. Kazhegeldin.  He is a big

21   part of Kazakhstan-related matters in -- in

22   London.

23       Q        Who else?

24       A        A few reporters, I would say.

25       Q        Which reporters?

1      Q      If you turn to the next page, page 3 --

2      A      Uh-huh.

3      Q      -- paragraph 10, Mr. Phanartzis --

4  Phanartzis' affidavit states, The next morning, on

5  January 30, 2014 at approximately 11:15 a.m., we

6  observed Mr. Akhmetshin entering the Cafe Royal

7  Coffee Shop on Regent Street.

8             Do you see that?

9      A      I do see this.

10     Q      Have you ever been to the Cafe Royal

11  Coffee Shop?

12     A      I believe I did visit that location.

13     Q      Were you there on January 30th, 2014?

14     A      Most likely, yes.

15     Q      Paragraph 12, At approximately

16  11:25 a.m., Mr. Akhmetshin was joined by an

17  unidentified businessman who appeared to be in his

18  40s.

19             Do you see that?

20     A      Yes, I do see it.

21     Q      And it says the businessman was

22  carrying a laptop.

23     A      Uh-huh.

24     Q      Do you have an understanding as to who

25  this businessman was?

[Page 190]

1      A     It was a client in a research project I

2    was doing.

3      Q     Who was the client?

4      A     This Israeli businessman, Mr. Halpert.

5      Q     Could you -- could you spell that name?

6      A     Halpert, H-A-L-P-E-R-T.  Halpert.

7      Q     What's his first name?

8      A     Barukh.

9      Q     Can you spell that?

10     A     B-A-R-U-K-H, I think, or H.

11     Q     Okay.  Paragraph 13 says, After

12   exchanging pleasantries, Mr. Akhmetshin handed the

13   businessman an external hard drive and stated that

14   it contained internal documents and emails from

15   IMR.

16           Did you ever provide Mr. Halpert with

17   an external hard drive of documents?

18     A     I believe I have given Mr. Halpert an

19   external drive.

20     Q     Did those documents contain --

21   withdrawn.

22           Did that hard drive contain documents

23   and emails from IMR?

24           MR. SPERDUTO:  Objection to the form.

25           THE WITNESS:  I don't believe it was

[Page 191]

1   with IMR.  I think Mr. Halpert's interest was with

2   Kazakhstan assets, so it was probably something

3   about The Trio.

4        BY MR. COGAN:

5        Q    What was Mr. Halpert's interest with

6   The Trio?

7             THE WITNESS:  Can I just discuss these

8   matters?  In the Halpert case -- he has a -- was a

9   client at that time, Halpert.

10            MR. SPERDUTO:  Would you --

11            THE WITNESS:  It was --

12            MR. SPERDUTO:  -- like to --

13            THE WITNESS:  -- a research project

14   and --

15            MR. SPERDUTO:  Would you like to

16   discuss this off the record or --

17            MR. COGAN:  We can go off the record.

18   Let me withdraw the question and just ask a couple

19   of foundational questions.  Okay?

20            MR. SPERDUTO:  Yeah.

21        BY MR. COGAN:

22        Q    Was Mr. Halpert engaged in litigation

23   at the time he engaged you?

24        A    He mentioned that they are considering

25   legal actions.

[Page 192]

1      Q      Is he a lawyer?

2      A      Yes, I think he's a lawyer.  He is a

3  lawyer, yes.

4      Q      Where is he admitted?  Do you know?

5      A      I know that he went to law school in

6  England, and I think somewhere in Israel.  I do

7  not know for a fact.

8      Q      You said, "He mentioned that they are

9  considering legal actions."  Who's "they"?

10      A      His company or his clients.

11      Q      Who is his company?

12      A      He has an entity in Israel which is

13  involved in work in former Soviet -- not just

14  former Soviet Union, but in -- around the world.

15      Q      And did you have an understanding as to

16  what this litigation involved?

17      A      It had to do with assets exchange or

18  acquisition.

19      Q      There was a potential litigation

20  involving either an asset exchange or an

21  acquisition; is that what you testified to?

22      A      It's potential litigation on the

23  ownership of assets.

24      Q      Did any litigation ever get filed to

25  your knowledge?

