## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In re: APPLICATION OF INTERNATIONAL
MINERAL RESOURCES B.V. FOR AN ORDER
TO TAKE DISCOVERY PURSUANT TO 28
U.S.C. § 1782

Case No. 1:14-MC-00340 (GK)

**Oral Argument Requested**

### THIRD-PARTY INTERVENOR EUROCHEM VOLGA-KALIY LLC'S RESPONSE TO INTERNATIONAL MINERAL RESOURCES B.V.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ADDITIONAL DAY OF DEPOSITION

Patrick P. Salisbury
Salisbury & Ryan LLP
1325 Avenue of the Americas
New York, New York  10019-6026
Tel: (212) 977-4660
Fax: (212) 977-4668
PS@SalisburyRyan.com

Edward J. Shapiro
William H. Rawson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004-1304
Tel: (202) 637-2200
Fax: (202) 637-2201
edward.shapiro@lw.com
william.h.rawson@lw.com

*Attorneys for EuroChem Volga-Kaliy LLC*

Dated:  June 18, 2015

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

    A.    The Underlying Dispute Between ECVK and IMR ...............................................3

    B.    Salisbury & Ryan's Retention of Rinat Akhmetshin ............................................5

    C.    Mr. Akhmetshin's Consulting Work For Salisbury & Ryan .................................7

    D.    Mr. Akhmetshin Performed No Strategic Communications Work For Salisbury & Ryan .............................................................................................11

    E.    Salisbury & Ryan Ends Its Retention of Mr. Akhmetshin ..................................12

    F.    IMR's 28 U.S.C. § 1782 Application And Motion To Compel ...........................13

ARGUMENT ..................................................................................................................14

I.     MR. AKHMETSHIN IS CATEGORICALLY IMMUNE FROM DISCOVERY BECAUSE SALISBURY & RYAN RETAINED HIM EXCLUSIVELY AS A CONSULTING EXPERT .................................................................................14

II.    THE SPECIFIC DOCUMENTS THAT IMR IDENTIFIES ARE PROTECTED FROM DISCOVERY BY THE CONSULTING EXPERT IMMUNITY AND THE ATTORNEY WORK PRODUCT DOCTRINE ...................................................15

III.   IMR FAILS TO ESTABLISH THAT THE CRIME-FRAUD EXCEPTION APPLIES ......................................................................................................20

CONCLUSION ...............................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Application of Chevron Corp.*,
   633 F.3d 153 (3d Cir. 2011) ...................................................................... 19, 27

*Chapman v. Wagener Equities, Inc.*,
   No. 09 C 07299, 2014 WL 540250 (N.D. Ill. Feb. 11, 2014)................................................25

*Ecuadorian Plaintiffs v. Chevron Corp.*,
   619 F.3d 373 (5th Cir. 2010) ..........................................................................19

*\*Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*,
   296 F.R.D. 3 (D.D.C. 2013)................................................................ 14, 17, 19

*\*Genesco, Inc. v. Visa U.S.A., Inc.*,
   296 F.R.D. 559 (M.D. Tenn. 2014).................................................................. 14, 18

*Intervet, Inc. v. Merial Ltd.*,
   No. 8:07CV194, 2007 WL 1797643 (D. Neb. June 20, 2007) .............................................19

*Plymovent Corp. v. Air Tech. Solutions*,
   243 F.R.D. 139 (D.N.J. 2007)............................................................. 14, 19

*Precision of New Hampton v. Tri Component Prods. Corp.*,
   No. C12-2020, 2013 WL 2444047 (N.D. Iowa June 5, 2013)................................................17

*\*In re Sealed Case*,
   107 F.3d 46 (D.C. Cir. 1997) .......................................................... 20, 21, 22, 25

*\*Tri-State Hosp. Supply Corp. v. United States*,
   238 F.R.D. 102 (D.D.C. 2006)...................................................................20, 21

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ......................................................................18

*\*United States v. Finotti*,
   CRIM No. 88-0286 (HHG), 1988 WL 129723 (D.D.C. Nov. 17, 1988) ...............................26

*\*United States v. Hooker Chem. & Plastics Corp.*,
   112 F.R.D. 333 (W.D.N.Y. 1986) ...................................................................18

*\*United States v. White*,
   887 F.2d 267 (D.C. Cir. 1989) ........................................................................26

*Vanguard Savings & Loan Association v. Banks*,
  No. CIV. A. 93-4627, 1995 WL 71293 (E.D. Pa. Feb. 17, 1995) ........................................17

*\*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
  288 F.R.D. 222 (D.D.C. 2012) ...........................................................................................14

*White v. Electrolux Communications*,
  No. 13 C 1617, 2014 WL 1365424 (N.D. Ill. Apr. 7, 2014) ................................................17

## STATUTES

28 U.S.C. § 1782 ................................................................................................................3, 13

## RULES

Fed. R. Civ. P.
  26(b)(3) ...........................................................................................................................16, 17
  26(b)(4)(B) .............................................................................................................................14
  26(b)(4)(D) .......................................................................................................................*passim*

## TREATISES

8A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2032 (3d ed.
  2015) .......................................................................................................................................14

## INTRODUCTION

The Court should deny International Mineral Resources B.V.'s ("IMR") motion to compel production of documents and additional day of deposition from respondent Rinat Akhmetshin.

*First*, the disputed documents are immune from discovery under Federal Rule of Civil Procedure 26(b)(4)(D) because third-party intervenor EuroChem Volga-Kaliy LLC's ("ECVK") litigation counsel, Salisbury & Ryan, LLP, retained Mr. Akhmetshin exclusively as a consulting expert in connection with the Dutch litigation between ECVK and IMR.  IMR has not disputed that Salisbury & Ryan retained Mr. Akhmetshin as a consulting expert, nor offered any reason why the immunity of Rule 26(b)(4)(D) does not apply.  The Court should deny the requested further discovery from Mr. Akhmetshin on the basis of this immunity alone.

*Second*, the specific documents that IMR seeks are protected from discovery by both the consulting expert immunity and attorney work product doctrine, despite IMR's claims that (i) they were created for other reasons, and therefore enjoy no privilege, or (ii) Mr. Akhmetshin waived privilege.  The documents are privileged because they relate to only Mr. Akhmetshin's work as a consulting expert for Salisbury & Ryan, and not to any purported strategic communications work.  And Mr. Akhmetshin lacks the legal capacity to waive privilege over any of the documents, intentionally or otherwise.  Indeed, the consulting expert immunity cannot be waived, and even if it could be, ECVK has not done so.  Nor has ECVK waived the protections of the attorney work product doctrine.

*Third*, IMR's assertion of the crime-fraud exception is groundless.  IMR presents no evidence whatsoever that litigation counsel (let alone ECVK itself) had any unlawful intent, as the exception requires, because there is none—and the evidence that ECVK offers herewith should put that to rest once and for all.  Indeed, IMR's attempt to show that even Mr.

Akhmetshin engaged in misconduct is inadequate.   The sworn declarations of Vladimir Krakhmalnyy, Valery Sidnev, and Patrick Salisbury, attached to this response, confirm that ECVK did nothing more than commission normal-course litigation research, and neither instructed nor had any reason to believe that Mr. Akhmetshin was engaged in any illegal hacking such as IMR alleges.   Indeed, it is undisputed that Mr. Akhmetshin's instructions were precisely the opposite: "all services provided by [Mr. Akhmetshin] will be made in full compliance with all applicable laws of the U.S. and other relevant jurisdictions."   *See infra* Background, parts B and C.   And the evidence of his conduct is plainly insufficient to support the allegation that even Mr. Akhmetshin had an unlawful intent.   Moreover, at the time, IMR and its owners and affiliates faced widespread allegations of fraud and corruption, resulting in the documented disclosure of significant amounts of information about the group; that reality explains why information about the group was so widely circulated.   Finally, IMR does not even allege that any specific communications furthered the "crime" in which ECVK was supposedly involved. IMR simply argues that every single document that Mr. Akhmetshin withheld must be related to ECVK's supposed intent, but that is not nearly enough.