[Page 193]

1      A      I am not sure.

2      Q      Is Mr. Halpert still a client of yours?

3      A      No.

4      Q      No?

5      A      I -- he recently appeared, so it's just

6  on -- I haven't heard from him in a long time, but

7  he recently was in Washington, and I met with him.

8      Q      Did you ever sign an engagement letter

9  with either Mr. Halpert or anybody associated with

10 him?

11     A      We had a verbal agreement.

12     Q      Did you ever sign an engagement letter

13 with anybody associated with Mr. Halpert?

14     A      I don't remember.  I might have.  I do

15 not remember exactly.

16     Q      Did you ever get paid any money by

17 either Mr. Halpert or anyone associated with him?

18     A      Yes, I have been paid.

19     Q      Was that payment in connection with

20 this contemplated litigation that you were

21 describing earlier?

22     A      Just payment with this expert research.

23     Q      Was the expert research that you were

24 doing in connection with the contemplated

25 litigation?

1       A       Correct.

2       Q       How is that payment made?  Like,

3   electronically; was it a wire; a check; cash?

4       A       I think it was a wire.

5       Q       Where had you obtained the documents on

6   the hard drive that you gave to Mr. Halpert?

7       A       On London information exchange bazaar.

8       Q       From whom?

9       A       From one of the participants in that

10  bazaar.

11      Q       Who -- which participant on the bazaar

12  did you obtain those documents from?

13      A       Mr. Kazhegeldin.

14      Q       Where did Mr. Kazhegeldin obtain the

15  documents?

16              MR. SPERDUTO:  Objection: form;

17  capacity.

18              THE WITNESS:  I honestly don't know.

19          BY MR. COGAN:

20      Q       Did you ask him?

21      A       No.

22      Q       Did he tell you?

23      A       No.

24      Q       Can you tell me about the circumstances

25  under which Mr. Kazhegeldin gave these documents

[Page 195]

1    to you?  In other words, did you ask him for

2    documents; did he just voluntarily give them to

3    you; or how did that happen?

4              MR. SPERDUTO:  Objection to form; calls

5    for a narrative.

6              THE WITNESS:  Should I --

7         BY MR. COGAN:

8         Q    You can answer.

9              THE WITNESS:  -- answer?

10        BY MR. COGAN:

11        Q    Yes.

12        A    As a part of my work for Mr. Halpert, I

13   introduced him to Mr. Kazhegeldin, so we had -- we

14   had the one meeting, very long meeting.  And -- so

15   it came as a result of the meeting.

16        Q    What documents were contained on the

17   external hard drive?

18             MR. SPERDUTO:  Objection to the form;

19   capacity.

20             THE WITNESS:  Some data, I'd say.

21             THE COURT REPORTER:  Some what?

22             THE WITNESS:  There -- there's some

23   data, I think; they're documents, files.

24        BY MR. COGAN:

25        Q    Emails?

[Page 196]

1      A      It might have been emails as well.

2      Q      Did you review these documents before

3   you handed them off to Mr. Halpert?

4      A      Not really.

5      Q      You don't look at them?

6      A      Some general -- I had some general

7   understanding what it was, but Mr. Kazhegeldin

8   told me.

9      Q      What was your general understanding of

10  what it was?

11     A      It was some background information

12  about these issues which Mr. Halpert was

13  interested in.

14     Q      Which were what?

15     A      The standing of -- Trio's standing in

16  the Kazakhstan.

17             THE COURT REPORTER:  The what?

18             THE WITNESS:  Trio's -- Trio's, this

19  group of people, standing in Kazakhstan.

20     BY MR. COGAN:

21     Q      What did you tell Mr. Halpert at the

22  coffee shop about the documents that you were

23  giving him?

24             MR. SPERDUTO:  To the extent that he's

25  a lawyer and you were having that discussion in a

[Page 197]

1    legal context and the communication was for

2    purposes of rendering legal advice, you're

3    directed not to answer.  Otherwise, you can

4    answer.

5              THE WITNESS:  No, it's -- I think

6    that -- Halpert was very clear about sensitivity

7    of this issue, so it's my work for him.

8              MR. COGAN:  You're instructing him not

9    to answer, Counsel?

10             MR. SPERDUTO:  I'm not -- is there a

11   pending question or -- I guess I am for now.