*Fourth*, and finally, certain arguments that IMR has made with respect to particular categories of documents are no longer at issue.   Salisbury & Ryan has now reviewed the 261 documents that Mr. Akhmetshin has withheld from production to IMR and determined that 34 are not subject to any privileges that belong to ECVK.[1]   ECVK accordingly does not address those documents here and defers to Mr. Akhmetshin about whether to produce those documents

---

[1] Mr. Akhmetshin's privilege log lists 263 documents but Mr. Akhmetshin has since produced two of those documents, entries number 226 and 227, to IMR because they are not privileged. *See* Dkt. 27, Exh. R (April 27, 2015 Letter from K. Sperduto to J. Cogan).   Of the 261, the 34 that are not subject to any privileges that belong to ECVK are entries 1, 2, 3, 99, 111, 112, 113, 150, 175, 177, 179, 181, 182, 192, 207, 214, 217, 218, 219, 220, 221, 222, 224, 225, 228, 229, 230, 231, 232, 249, 250, 251, 252, and 253.

to IMR.[2]   Moreover, ECVK also determined that, of the 227 that are subject to ECVK's privileges, none implicate the attorney client privilege, and accordingly ECVK makes no such claim as to these specific documents at issue here.   Where ECVK believes any privilege to which it is entitled exists, ECVK has asserted it and will continue to do so.   Nothing in this submission, or in ECVK's decisions concerning whether to assert any privilege in connection with this proceeding, is intended to constitute a waiver, nor should be construed as a waiver in any respect.

## BACKGROUND

### A.     The Underlying Dispute Between ECVK and IMR

ECVK is a wholly owned subsidiary of JSC MCC EuroChem ("EuroChem"), which is part of the Swiss-headquartered EuroChem Group AG, one of the largest fertilizer producers in the world.  June 18, 2015 Declaration of Patrick Salisbury ("2d Salisbury Decl.") ¶ 3 and Exh. 1; Declaration of Valery Sidnev ("Sidnev Decl.") ¶ 5.   EuroChem is one of the world's leading agrochemical companies ranking among the top three European and top ten global industry leaders.   2d Salisbury Decl. ¶ 3 and Exh. 1.   EuroChem produces primarily nitrogen and phosphate fertilizers, as well as certain organic synthesis products and iron ore, and has over $5 billion in annual revenues.  *Id.*   The group operates production facilities in Belgium, Lithuania, China, Russia, and Kazakhstan, and employs more than 22,000 people.   *Id.*   EuroChem is

---

[2] ECVK understands that Mr. Akhmetshin may assert, in his separate response to be filed today, that certain of those documents are nonetheless protected from discovery by privileges owned by Mr. Akhmetshin or others, or are not privileged but are also unresponsive to IMR's subpoena.   ECVK notes in this connection that IMR's document request to Mr. Akhmetshin appears to be broader than the discovery requested by IMR in its § 1782 Application and ordered by the Court.   *Compare* Dkt. 1 at 17 (claiming to seek "a discrete universe of documents and testimony related to Mr. Akhmetshin's own unlawful efforts on behalf of EuroChem and/or ECVK") *with* Dkt. 27, Exh. G (by use of "and/or", requesting all documents about IMR, Shaft Sinkers, and ENRC, regardless whether they relate also to ECVK).

"committed to following best international corporate governance practices," and recognizes that "[f]undamental to [its] business success is the existence of a strong culture of corporate compliance and internal control." *Id.* EuroChem's Board of Directors contains ten members, five of whom are independent directors. *Id.* PricewaterhouseCoopers is EuroChem's external auditor. *Id.* In short, EuroChem is a responsible member of the European corporate community. *Id.*

In October 2012, ECVK initiated two foreign arbitrations against a company, Shaft Sinkers (Pty) Ltd., that it had engaged to complete a $350 million mine shaft construction contract. *Id.* ¶ 8. Seeking about $1 billion in damages for wasted costs and lost profits, ECVK alleged that Shaft Sinkers (i) fraudulently induced ECVK to enter into the construction contract despite knowing that it would be unable to complete the project; (ii) paid more than $400,000 in bribes to the ECVK representative overseeing the project; and (iii) committed massive procurement fraud. *Id.* ¶ 32. ECVK hired Salisbury & Ryan, LLP, led by senior partner Patrick Salisbury, to represent it in the foreign arbitrations, and in any related proceedings. *Id.* ¶¶ 8, 31; Sidnev Decl. ¶¶ 7-10.

Early in the arbitrations, Salisbury & Ryan determined that Shaft Sinkers might be financially unable to satisfy the expected judgment and, regardless, that Shaft Sinkers's controlling parent might also be responsible for Shaft Sinkers's fraud. 2d Salisbury Decl. ¶ 34. Yet Salisbury & Ryan did not know the precise organizational structure of Shaft Sinkers and its related entities. *Id.* ¶ 35. Salisbury & Ryan believed that three oligarchs from Kazakhstan and Kyrgyzstan, Alexander Machkevitch, Patokh Chodiev, and Alijan Ibragimov, owned entities that owned and controlled Shaft Sinkers, including possibly International Mineral Resources B.V. ("IMR"), a privately held Dutch company. *Id.* ¶¶ 9, 36. Press accounts commonly refer to these

individuals as the "Trio" or the "Troika."  Dkt. 38-1 ¶ 14.  But Salisbury & Ryan was not certain which of the Trio's many entities owned and controlled Shaft Sinkers.  2d Salisbury Decl. ¶¶ 35, 48.  Salisbury & Ryan thus endeavored to research the Trio and their business activities, including IMR and Shaft Sinkers.  *Id.* ¶ 49.

That research proved difficult for Salisbury & Ryan to conduct without help, not least because Kazakhstan's business environment is opaque.  *Id.* ¶ 50.  Salisbury & Ryan therefore required the assistance of someone more familiar with the region.  *Id.*  Accordingly, Salisbury & Ryan turned to Rinat Akhmetshin, having engaged him previously and knowing his relevant expertise.  *Id.* ¶ 51.

### B.  Salisbury & Ryan's Retention of Rinat Akhmetshin

Mr. Akhmetshin is a former Russian citizen who now lives in Washington, D.C.  *Id.* ¶ 52. He is the CEO and founder of the International Eurasia Institute for Economic and Political Research and a recognized expert on business and political matters in Kazakhstan, Russia, and other former Soviet countries.  *Id.* ¶¶ 53-57.  Mr. Akhmetshin also has broad access to third-party sources that, like him, know and understand the region.  *Id.*  With that background, Mr. Akhmetshin often works as an expert consultant for parties litigating business disputes in the U.S. and the U.K. that involve Russian and Kazakh entities.  *Id.*

Salisbury & Ryan thus retained Mr. Akhmetshin in July 2012 to research the Trio and their business activities, including ENRC, IMR, and Shaft Sinkers, to determine which entities might be liable for Shaft Sinkers's fraud and then, later, to investigate ECVK's claims against the entity identified as the proper defendant.  *Id.* ¶¶ 53-57, 60.  Specifically, and without waiving any privilege, Salisbury & Ryan engaged Mr. Akhmetshin "to research and consult with respect to the unique legal, social, economic, and political issues that arise in Eurasia relevant to

[ECVK's litigation against IMR]."   Dkt. 10-1 ¶ 3;  *see also id.*  at Exh. A (July 26, 2012 Engagement Letter from Salisbury & Ryan to Mr. Akhmetshin ("[Y]ou will provide the Client with assistance in the Client's investigation of claims it may have against companies relating to a mining project being built by the Client in Russia which has encountered delays.  You will assist in such endeavors by researching and providing information concerning the relevant parties and other requested information.")).