12   Yeah, let me -- let me instruct him not to answer

13   now based on his last response.

14             And if you want me to -- if you want to

15   take a break -- short break and we can clarify

16   this a little bit privately, then we can be more

17   prompt in our objections.

18             MR. COGAN:  Okay.  Go ahead.  Take a

19   break, please.

20             THE VIDEOGRAPHER:  Going off the record

21   at 2:57 p.m.

22             (Recess -- 2:57 p.m.)

23             (After recess -- 3:03 p.m.)

24             THE VIDEOGRAPHER:  We're back on the

25   record at 3:03 p.m.

1           MR. COGAN:  Does your instruction

2    stand?

3           MR. SPERDUTO:  Can you just read back

4    the last question so I can be -- put it in

5    specific context?

6           MR. COGAN:  I'll just ask it again.

7           MR. SPERDUTO:  Yes, please.  Thank you.

8       BY MR. COGAN:

9       Q    What did you tell Mr. Halpert about the

10   documents that were contained on the hard drive

11   that you gave him?

12      A    I told him --

13           MR. SPERDUTO:  I think that's a

14   different question.

15           MR. COGAN:  It is different.  Yeah.

16           MR. SPERDUTO:  So -- and I'll object to

17   the form to that, and I think based on my current

18   understanding of these circumstances and

19   relationships, I'm going to let him answer that

20   question, but I'm going to designate this part of

21   the transcript as confidential.

22           Go ahead.  If anything.

23           (THE FOLLOWING PORTION WAS DESIGNATED

24   AS CONFIDENTIAL - ATTORNEYS' EYES ONLY AND IS

25   BOUND SEPARATELY.)

[Page 222]

1      Q      If you turn to page 4, paragraph 8 --

2      A      I do see it.

3      Q      You see that you write here, I am not a

4    computer specialist, and I am not capable of

5    hacking.

6           Do you see that?

7      A      I do see it, yes.

8      Q      Do you know anyone who is capable of

9    hacking?

10     A      I don't.

11     Q      None of your contacts, to your

12   knowledge, have the ability to hack a computer

13   system?

14     A      I do not know a single person who could

15   do that.

16     Q      Paragraph 15 on the last page, page 6,

17   you state, All of the due diligence and related

18   information that I presented to Salisbury & Ryan

19   was publicly available or made available to me

20   through my personal contacts in Central Asia and

21   Russia.

22           Do you see that?

23     A      I do see.

24     Q      Who are the personal contacts that

25   you're referring to here?

1            MR. SPERDUTO:  Well, to the extent that

2    that invokes his research and what he did on

3    behalf of Salisbury & Ryan, he's directed not to

4    answer under 26(b)(4)(D).

5         BY MR. COGAN:

6         Q    You're obviously aware of the fact that

7    IMR has asserted in this proceeding that it

8    believes that you organized the hacking of its

9    computer systems?

10            You're aware of the fact that it's

11   asserted that?

12        A    Yeah.  Alleged that, yes.

13        Q    And you deny that; right?

14        A    I deny that, yes.

15        Q    Do you have any knowledge at all

16   concerning the hacking of IMR's computer systems?

17        A    I'm aware of news articles which

18   addressed those IMR or -- I don't remember IMR or

19   Trio statements, and they said that why would

20   anyone bother hacking them because they are

21   leaking data.

22            And there's a lot of things I read in

23   the news reports that there are a lot of internal

24   documents and internal data which was released by

25   the IMR employees and ENRC employees or Trio's

1    employees which is floating out there.

2        Q    Other than what you've read in

3    newspaper accounts, do you have any knowledge

4    regarding the hacking of IMR's or ENRC's or Shaft

5    Sinkers' computer systems?

6        A    I'm not aware of anything.

7        Q    Did you have communications with Mark

8    Hollingsworth -- withdrawn.

9             Do you know who Mark Hollingsworth is?

10       A    I know Mark Hollingsworth, yes.

11       Q    Who is he?

12       A    He's a journalist, and I think he also

13   works for K2, intelligence firm.

14       Q    The K2 intelligence firm, is that the

15   firm you referred to earlier that you thought

16   might have been hacking your computers?

17       A    I have -- I am aware that they've been

18   researching my persona and my contacts.