As outside litigation counsel, Salisbury & Ryan had the authority to hire testifying experts and consultants without advance notice to ECVK and without prior approval.   2d Salisbury Decl. ¶ 58.  That is precisely what occurred here, as Salisbury & Ryan identified and retained Mr. Akhmetshin as an appropriate consulting expert without any involvement or knowledge of ECVK.  *Id.*; Sidnev Decl. ¶¶ 11-12.  Indeed, at the time that Salisbury & Ryan retained him, Mr. Akhmetshin had had no previous contact with anyone at EuroChem or ECVK, and Mr. Akhmetshin did not meet or correspond with anyone at EuroChem or ECVK at the time of his retention.  2d Salisbury Decl. ¶ 58; Dkt. 38-1 ¶ 5.

When Salisbury & Ryan retained Mr. Akhmetshin, Mr. Salisbury carefully instructed Mr. Akhmetshin that his work must comply fully with all U.S. laws and any relevant foreign laws. 2d Salisbury Decl. ¶ 58; Dkt. 38-1 ¶ 4.  Mr. Akhmetshin's engagement letter reiterated this basic condition of the agreement: "all services provided by [Mr. Akhmetshin] will be made in full compliance with all applicable laws of the U.S. and other relevant jurisdictions."  Dkt. 10-1, Exh. A.  Mr. Akhmetshin confirmed that he understood and would comply, so Salisbury & Ryan proceeded to hire him.  2d Salisbury Decl. ¶ 58; Dkt. 38-1 ¶ 4.

### C.      Mr. Akhmetshin's Consulting Work For Salisbury & Ryan

Mr. Akhmetshin proceeded with his consulting work for Salisbury & Ryan, under their exclusive direction.  2d Salisbury Decl. ¶ 61.  Most of Mr. Akhmetshin's research entailed gathering and analyzing published information (including some from relatively obscure sources that were harder to find).  *Id.* ¶ 64.  Another of Mr. Akhmetshin's important resources was the exchange of financial, political, social, and cultural news and information that exists in London.  Dkt. 38-1 ¶¶ 14-17.  There, Mr. Akhmetshin was able to obtain information about the Trio and their business activities, including their public company Eurasian Natural Resources Corporation ("ENRC"), IMR and Shaft Sinkers.  *Id.*

One of the key factors that helped Mr. Akhmetshin obtain information by exchange was that the Trio was by then embroiled in a series of scandals related to the forced 2014 de-listing of ENRC from the London Stock Exchange, amid widespread allegations of fraud and corruption.  *Id.*; 2d Salisbury Decl. ¶ 62.  Specifically, for example, (1) in 2011, the U.K. media reported, and ENRC later confirmed in its 2012 public filings, that ENRC was under investigation by the U.K. Serious Fraud Office "about allegations of corruption at subsidiaries of the FTSE 100 mining group" (ENRC also admitted that its actions were under investigation by the U.K. Financial Services Authority); (2) on April 25, 2013, the SFO, itself announced a criminal investigation (still ongoing) into ENRC and the Trio: "the focus of the investigation will be allegations of fraud, bribery and corruption relating to the activities of the company or its subsidiaries in Kazakhstan and Africa;" (3) in 2011 the Trio paid an undisclosed fine to settle a long-running criminal money laundering and tax evasion investigation by the Belgian authorities; and (4) in 2012, ENRC paid $1.2 billion to settle a lawsuit brought by the former owner of an expropriated copper mine in the Democratic Republic of Congo.  2d Salisbury Decl. ¶¶ 17-22 and exhibits cited therein.

During the same period, ENRC's chairman and a number of its independent directors and senior officers resigned and made troubling public statements disparaging the integrity of ENRC's owners and management. *Id.* ¶¶ 15, 25, 27 and exhibits cited therein. The chairman stated to the U.K. press: "These guys [the Trio] are mad. This is a public company that's run by private people. It's more than bloody peculiar. It's run by oligarchs. As soon as you get the opportunity to sell your shares I'd sell them." *Id.* ¶ 14 and Exh. 10. And Dechert LLP, the outside law firm that ENCR had retained to investigate whistleblower allegations of fraud, bribery, and corruption related to the activities of ENRC and its subsidiaries in Kazakhstan and Africa, abruptly quit on the eve of the firm's internal report. *Id.* ¶¶ 14, 22. The U.S. Department of Justice was also reportedly investigating "transnational corruption" at ENRC at the time, with the former ENRC chief of compliance providing information to the U.S. authorities. *Id.* ¶ 24 and Exh. 16. Finally, ENRC's own counsel concluded in an report leaked to the U.K. press that the Trio-controlled companies went to extraordinary lengths to conceal their fraudulent activities, not only by erasing computer data and falsifying financial statements, but even constructing a fake office in order to deceive ENRC's own outside counsel investigating fraud allegations. *Id.* ¶ 23 and Exh. 2.[3]

Unsurprisingly, in connection with this turmoil, information about the Trio and ENRC began to circulate in London, including through disclosures by current and former ENRC directors, executives, and employees, who were leaking information to separate themselves from the Trio and their operations. *Id.* ¶¶ 25-27. Although some of that information was not originally meant to become generally available, it increasingly became available through a variety of private sources, including in connection with the various investigations, departure

---

[3] For more detail about the turmoil surrounding the Trio and its business activities, *see* 2d Salisbury Decl. ¶¶ 11-30.

leaks, and turmoil swirling around the Trio, ENRC, and its affiliates. *Id.* Indeed, ENRC sued its former independent director, Sir Paul Judge, alleging that he was the source of massive leaking of confidential inside information while an ENRC director. *Id.* ¶ 28 and Exhs. 17, 18. And the London High Court of Justice found that materials were indeed circulating freely and were leaked by corporate officers or directors of ENRC. *Id.* (citing *Eurasian Natural Resources Corporation, Ltd.*, 2014 WL 5483609 at ¶ 12 ("It is clear that, in 2010, [ENRC] became concerned that confidential information about the company was being leaked to third party sources, in particular the press.") and at ¶ 13 ("The defendant has admitted . . . that some of the information he gave to the 'journalist' was confidential to [ENRC].")). Similarly, after ENCR sued Dechert, the London High Court of Justice referred to "the whistleblower report" and the "allegations about ENRC in a letter from Dechert to ENRC" having been leaked to the press. *Id.* ¶ 29 and Exh. 30.

Mr. Akhmetshin obtained information often by exchanging information in his possession with journalists and others whom he believed had information about the Trio and their business operations that might be relevant to his assignment. Dkt. 38-1 ¶¶ 14-17. Those journalists included Simon Goodley and Mark Hollingsworth of the Guardian, Ken Silverstein of Harpers, and Kirstin Ridley of Thomson Reuters. *Id.* The journalists were similarly interested in the Trio, including ECVK's dispute with IMR and Shaft Sinkers, and so sought information from Mr. Akhmetshin. *Id.* Among Mr. Akhmetshin's other sources of information was Global Witness, the highly respected London-based organization funded by George Soros whose mandate is to expose international corruption, and which was nominated for the Nobel Peace Prize for its efforts in this regard. *Id.*; Salisbury Decl.. ¶ 77 and Exh. 21.