19       Q    Well, there's a difference between

20   researching your persona and your contacts and

21   then hacking your computer systems.

22            I'm just wondering -- you testified

23   earlier that you suspected that K2 may have been

24   hacking your emails or your telephones.

25            Do I have that not right --

1        A       I --

2        Q       -- is that wrong?

3        A       -- was suspecting that someone is

4    trying to hack my documents.  If I would know that

5    it's K2, I obviously would take some legal

6    measures against it.  But I was -- had suspicion

7    that my data might have been or I was under

8    observation.

9        Q       Is Mr. Hollingsworth a friend of yours?

10       A       No.

11       Q       Okay.  Do you have a working

12   relationship with him?

13       A       I met him in the capacity -- his

14   capacity as a journalist.

15       Q       Okay.  Have you ever asked him whether,

16   to his knowledge, K2 was involved in hacking your

17   emails or telephones?

18       A       I don't remember that conversation.

19       Q       Did you ever have any communications

20   with Mr. Hollingsworth related to the work that

21   you had been engaged to do by Salisbury & Ryan?

22       A       He approached me with offer to work as

23   a consulting expert on matters related to

24   Kazakhstan.

25       Q       Other than his approach to you, did you

1    have any communications with him related to either

2    IMR or The Trio or ENRC or Shaft Sinkers?

3                MR. SPERDUTO:  With respect to his

4    efforts for Salisbury & Ryan or otherwise?

5         BY MR. COGAN:

6         Q     Let's start with respect to your

7    efforts for Salisbury & Ryan.

8                MR. SPERDUTO:  And that gets a

9    26(b)(4)(D) direction.

10               Don't answer that one.  But you can

11   answer it otherwise.

12               THE WITNESS:  Yes.

13               MR. COGAN:  All right.  Let's do it

14   this way.

15               Will you mark this, please?

16               (Akhmetshin Deposition Exhibit 13 was

17   marked for identification and attached to the

18   transcript.)

19        BY MR. COGAN:

20        Q     I'm showing you a document that's been

21   marked Exhibit 13, Bates stamped AKH000016.

22        A     Uh-huh.

23        Q     Do you recognize this to be an email

24   exchange that you had with Mr. Hollingsworth?

25        A     It does look like his email to me.

1    said, and we'll -- we'll start over.

2        A    Okay.

3        Q    Did you have -- other than the email

4    that we're looking at right now, did you have

5    other communications with Mr. Hollingsworth about

6    the lawsuit between EuroChem and IMR?

7        A    I might have.  I don't remember

8    exactly.

9        Q    Okay.  Did you provide him with

10   information related to EuroChem or IMR?

11       A    He was writing an article.  I might

12   have helped him with the article.

13       Q    Why?

14       A    Mr. Hollingsworth is a very prominent

15   member of London information exchange bazaar.

16       Q    So what -- what does that have to do

17   with why you're helping him?

18       A    As a favor -- he was asking for a

19   favor, and it was possible for me to help him with

20   that favor.

21       Q    Did you have any communications with

22   Mr. Hollingsworth in connection with the work that

23   you were doing for Salisbury & Ryan?

24            MR. SPERDUTO:  Objection.

25            Not to answer.  Rule 26.

1          MR. COGAN:  Without even getting into

2     the substance?

3          MR. SPERDUTO:  Yeah, because the

4     identity of sources and the research he did and

5     that effort is all protected.  As I understand his

6     testimony at this point, his contacts with

7     Mr. Hollingsworth were part of this information

8     exchange he's talked about unrelated to the

9     Salisbury & Ryan representation.

10          MR. COGAN:  Will you mark this, please?

11          (Akhmetshin Deposition Exhibit 14 was

12     marked for identification and attached to the

13     transcript.)

14     BY MR. COGAN:

15     Q    Mr. Akhmetshin, I'm showing you a

16     document that's been marked Exhibit 14, Bates

17     stamped AKH000028.

18          Do you recall that you sent

19     Mr. Hollingsworth both the official Dutch version

20     and the English translation of the lawsuit that

21     was filed in Amsterdam by ECVK against IMR?

22     A    Yes, it appears that way.

23     Q    You write, The name of the U.S. lawyer

24     who handles it is Patrick Salisbury.