To facilitate Mr. Akhmetshin's research, Mr. Salisbury thus authorized Mr. Akhmetshin to share limited non-confidential and non-privileged information about the Dutch litigation between ECVK and IMR with specific journalists or others with an interest in covering ENRC and the Trio under two express conditions: (1) Mr. Akhmetshin believed that sharing the information would assist his research for Salisbury & Ryan, and (2) the information that he disclosed was already in the public domain.   2d Salisbury Decl. ¶ 67.   The only specific document that Mr. Salisbury authorized Mr. Akhmetshin to share was ECVK's filed Dutch complaint against IMR.  *Id.*[4]

Although Mr. Salisbury did not know the identity of each of Mr. Akhmetshin's research sources, Mr. Salisbury understood—and continues to understand—that all of Mr. Akhmetshin's research efforts were fully lawful.  *Id.* ¶¶ 64-65, 68.  Mr. Akhmetshin has confirmed that at no time while working for Salisbury & Ryan did he hack into the computer systems of IMR, nor did he ask or encourage anyone else to do such hacking.  Dkt. 38-1 ¶ 7.  Mr. Akhmetshin has also confirmed that he did not otherwise obtain, access, or distribute information that he believed to be hacked from IMR.  *Id.*

All of Mr. Akhmetshin's work for Salisbury & Ryan was done at the law firm's request. 2d Salisbury Decl. ¶¶ 61, 67.  As ECVK's outside litigation counsel, Salisbury & Ryan had—and exercised—full authority to conduct background research.  *Id.* ¶ 58; Sidnev Decl. ¶ 11.  Mr. Akhmetshin was accordingly supervised by, and reported to, Mr. Salisbury.  2d Salisbury Decl. ¶¶ 59, 61.  ECVK itself never participated actively in Mr. Akhmetshin's consulting work for Salisbury & Ryan.  *Id.*  Indeed, except for one single unsuccessful pitch concerning a different assignment (discussed below), no one at ECVK ever even met Mr. Akhmetshin before, during,

---

[4] In the Netherlands, such materials are public but are not always easy to obtain, because they are not available electronically. 2d Salisbury Decl. ¶ 67.

or after his work for Salisbury & Ryan.   Declaration of Vladimir V. Krakhmalnyy ("Krakhmalnyy Decl.") ¶¶ 6, 9; Sidnev Decl. ¶¶ 12, 17.

Finally, all of Mr. Akhmetshin's work for Salisbury & Ryan was in a consulting capacity. 2d Salisbury Decl. ¶¶ 61, 67.  Salisbury & Ryan did not identify Mr. Akhmetshin as a testifying expert in the Dutch Action or the foreign arbitrations.  *Id.* ¶ 53.  Nor was Mr. Akhmetshin called to testify or to act in any other capacity in the Dutch Action or the arbitrations.  *Id.*  Additionally, Mr. Akhmetshin never communicated with any other expert retained by Salisbury & Ryan.  *Id.* And Salisbury & Ryan never shared any information that it received from Mr. Akhmetshin with any other expert that it retained.  *Id.*  Mr. Akhmetshin had no involvement in the underlying disputes between ECVK and IMR and Shaft Sinkers and never previously worked on any matter for ECVK or its affiliates.  *Id.*

### D. Mr. Akhmetshin Performed No Strategic Communications Work For Salisbury & Ryan

In his work as an expert consultant, Mr. Akhmetshin sometimes assists clients who are unfamiliar with Western media with "strategic communications."   Dkt. 38-1 ¶ 9.   Mr. Akhmetshin proposed doing so for ECVK, and he met with EuroChem personnel and an attorney from Salisbury & Ryan in September 2012 in Moscow to present his proposal.  *Id.* ¶¶ 9-10; 2d Salisbury Decl. ¶ 66.  Members of EuroChem's Legal and Public Relations departments attended the meeting, as well as EuroChem's director responsible for corporate security, Vladimir Krakhmalnyy.   Sidnev Decl. ¶ 13-14; Krakhmalnyy Decl. ¶ 5.   Mr. Krakhmalnyy is not responsible for strategic communications for EuroChem or ECVK, and is also not responsible for EuroChem's or ECVK's civil litigation, and so had no involvement in ECVK's litigation and arbitrations against IMR and Shaft Sinkers.  Accordingly, he did not participate actively in the meeting.  Krakhmalnyy Decl. ¶¶ 3-5.

11

At the meeting, EuroChem's Legal and Public Relations departments rejected Mr. Akhmetshin's proposal. That proposal was the sole topic of discussion. Mr. Akhmetshin did not discuss his consulting work for Salisbury & Ryan. And Mr. Akhmetshin did not convey any documents or information at the meeting about IMR or any companies or people related to IMR. Sidnev Decl. ¶¶ 15-16; Krakhmalnyy Decl. ¶¶ 7-8; 2d Salisbury Decl. ¶ 66; Dkt. 38-1 ¶ 11.

After the meeting, Mr. Salisbury emphasized to Mr. Akhmetshin that his consulting work should continue to focus exclusively on researching the Trio and their business activities, including IMR and Shaft Sinkers. Dkt. 38-1 ¶ 12. Mr. Akhmetshin continued with that research and performed no strategic communications work for Salisbury & Ryan. *Id.* ¶ 13; 2d Salisbury Decl. ¶ 67.

### E.    Salisbury & Ryan Ends Its Retention of Mr. Akhmetshin

 In May 2013, Mr. Chodiev, of the Trio, contacted Andrey Melnichenko, then EuroChem's Chairman, and objected to Salisbury & Ryan's retention of Mr. Akhmetshin because Mr. Akhmetshin also represented Kazakh political opposition figures. *Id.* ¶ 71. Mr. Chodiev did not claim that Mr. Akhmetshin had engaged in any improper conduct, toward IMR or otherwise, and only discussed Mr. Akhmetshin's associations. *Id.* Mr. Melnichenko then contacted Mr. Salisbury and directed him to end Salisbury & Ryan's retention of Mr. Akhmetshin, to protect EuroChem's business relationships in Kazakhstan. *Id.* ¶ 72. Mr. Salisbury accordingly met with Mr. Akhmetshin on about May 27, 2013 and notified him that his engagement with Salisbury & Ryan had ended. *Id.* ¶ 73; Sidnev Decl. ¶ 17

 Since May 2013, Mr. Akhmetshin has provided no further consulting services to Salisbury & Ryan. 2d Salisbury Decl. ¶ 74. Between May and August 2013, Mr. Akhmetshin had little contact with anyone at Salisbury & Ryan. *Id.* Most of the minimal contact that he did have related to Salisbury & Ryan paying for the consulting services that he had previously

provided.  *Id*; Dkt. 38-1 ¶ 22.  Since August 2013, Mr. Akhmetshin has had no contact with anyone at Salisbury & Ryan until this § 1782 proceeding began, with one exception.  The exception was that Mr. Salisbury called Mr. Akhmetshin once in the fall of 2013 because he had expressed concerns about his computer being stolen and his telephones bugged during his work for Salisbury & Ryan and Mr. Salisbury wanted to confirm the details thereof.  2d Salisbury Decl. ¶ 74; Dkt. 38-1 ¶ 22.