25          And then you put Mr. Salisbury email.

1    my pick-up arrangement is on.  I just texted

2    before the --

3                MR. COGAN:  Off the record, please.

4                THE VIDEOGRAPHER:  Going off the record

5    at 3:58 p.m.

6                (Recess -- 3:58 p.m.)

7                (After recess -- 4:12 p.m.)

8                THE VIDEOGRAPHER:  We are back on the

9    record at 4:12 p.m.

10       BY MR. COGAN:

11       Q    Mr. Akhmetshin, did you have

12   communications with Simon Goodley regarding

13   The Trio, IMR, ENRC or Shaft Sinkers?

14       A    Yes.

15       Q    What did you discuss with him?

16                MR. SPERDUTO:  Is this in connection

17   with the Salisbury & Ryan engagement?

18                THE WITNESS:  Yes, that's only --

19                MR. SPERDUTO:  Pardon me?

20                THE WITNESS:  That's the only kind of

21   context I have --

22                MR. SPERDUTO:  Under those

23   circumstances, he's directed not to answer.  Rule

24   26.

25                (Akhmetshin Deposition Exhibit 17 was

[Page 245]

1    refers to.

2              He just want to make sure that the

3    documents which he received from me are authentic,

4    and they want to make sure that they are available

5    otherwise so -- so someone could obtain then

6    independently, but --

7        Q    You write in response, We'll check with

8    the U.S. lawyer and will get back, Simon.

9              Who is the U.S. lawyer you're referring

10   to there?

11       A    Mr. Salisbury, I think.

12       Q    Does this email refresh your

13   recollection that you were providing Mr. Goodley

14   with information in connection with the work that

15   you were doing for Mr. Salisbury?

16       A    I was providing Mr. Goodley with

17   publicly available documents.  They were filings

18   in the Netherlands court.

19       Q    Does this email refresh your

20   recollection that you were providing Mr. Goodley

21   with documents in connection with the work that

22   you were doing for Mr. Salisbury?

23             MR. SPERDUTO:  Asked and answered.

24   Move on.  You just said that, and he answered

25   that.

[Page 246]

1            MR. COGAN:  No, I asked that question,

2   and he answered a different question.

3            MR. SPERDUTO:  No, you're disappointed

4   in his answer, and you're trying again.  You don't

5   get two dips.  Move on.

6        BY MR. COGAN:

7        Q    Okay.  You can answer the question.

8            MR. SPERDUTO:  No, you can't.

9            MR. COGAN:  So you're instructing the

10  witness not to answer --

11           MR. SPERDUTO:  You can --

12           MR. COGAN:  -- that question?

13           MR. SPERDUTO:  -- read back his answer.

14  He already answered that.  Exactly the same words.

15           MR. COGAN:  Are you instructing him not

16  to answer my question?

17           MR. SPERDUTO:  I'm instructing him not

18  to answer it again.  He answered that in exactly

19  the same words.

20           MR. COGAN:  What's the basis for your

21  instruction?

22           MR. SPERDUTO:  Asked and answered.  He

23  answered it.

24           MR. COGAN:  You and I both know that's

25  not an appropriate instruction.

1          MR. SPERDUTO:  You're trying to get a

2     different answer.  That's all.  You and I both

3     know that.

4          I didn't hear -- can you tell me what

5     the difference is in that question and the

6     question immediately before that?

7          MR. COGAN:  It's identi- --

8          MR. SPERDUTO:  It's almost --

9          MR. COGAN:  It was an identical

10    question because I didn't get a response to the

11    question I asked.  I'll ask it --

12         MR. SPERDUTO:  You did get a response.

13    You didn't like the response.

14         MR. COGAN:  I'll ask the question again

15    and you can either instruct or not.

16      BY MR. COGAN:

17      Q     Does this document refresh your

18    recollection as to whether you were providing

19    Mr. Goodley with information in connection with

20    the work that you were doing for Mr. Salisbury?

21         MR. SPERDUTO:  Asked and answered a

22    third time.

23      BY MR. COGAN:

24      Q     You can answer.

25      A     I did not write these documents saying

# Excerpts from Pages 67-72 & 199-221

# Redacted Pursuant to Provisional Confidentiality Agreement