**F.    IMR's 28 U.S.C. § 1782 Application And Motion To Compel**

In April 2014, IMR applied to take discovery from Mr. Akhmetshin for use in the Dutch litigation between IMR and ECVK.  Dkt. 1.  Specifically, IMR sought evidence to support its allegation that Mr. Akhmetshin illegally obtained and disseminated IMR's confidential information on behalf of ECVK.  *Id.* at 1-2, 9-10.  IMR accordingly sought "a discrete universe of documents and testimony related to Mr. Akhmetshin's own unlawful efforts on behalf of EuroChem and/or ECVK".  *Id.* at 17.

After denying IMR's application without prejudice in September 2014, Dkt. 17, the Court granted IMR's renewed application, seeking the same discovery, on February 5, 2015.  Dkt. 22.  In that order, in response to Mr. Akhmetshin's argument that the application sought privileged information, the Court ruled that any and all questions about privilege go "to the merits" and are "to be decided after [IMR's] subpoena has been issued and parties can object to specific pieces of information," reserving them for later resolution if and as necessary.  *Id.* ¶ 2.

IMR served its subpoena on Mr. Akhmetshin that same day.  Dkt. 27 at 8.  The subpoena requests all "documents and communications concerning IMR, Shaft Sinkers, ENRC, EuroChem, ECVK and/or Salisbury & Ryan."  *Id.* at Exh. G.  Mr. Akhmetshin subsequently produced certain documents to IMR and withheld others on the basis of privilege, and IMR deposed Mr. Akhmetshin on April 7, 2015.  *Id.* at 8-14.  On May 18, 2015, IMR moved to

compel the production of every single document that Mr. Akhmetshin withheld on the basis of privilege, as well as a second deposition of Mr. Akhmetshin.  *Id.* at 14-19, 29-30.  On June 15, the Court granted ECVK's consent motion to intervene, to respond to IMR's motion to compel. Dkt. 37.

## ARGUMENT

I.   **MR. AKHMETSHIN IS CATEGORICALLY IMMUNE FROM DISCOVERY BECAUSE SALISBURY & RYAN RETAINED HIM EXCLUSIVELY AS A CONSULTING EXPERT**

Federal Rule of Civil Procedure 26(b)(4)(D) prohibits the discovery of "facts known or opinions held by an expert who has been retained . . . in anticipation of litigation . . . and who is not expected to be called as a witness at trial."  Fed. R. Civ. P. 26(b)(4)(D).[5]  This so-called "non-testifying expert privilege" is distinct from the attorney-client privilege and attorney work product doctrine, and is "designed to prevent the unfairness of counsel benefiting from an adversary's retention and financing of an expert."  *Genesco, Inc. v. Visa U.S.A., Inc.*, 296 F.R.D. 559, 580 (M.D. Tenn. 2014).  Although Rule 26(b)(4)(D) expressly refers to discovery "by interrogatory or deposition," courts logically interpret the rule broadly to prevent discovery by any means from consulting experts, including by requests for documents.  *See, e.g.*, *Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*, 296 F.R.D. 3, 9 (D.D.C. 2013) (granting protective order from deposition and document requests); *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 288 F.R.D. 222, 229-30 (D.D.C. 2012) (denying motion to compel production of documents but ordering discovery of certain facts by declaration); *Plymovent Corp. v. Air Tech. Solutions*, 243 F.R.D. 139, 143-44 (D.N.J. 2007) (affirming order

---

[5] The rule, renumbered in 2010, was formerly Rule 26(b)(4)(B).  Only the numbering changed, so cases interpreting Rule 26(b)(4)(B) are equally pertinent.  8A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2032 (3d ed. 2015).

quashing subpoena for documents and explaining that a narrower interpretation of Rule 26(b)(4)(D) "would allow an end run around the policies of the rule" and "any party could completely circumvent [26(b)(4)(D)] simply by serving a document subpoena").

Here, Salisbury & Ryan retained Mr. Akhmetshin exclusively as a consulting expert, to assist in research and analysis relevant to the Dutch litigation.  2d Salisbury Decl. ¶¶ 67, 53-57; Dkt. 38-1 ¶¶ 13-17.  In its instant motion, IMR has neither disputed that Salisbury & Ryan retained Mr. Akhmetshin as a consulting expert nor argued that Rule 26(b)(4)(D) is inapplicable to Mr. Akhmetshin's consulting work.  *See generally* Dkt. 27.  Mr. Akhmetshin is accordingly immune from discovery concerning the disputed documents, and this Court should deny discovery of the materials in his privilege log on that ground.  For the same reason, the Court should also deny IMR's request for an additional deposition of Mr. Akhmetshin.  Any questions that IMR would ask are either barred by the consulting expert immunity or beyond the scope of the discovery that the Court authorized.  While IMR seeks to defeat the consulting expert immunity on the instant motion through its generalized, meritless claims of waiver, it offers no viable basis to do so, as explained below.

## II. THE SPECIFIC DOCUMENTS THAT IMR IDENTIFIES ARE PROTECTED FROM DISCOVERY BY THE CONSULTING EXPERT IMMUNITY AND THE ATTORNEY WORK PRODUCT DOCTRINE

In an effort to avoid the categorical immunity of Rule 26(b)(4)(D), IMR argues that two discrete categories of specific documents are unprivileged and should be produced: (1) documents purportedly generated in support of a hypothetical "strategic communications campaign" for ECVK,[6] and (2) documents reflecting communications with third parties.[7]  Dkt.

---

[6] IMR identifies 24 specific such documents on Mr. Akhmetshin's privilege log, entries 22, 23, 24, 55, 56, 97, 98, 131, 156, 164, 165, 169, 170, 192, 201, 202, 203, 205, 247, 249, 251, 252, 253, and 261.  Of these 24 documents, ECVK has determined that five are not subject to any

27 at 22-28.  Both gambits fail.[8]  The documents at issue here relate solely to Mr. Akhmetshin's consulting expert work for Salisbury & Ryan.  2d Salisbury Decl. ¶¶ 67, 53-57; Dkt. 38-1 ¶¶ 13-17.  The consulting expert immunity that protects these documents accordingly remains undisturbed, and the attorney work product doctrine codified in Federal Rule of Civil Procedure 26(b)(3) also applies to protect them from discovery.

IMR's stubborn insistence that Mr. Akhmetshin conducted a strategic communications campaign for ECVK, Dkt. 27 at 23-25, ignores two critical facts that demonstrate otherwise.  First, although Mr. Akhmetshin proposed to conduct a strategic communications campaign for ECVK, the sworn testimony of Mr. Salisbury and of ECVK's general counsel confirm that they promptly rejected Mr. Akhmetshin's proposal and never engaged anyone, including Mr. Akhmetshin, to pursue such a strategy.  2d Salisbury Decl. ¶¶ 66-67; Sidnev Decl. ¶ 16.  Second, Mr. Akhmetshin's limited communications with journalists were fully within his consulting work for Salisbury & Ryan, as they were fundamentally necessary to that work.  2d Salisbury Decl. ¶¶

---

privileges that belong to ECVK because they do not relate to Mr. Akhmetshin's work for Salisbury & Ryan.  Those documents are entries 192, 249, 251, 252, and 253.

[7]  IMR identifies 64 specific such documents, including the 24 purported strategic communications.  The 40 additional documents are entries 1, 2, 3, 92, 99, 105, 106, 109, 110, 111, 112, 113, 150, 151, 157, 167, 175, 177, 179, 181, 182, 191, 207, 214, 217, 218, 219, 220, 221, 222, 224, 225, 226, 227, 228, 229, 230, 231, 232, and 250.  Entries 226 and 227 are actually not at issue, as Mr. Akhmetshin recently produced them.  *See* Dkt. 27, Exh. R (April 27, 2015 Letter from K. Sperduto to J. Cogan).  Of the remaining 38, ECVK has determined that 29 are not subject to any privileges that belong to ECVK because they do not relate to Mr. Akhmetshin's work for Salisbury & Ryan.  Those documents are entries 1, 2, 3, 99, 111, 112, 113, 150, 175, 177, 179, 181, 182, 207, 214, 217, 218, 219, 220, 221, 222, 224, 225, 228, 229, 230, 231, 232, and 250.

[8]  IMR also argues about a third category of documents:  documents dated after August 31, 2013.  Dkt. 27 at 28-29.  But ECVK understands that, at present, there is no dispute about the privilege of any such documents.  ECVK takes no position on the responsiveness of documents created three months after Salisbury & Ryan ended Mr. Akhmetshin's engagement, except to note the scope of discovery requested by IMR and ordered by the Court:  "a discrete universe of documents and testimony related to Mr. Akhmetshin's own unlawful efforts on behalf of EuroChem and/or ECVK".  Dkt. 1 at 17.

67, 53-57; Dkt. 38-1 ¶¶ 13-17; Dkt. 10-1 ¶ 6.  Mr. Salisbury authorized those communications, and authorized Mr. Akhmetshin to disclose public information, only in order to permit Mr. Akhmetshin to have information to trade for that which he was able to obtain in return. Accordingly, it is clear that this category of disputed materials was generated in the course of and in furtherance of Mr. Akhmetshin's research work for ECVK and is therefore subject to the consulting expert immunity and the attorney work product doctrine.

IMR's further argument that these "strategic communications" should be produced because they were "shared with third parties," Dkt. 27 at 25, adds nothing of substance to the foregoing analysis.   IMR's thesis—that materials supplied to third parties as part of an information exchange cannot be subject to 26(b)(4)(D) or Rule 26(b)(3)—ignores the nature of Mr. Akhmetshin's research work and of the law.

First, as a matter of law, the "general trend" is to hold that the Rule 26(b)(4)(D) consulting expert immunity is not subject to waiver.  *Eidos*, 296 F.R.D. at 7-8 ("elect[ing] to follow this line of cases"); *Precision of New Hampton v. Tri Component Prods. Corp.*, No. C12-2020, 2013 WL 2444047, at *5-6 (N.D. Iowa June 5, 2013) (after surveying cases, finding that it "appears dubious that the waiver doctrine applies to" the consulting expert immunity); *Vanguard Savings & Loan Ass'n v. Banks*, No. CIV. A. 93-4627, 1995 WL 71293, at *1-2 (E.D. Pa. Feb. 17, 1995) (rejecting claim of waiver outright).  That is because the consulting expert immunity prohibits discovery of information from non-testifying experts "on the basis of fairness", independent of whether (1) the information might also be privileged attorney work product, or (2) its confidentiality has been safeguarded accordingly.  *Vanguard*, 1995 WL 71293, at *2.  The consulting expert immunity is thus "unrelated to the work product privilege," and claims of waiver are "wholly irrelevant and totally unpersuasive."  *Id.*  The "only question is

whether [the proponent] can meet the requirements set forth in [Rule 26(b)(4)(D)]." *Id.* IMR's case, *White v. Electrolux Communications*, No. 13 C 1617, 2014 WL 1365424 (N.D. Ill. Apr. 7, 2014), is the minority view and, in any event, is not binding here.

Moreover, even if the consulting expert immunity is subject to waiver, Mr. Akhmetshin has not waived the immunity or the attorney work product doctrine because he lacks the legal capacity to do so. The consulting expert immunity and attorney work product doctrine belong to ECVK and not Mr. Akhmetshin. Thus, only ECVK has the legal capacity to waive the privileges. *United States v. Hooker Chem. & Plastics Corp.*, 112 F.R.D. 333, 338 (W.D.N.Y. 1986) (finding that a consulting expert's disclosures to the press did not constitute waiver because only defendant, as holder of the protections, could waive the protections). Mr. Akhmetshin cannot possibly waive privilege over these specific documents and communications, whether by disclosing them to third parties or supposedly providing an inadequate privilege log, as IMR also claims. Dkt. 27 at 14-19.[9]

Finally, even if Mr. Akhmetshin had the capacity to waive the consulting expert immunity or attorney work product doctrine, he has not done so as to any of these documents. IMR claims that the relevant inquiry as to wavier of both the consulting expert immunity and the attorney work product doctrine is "whether the proponent 'had a reasonable basis for believing that the recipient would keep the disclosed material confidential.'" Dkt. 27 at 26 (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010) (which addresses the attorney work

---

[9] As a threshold matter, a privilege log is unnecessary here because all of the documents in question are protected by the consulting expert immunity and that immunity does "not require a privilege log". *Genesco, Inc. v. Visa U.S.A., Inc.*, 296 F.R.D. 559, 582 (M.D. Tenn. 2014) (finding that the affidavits and "other documents" provided an ample basis to assess the privilege issues).

product doctrine only, and not the consulting expert immunity).  But that is not the correct standard for the waiver of either protection.

Those cases that even contemplate waiver of the consulting expert immunity apply only in entirely different circumstances in which the "consultant" injects his work product directly into the case where the consulting expert is called to testify or shares his work product with other experts who do.  *Eidos*, 296 F.R.D. at 7-9 (finding, at most, "very limited" waiver even though the proponent attached the consulting expert's declaration to an earlier filing); *see also Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (finding waiver where proponent disclosed consulting expert's report to court-appointed neutral expert).  Simple disclosure of the consulting expert's underlying materials to the other side, however, does not put the consultant's opinions or factual knowledge into issue, and is therefore not a waiver. *Plymovent*, 243 F.R.D. at 146 (no waiver even though plaintiff submitted consulting expert's interview and report in support of an application for a preliminary injunction); *Intervet, Inc. v. Merial Ltd.*, No. 8:07CV194, 2007 WL 1797643, at *1-2 (D. Neb. June 20, 2007) (no waiver though plaintiff filed consulting expert's declaration in a separate but related action between the same parties).  Here, IMR does not and cannot allege that Mr. Akhmetshin, Salisbury & Ryan, or ECVK ever furnished Mr. Akhmetshin's work product even to IMR, let alone that ECVK called Mr. Akhmetshin to testify in the Dutch litigation or provided Mr. Akhmetshin's work product with any other expert that it retained.  And they did not do so.  2d Salisbury Decl. ¶ 53; Dkt. 38-1 ¶ 6.  The connection that would allow IMR to prove a waiver under the correct legal standard is therefore simply absent.

As to the attorney work product doctrine, "it is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product

doctrine is waived." *In re Application of Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (finding waiver where proponent disclosed documents to court-appointed neutral expert). IMR does not attempt to show any such disclosure. Mr. Akhmetshin's correspondence with certain journalists and researchers, and with Akezhan Kazhegeldin, was hardly inconsistent with keeping his work from IMR—whom each of these individuals was investigating for their own reasons. 2d Salisbury Decl. ¶¶ 11-30; Dkt. 38-1 ¶¶ 14-17. IMR cannot show otherwise, nor has it even attempted to do so.

While ECVK believes that the privileges have been sufficiently established without the need for any *in camera* review, it believes that any lingering questions could easily be resolved through such a procedure. In any event, ECVK respectfully urges that the Court should not determine that any of these materials are *un*privileged until after at least the opportunity for such a review and explanation.

## III.   IMR FAILS TO ESTABLISH THAT THE CRIME-FRAUD EXCEPTION APPLIES

Notwithstanding the very serious nature of such an allegation, and without the strong evidentiary support that is required, IMR baselessly asserts that the crime-fraud exception applies to every single document that Mr. Akhmetshin withheld. Dkt. 27 at 19-21. Yet IMR falls well short of establishing that the exception applies and the Court should reject IMR's bid summarily.

As a threshold matter, the crime-fraud exception is not lightly or casually applied. Rather, the party seeking to invoke the exception bears a heavy burden. "[M]ore is necessary than mere allegations of wrongdoing[.]" *Tri-State Hosp. Supply Corp. v. United States*, 238 F.R.D. 102, 104 (D.D.C. 2006). (quotation omitted). Rather, to "drive the privilege away, there must be something to give colour to the charge; there must be *prima facie* evidence that it has

some foundation in fact." *Id.* (quotation omitted).  The party seeking disclosure "satisfies its burden of proof if it offers evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997).

Unsurprisingly, the standard a party must meet to establish the crime-fraud exception is highly demanding.  To overcome the attorney work product doctrine, the party seeking disclosure must show that the client used the attorney to further a crime or fraud.  *Tri-State Hosp.*, 238 F.R.D. at 104-05.  The focus – in the standard, but not in IMR's motion – is on "the *client's* intent in consulting with the lawyer or in using the materials the lawyer prepared." *In re Sealed Case*, 107 F.3d at 51 (emphasis added).  "The question is:  Did the *client* consult the lawyer or use the material for the purpose of committing a crime or fraud?" *Id.* (emphasis added).

IMR comes nowhere close to attempting, let alone making, such a showing.  Most fundamentally, IMR presents no real evidence that ECVK itself had any unlawful intent, as the exception requires.  *In re Sealed Case*, 107 F.3d at 50 (reversing a finding of crime-fraud where there was insufficient evidence that the client had anything to do with its employee's crime). IMR argues repeatedly in its moving papers that it has submitted "substantial evidence" and/or "ample evidence" that "Mr. Akhmetshin was hired by Salisbury & Ryan on behalf of ECVK to hack into IMR's computer systems, steal IMR's confidential information, and disseminate it to third parties." Dkt. 27 at 19-20.

In reality, however, IMR's argument is not only unsupported, but has it backward: the only persuasive evidence of record demonstrates that ECVK did not retain or direct Salisbury & Ryan to "hack into IMR's computer systems, steal IMR's confidential information, [or]

disseminate it to third parties," nor did Salisbury & Ryan direct anyone to obtain information from IMR or any of its affiliates in any improper manner.   In fact, Salisbury & Ryan's engagement letter with Mr. Akhmetshin specifically required that he comply with all applicable laws in the conduct of his research, and Salisbury & Ryan never knew of nor of course condoned (let alone directed or procured) any improper information-gathering by Mr. Akhmetshin.   2d Salisbury Decl. ¶¶ 60, 68, 76-80.   And the record demonstrates conclusively that ECVK did not participate actively in the decision to retain Mr. Akhmetshin, let alone know of the details concerning the research he was conducting or the manner in which he was conducting it.   *Id.* ¶¶ 58-59, 61; Sidnev Decl. ¶¶ 11, 14, 17; Krakhmalnyy Decl. ¶¶ 6, 9.

This conclusive and unrebutted evidence demonstrating the absence of any link between (1) any improper purpose or act by ECVK or even its litigation counsel and (2) any act by Mr. Akhmetshin is itself sufficient to end the inquiry.   The "critical consideration" is that IMR's evidence must be aimed at the intent and action of ECVK, the client.   *In re Sealed Case*, 107 F.3d at 50 (reversing a finding of crime-fraud where there was insufficient evidence that the client had anything to do with its employee's crime).   Because IMR cannot link ECVK to its claims of illegality, its motion must be denied.

But there are additional reasons why IMR's crime-fraud argument cannot succeed.   The only evidence that IMR did present – all of which points only to Mr. Akhmetshin – is woefully insufficient.   In the Dutch litigation, IMR has never even alleged that ECVK or Mr. Akhmetshin engaged in any improper conduct toward it, including by hacking, let alone offered any evidence of such conduct.   2d Salisbury Decl. ¶¶ 45-47; Sidnev Decl. ¶ 18.   Here, IMR presents only two pieces of evidence, of the most questionable character—neither of which is probative against Mr. Akhmetshin, let alone ECVK or its litigation counsel.   First, IMR relies heavily on the "London

coffee shop" conversation in which Mr. Akhmetshin apparently made a number of boasts about information he obtained from IMR—but aspects of the record concerning his purported statements shop deprive that event of any probative force:

(1)  Virtually none of the things Mr. Akhmetshin purportedly said attributed misconduct *to ECVK*.  The only allegation that could possibly be meaningful is his boast that he had arranged hacking "on behalf of" ECVK, but those do not even purport to be his own words.  Nor has Mr. Akhmetshin agreed that he said them.  IMR conveniently did not ask Mr. Akhmetshin at his deposition whether he had said that—or any of the things alleged in paragraphs 14, 18-19 or 21 concerning ECVK or certain affiliated persons.  *See generally id.*  Accordingly, IMR's overreaching assertion that "Mr. Akhmetshin tacitly admitted that the London Coffee Shop conversation occurred exactly as Mr. Phanartzis described it", Dkt. 27 at 20, is simply incorrect.[10]

(2)  Whether Mr. Akhmetshin said the particular words in the coffee shop or not, they prove nothing because (a) he has testified they were not true; he lacks the technical skill to "hack" and he did not organize or procure hacking against IMR or anyone else, Dkt. 38-1 ¶ 7.

---

[10] Most of the things Mr. Akhmetshin purportedly said are innocuous on their face.  He indeed "dealt with" ECVK's "head of security", *see* Dkt. 27, Exh. D at ¶ 18, in the course of a conversation concerning a pitch to do strategic communications work, during which the head of security paid little attention because he was not interested, and which ECVK promptly declined to pursue.  Sidnev Decl. ¶¶ 14-16; Krakhmalnyy Decl. ¶¶ 5, 8.  And yes, Mr. Akhmetshin was "hired … because of his expertise in disputes that require sensitive work and because of his contacts in Kazakhstan," Dkt. 27, Exh. D at ¶ 19, as Patrick Salisbury has explained in more detail—and the same might readily be said of any forensic accounting assignment or investigative assignment that a large accounting firm or Kroll Associates might conduct anywhere, particularly in regions of the world where commercial practices are not heavily regulated and not transparent.  It hardly supports an inference of misconduct, particularly in light of the testimony of ECVK's own representatives.  Paragraphs 20-22 of Mr. Phanartzis's declaration are of a similar nature.  Dkt. 27, Exh. D at ¶ 20-22.  Forensic and investigative consultants do perform services at which lawyers are not nearly as adept, particularly if they are not from that region, and consulting experts meet with lawyers in the normal course of their work.

(b) Mr. Salisbury has explained in detailed sworn testimony that Mr. Akhmetshin was retained to conduct legitimate research and analysis, not to obtain information illegally (which was prohibited under his consulting agreement), 2d Salisbury Decl. ¶¶ 48-60, and (c) none of the materials he provided appeared or were identified to come from hacking or other illicit means. *Id.* ¶¶ 68, 76-80.  The testimony of ECVK's head of security, Vladimir Krakhmalnyy, and its General Counsel Valery Sidnev ice the cake—there was no guidance, request or permission to obtain information illegally.   Sidnev Decl. ¶ 19; Krakhmalnyy Decl. ¶ 10.   Thus, Mr. Phanartzis's uncorroborated assertion that Mr. Akhmetshin said he had organized a computer hacking "on behalf of ECVK" hardly establishes that Mr. Akhmetshin actually did so.

Second, IMR offers a description of a thumb drive allegedly containing both sensitive IMR information and indications that it had been accessed by someone designated "RA" and another person designated "Scott Horton," from which IMR tries to promote the inference that this "must have" originated with Mr. Akhmetshin, and that Mr. Akhmetshin "must have" obtained this information through improper means, and "must have" done so at ECVK's and its litigation counsel's direction.  Dkt. 27 at 13, 21.  This "evidence" is woefully inadequate on its face.  It suffers from multiple foundational defects of the most basic kind, raises substantially more questions than it purports to answer, and cannot support any inference of misconduct even by Mr. Akhmetshin, let alone by Salisbury & Ryan and/or ECVK.

This purportedly probative physical evidence was never produced, calling into question whether it has the characteristics attributed to it in testimony.  Indeed, IMR acknowledges that it has no idea where the thumb drive actually came from—and whether the unknown source of the document himself or herself introduced electronic evidence that a user designated "RA," or another user designated "Scott Horton," obtained access to the files on the thumb drive.  Dkt. 27

at 20-21.  To put it more pointedly, we do not know (and IMR itself does not purport to know) whether this file was generated in the course of an investigation by the Serious Fraud Office, nongovernmental organizations such as Global Witness, or journalists—nor how many other hands it may have passed through on its purported way to an envelope in the lobby of a London hotel.  It could have been assembled by IMR itself from multiple files, accessed by technicians who opened accounts under "user names" RA and Scott Horton, and delivered anonymously to IMR's own investigator.  Nor is there any indication what "certain [unidentified] files" were supposedly "accessed," let alone when, by whom or whether such access was unauthorized.  To put it mildly, the authenticity of the purported thumb drive suffers from such dramatic defects that no one could take it seriously as probative evidence.  *Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 540250, at *9-10 (N.D. Ill. Feb. 11, 2014) (requiring authentication of hard drive in order for the court to consider the contents of the drive as evidence on a Rule 23 motion).[11]

Finally, even if all of these fundamental deficiencies could be overlooked—and they cannot—IMR's attempt to establish the crime-fraud exception would still face an insuperable obstacle.  *Nothing in the thumb drive contains or supports the suggestion that Salisbury & Ryan, let alone ECVK, had any hand in procuring any improper information-gathering that it might suggest.*  This is, to put it gently, an insufficient basis on which to establish the serious showing that the crime-fraud exception requires.  As in *In re Sealed Case*, IMR offers the Court "no way

---

[11] IMR's assertions about what the purported files must be, where they must have come from, and how they must have been obtained is offered primarily by a lawyer with no apparent technical expertise or foundation to draw any such conclusions (*see generally* Dkt. 27, Exh. F, Declaration of Thadeusz Jarmolkiewicz), while the witness who purports to have the requisite expertise asserted only that she knew the user names adopted by whomever accessed "certain files" on the thumb drive.  There is not only no evidence who those users actually were, but no indication what files they accessed or how sensitive they were, or when they were accessed.

of knowing or even guessing whether [Mr. Akhmetshin] was on a frolic of his own, against the

advice of [Salisbury & Ryan], when he [supposedly took IMR's confidential information]" even

if he acted as IMR alleges.  107 F.3d at 50 (reversing a finding of crime-fraud where there was

insufficient evidence that the client had anything to do with its employee's crime).  This can

hardly overcome the sworn testimony submitted by ECVK and its litigation counsel that counsel

unambiguously instructed Mr. Akhmetshin to conduct research using proper legal means in the

parties' written agreement, that counsel had no reason to doubt that Mr. Akhmetshin did so, and

that ECVK itself had little to no contact with Mr. Akhmetshin throughout the course of his

engagement.  2d Salisbury Decl. ¶¶ 68, 76-80; Sidnev Decl. ¶¶ 11-12, 17-19.[12]

Finally, IMR also fails to establish that the crime fraud exception applies because IMR

does not even attempt to link ECVK's supposed intent to any specific communications or

documents.  The crime-fraud exception "has a precise focus," and "applies only when the

*communications* between the client and his lawyer *further* a crime, fraud or other misconduct."

*United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added) (reversing a finding

that the crime-fraud exception applied because there was no evidence that the privileged

communication furthered the client's crime).  *See also United States v. Finotti*, CRIM No. 88-

---

[12] There are other stray facts from which IMR tries to draw sinister inferences, but these are obviously weightless.  For example, IMR "presumes" that a list of search terms Mr. Akhmetshin obtained from a journalist were "search terms for Mr. Akhmetshin to use to look for information, presumably in the set of documents Mr. Akhmetshin obtained through the improper hacking of IMR's computers."  Dkt. 27 at 21 n.3 (*citing* Dkt. 27, Exh. M).  This not only "presumes" the unsupported conclusion that Mr. Akhmetshin engaged in hacking, but ignores both that the topics were the subject of Mr. Akhmetshin's legitimate research and the ubiquitous modern practice of using search terms in computerized search engines, such as Google.  Indeed, ten minutes worth of just such a search of these names along with IMR, and in other combinations, produces a wealth of interesting information concerning IMR's business relationships and shows that the subject terms are names of people and entities who have been involved in one way or another with the Trio.

0286 (HHG), 1988 WL 129723, at *1-2 (D.D.C. Nov. 17, 1988) (rejecting the crime fraud exception because the challenged communication did not further the crime). "It does not suffice that the communications may be related to a crime." *White*, 887 F.2d at 271. Rather, the communications "must actually have been made with an intent to further an unlawful act." *Id.* IMR does not even allege that any specific communications or documents were actually made with an intent by ECVK to further an unlawful act. Instead, IMR simply argues that every single document that Mr. Akhmetshin withheld must be related to ECVK's imagined intent. Dkt. 19-21. That is not enough.

IMR fails to meet its burden to provide *prima facie* evidence that its crime-fraud allegations have foundation in fact, and the Court should reject those allegations. Nor has IMR showed a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review may reveal evidence to establish that the crime-fraud exception applies. *In re Application of Chevron Corp.*, 633 F.3d at 167.

## <u>CONCLUSION</u>

For the reasons stated above, as to the documents addressed in this response, the Court should deny International Mineral Resources B.V.'s motion to compel production of documents and additional day of deposition.

Dated: June 18, 2015                    Respectfully submitted,


                                        */s/ Edward J. Shapiro*
                                        Edward J. Shapiro
                                        William H. Rawson
                                        LATHAM & WATKINS LLP
                                        555 Eleventh Street NW, Suite 1000
                                        Washington, DC 20004-1304
                                        Tel.: (202) 637-2200
                                        Fax: (202) 637-2201
                                        edward.shapiro@lw.com
                                        william.h.rawson@lw.com

                                        Patrick P. Salisbury
                                        Salisbury & Ryan LLP
                                        1325 Avenue of the Americas
                                        New York, New York 10019-6026
                                        Tel.: (212) 977-4660
                                        Fax: (212) 977-4668
                                        PS@SalisburyRyan.com

                                        *Attorneys for EuroChem Volga-Kaliy LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June, 2015, I electronically filed the foregoing Third-Party Intervenor EuroChem Volga-Kaliy LLC's Response to International Mineral Resources B.V.'s Motion to Compel Production of Documents and Additional Day of Deposition with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record via electronic mail.

*/s/ Edward J. Shapiro*
Edward J. Shapiro
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004-1304
Tel.: (202) 637-2200
Fax: (202) 637-2201
edward.shapiro@lw.com

*Attorney for EuroChem Volga-Kaliy LLC*