## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF INTERNATIONAL MINERAL
RESOURCES B.V. FOR AN ORDER TO TAKE
DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Applicant.

)
)
)
)
)
)
)
)
)
)

1:14-MC-00340
JUDGE KESSLER Assigned:
April 3, 2014 Miscellaneous

## DECLARATION OF PATRICK P. SALISBURY

Pursuant to 28 U.S.C. § 1746, I, Patrick P. Salisbury, declare under penalty of perjury as follows:

1.      I am the senior partner of Salisbury & Ryan, LLP "(S&R)", a law firm based in New York, New York.  I have been a member in good-standing of the Bars of the State of California since 1982, the State of New York since 1993 and the District of Columbia since 1995 and am admitted to practice before the federal courts in several states.

2.      I make this declaration in support of EuroChem Volga-Kaliy LLC'S ("ECVK") Opposition to the Motion of International Mineral Resources B.V. ("IMR") to Compel Production of Documents and Additional Day of Deposition, based on my personal knowledge following reasonable inquiry.

### A.      The underlying dispute

3.      ECVK is a wholly owned subsidiary of JSC MCC EuroChem ("EuroChem"), which is part of the Swiss-based EuroChem Group AG, one of the largest fertilizer producers in the world.  EuroChem is one of the world's leading agrochemical companies ranking among the

top three European and top ten global industry leaders, with over $5 billion in annual revenues and operations in numerous countries.[1]   The group operates production facilities in Belgium, Lithuania, China, Russia, and Kazakhstan, and employs more than 22,000 people.   In concert with best practices employed by major Western European public companies, EuroChem is "committed to following best international corporate governance practices."  *Id.* at 61. EuroChem recognizes that "[f]undamental to [its] business success is the existence of a strong culture of corporate compliance and internal control."  *Id.* at 64.   To that end, EuroChem's Board of Directors "formulates the strategy for the Group and ensures that proper checks and balances are in place to serve [its] stakeholders."  *Id.* at 61.   Additionally, the Board "delegates and oversees the work of the Management Board."  *Id.* at 60.   The Board contains ten members, five of whom are independent directors.  *Id.* at 62-62.   EuroChem also has a three-person Audit Committee, two of whom are independent directors.  *Id.* at 64.   The Committee's primary purpose is to provide oversight of the financial reporting process, the audit process (both external and internal) and the system of internal controls and compliance with laws and regulations."  *Id.* at 72.  And PricewaterhouseCoopers is EuroChem's external auditor.  *Id.*   In short, EuroChem is a responsible member of the European corporate community.

4.    In 2007, EuroChem was planning the development of an integrated mining-and-processing facility on the site of a large potash deposit in Southern Russia to be carried out by its

---

[1]   *See* EuroChem 2014 Annual Report (Exh. 1).

subsidiary ECVK (the "Project").  Developing its own mineral base for producing potassium would make EuroChem one of only four companies in the world that produces all three essential plant nutrients (nitrogen, phosphate and potassium).  Doing so remains one of EurocChem's main strategic goals, and to that end EuroChem planned to invest over $2 billion in the first phase of the Project which would have resulted in initial production capacity of 2.3 million tons of potash per year commencing in 2014.

5.    In the fall of 2007, ECVK commenced negotiations with a South African shaft-sinking company named Shaft Sinkers (Pty) Ltd. ("ShS") for the design and construction of one of the two deep mining shafts required for the extraction of potash.  The contract between ShS and ECVK for the design of the shaft was concluded in December 2007, and the main $350 million contract for the building and construction works was concluded in July 2008.

6.    However, by the end of 2011, after almost four years of futile efforts accompanied by numerous shaft floodings and collapses, instead of the 1117-meter (over 3000-feet) deep shaft that ShS were supposed to build, ECVK ended up with a 93-meter deep, flooded hole in the ground, having incurred $282 in wasted costs, and facing the prospect of starting the sinking anew using a completely different technology, with an attendant significant production delay and lost profits in excess of $700 million.

7.    EuroChem suspended any further work by ShS in December 2011 and terminated it from the Project in early 2012.  EuroChem's subsequent investigation revealed that ShS had (i) fraudulently induced ECVK to enter into the $350 million contract that it knew it would not be

3

able to complete; (ii) bribed ECVK's Chief of the Mine Construction Division overseeing Shaft Sinkers' work on the Project; and (iii) committed massive procurement fraud.

8.      In March 2012, ECVK retained S&R to represent ECVK in its dispute with ShS. S&R served as ECVK's lead counsel in the arbitration proceedings against ShS filed in October 2012 before the Swiss Chambers' Arbitration Institution in Zurich and the International Chambers of Commerce in Paris, as well as in the lawsuit filed against IMR in the Dutch court in March 2013 (the "Dutch Action"). S&R was hired to represent ECVK in the Swiss and ICC Arbitrations, and in any related proceedings by ECVK through EuroChem's General Counsel, Valery Sidnev, who controls and directs outside counsel for ECVK. To the extent ECVK directed S&R's work, Mr. Sidnev provided such direction. In the course of its engagement, S&R reported only to EuroChem's Chairman, CEO and General Counsel.

### B.      Applicant IMR

9.      IMR is a private limited liability company incorporated in The Netherlands. It is owned, through holding companies, by three billionaire oligarchs from Kyrgyzstan and Uzbekistan -- Alexander Machkevitch, Patokh Chodiev, and Alijan Ibragimov -- known as the "Trio." IMR is the defendant in a $1 billion claim brought by ECVK in the Amsterdam District Court for fraud, bribery and corruption committed by IMR's subsidiary ShS on ECVK's Project.

10.      IMR is part of the Trio's mining and metal-processing business empire, which was built during the murky post-Soviet privatization of the early 1990s and which primarily

4

included Eurasian Natural Resources Corporation Plc ("ENRC") – a company that was publicly traded on the London Stock Exchange from 2007 until its 2014 delisting amid swirling corruption scandals and criminal inquiries.

11.    In particular, according to allegations brought by the U.K. Serious Fraud Office ("SFO"), other respected organizations, as well as ENRC's own public admissions and credible press reports, ENRC and/or the Trio engaged in *"fraud, bribery, and corruption,"*[2] *"corruption at subsidiaries,"*[3] *"money laundering and forgery,"*[4] *"tax evasion,"*[5] *"money being siphoned off from the employees' fund,"*[6] the audit committee's investigation *"obstructed,"*[7] *"continual attempts to block the internal inquiry into alleged corruption,"*[8] *"documents being destroyed and electronic data being falsified,"*[9] *"staff forging documents, supplying the wrong computer to the investigative team, and setting up a 'false office,'"*[10] *"the dismissal of internal*

---

[2]  The Guardian, *ENRC: Serious Fraud Office Launches Criminal Investigation*, Apr. 25, 2013 (Exh. 2).

[3]  The Telegraph, *ENRC in Talks with SFO Over Corruption Allegations*, Dec. 11, 2011 (Exh. 3).

[4]  Financial Times, *Case Against Three ENRC Oligarchs Settled*, Aug. 17, 2011 (Exh. 4).

[5]  ENRC Prospectus, pp. 191-92 (Exh. 5).

[6]  The Telegraph, *ENRC Cash 'Used to Pay University Fees of Official's Son,'* Apr. 19, 2012 (Exh. 6).

[7]  The Telegraph, *ENRC in Talks With SFO Over Corruption Allegations*, Dec. 11, 2011 (Exh. 3).

[8]  The Telegraph, *SFO Inquiry to Examine ENRC's Offshore Payments*, Apr. 27, 2013 (Exh. 7).

[9]  The Telegraph, *ENRC Cash 'Used to Pay University Fees of Official's Son,'* Apr. 19, 2012 (Exh. 6).

[10]  The Guardian, *ENRC: Serious Fraud Office Launches Criminal Investigation*, Apr. 25, 2013 (Exh. 2).

*investigators and serious threats to officials carrying out the inquiry,*[11] and even *"death threats.*"[12]

12.     "Key members of the Chodiev Group" – *i.e.,* the Trio, including Patokh Chodiev, IMR's witness who submitted a declaration in support of its application herein – were reported "to have had business links with organized crime in the former Soviet Union."[13]

C.    **Track record of fraudulent business practices**

13.     The Trio owned ENRC before its IPO in December 2007, remained its major shareholder after the IPO, and took the company private when it was delisted from the London Stock Exchange in November 2014.  ENRC is not a party to the Dutch Action; nevertheless, its brief history as a public company left a track record of corrupt and fraudulent practices that provides a relevant background to IMR's current application.

14.     Major corporate governance issues, as well as corruption scandals, plagued the Trio and ENRC from the inception of its listing on the London Stock Exchange in December 2007.  In an ill-fated attempt to deal with these issues, ENRC installed Sir Richard Sykes, former CEO of GlaxoSmithKline, as the senior independent director of ENRC.  But that attempt at improving transparency and corporate governance failed when in June 2011 the Trio voted

---

[11] The Telegraph, *SFO Inquiry to Examine ENRC's Offshore Payments*, Apr. 27, 2013 (Exh. 7).

[12] Financial Times, *Three ENRC Founders Weigh Buy-out Offer*, Apr. 19, 2013 (Exh. 8).

[13] BBC News, *The Steel Maharajah*, July 24, 2002 (Exh. 9).

against the reappointment of Sykes and other independent directors at the very time they were investigating allegations of fraud orchestrated by the Trio.  Sir Richard responded to his ouster by the Trio by stating to the UK press: "These guys [the Trio] are mad. This is a public company that's run by private people, It's more than bloody peculiar. It's run by oligarchs.  As soon as you get the opportunity to sell your shares I'd sell them."[14]

15.    Kenneth Olisa, another U.K. independent director ousted by the Trio during the same purge, published an open letter to the ENRC board, expressing the same sentiment and labelling ENRC's governing style as "more Soviet than City."[15]  In that letter, Mr. Olisa also referred to the "leaks from within" ENRC.[16]

16.    As far as the corrupt business practices of the Trio and ENRC, those were revealed in several major corporate scandals that erupted in the past few years, as summarized briefly below.

17.    In July 2011, the Trio agreed to pay a fine in undisclosed amount to settle a long-running criminal money laundering and tax evasion investigation by the Belgian authorities. "The Belgian case involved allegations of money-laundering and forgery revolving around the

---

[14] This is Money, *Sykes Slams 'Mad' Oligarchs at Miner ENRC*, June 9, 2011 (Exh. 10).

[15] The Telegraph, *ENRC 'More Soviet Than City', Says Ousted Board Member Ken Olisa*, June 9, 2011 (Exh. 11).

[16] This is Money, *Sykes Slams 'Mad' Oligarchs at Miner ENRC*, June 9, 2011 (Exh. 10).

7

use of $55m in commissions that Tractabel, a Belgian engineering group, paid the men in the mid-1990s."[17]

18.    In 2012, ENRC agreed to pay $1.2 billion to settle a lawsuit brought by the former owner of an expropriated copper mine in the Democratic Republic of Congo, which alleged that the mine had been stolen by the Congolese authorities with the assistance of ENRC and massive bribes had been paid in connection therewith.[18]  In that transaction, the Congolese government seized a major mining operation from ENRC rival First Quantum Minerals and sold it to an associate of the President of Congo for $20 million. Within months, that mine was resold to ENRC. Fraud and bribery allegations erupted; major shareholders in the UK sold their holdings in ENRC; and First Quantum Minerals, the original owner of the expropriated Congo mine, sued ENRC for $2 billion. The scandal reached the UK Parliament, where Eric Joyce, a Labour MP, demanded an investigation and said the deal had left ENRC's reputation "wreck[ed]."[19]

19.    At the end of 2011, UK media reported, and ENRC confirmed, that ENRC was under investigation by the U.K. Serious Fraud Office "about allegations of corruption at

---

[17]  Financial Times, *Case Against Three ENRC Oligarchs Settled*, August 17, 2011 (Exh. 4). *See also* ENRC Prospectus at pp. 191-92 (Exh. 5).

[18]  *See* ENRC 2011 Annual Report at p. 130 (Exh. 12) and Global Witness' Memorandum to ENRC shareholders dated June 12, 2012, p. 9 (Exh. 13).

[19]  The Telegraph, *MP Calls for Serious Fraud Office Checks on ENRC*, Apr. 8, 2011 (Exh. 14).

subsidiaries of the FTSE 100 mining group."[20] ENRC itself acknowledged in its December 2012 public filing that it was under investigation by the SFO in the U.K. on claims of massive corruption in Africa and Kazakhstan. ENRC admitted that "the [SFO] investigations are ongoing and there can be no certainty as to the outcomes. It is additionally possible that the scope of the SFO reporting process will be widened and/or that other investigations may be necessary as a result of the findings of the existing investigation. The outcome of the investigations may raise issues including those regarding compliance by the Company, its directors, and employees with applicable laws including those relating to anti-bribery and corruption, sanctions, money laundering and fraud."[21]

20.    The scope of the SFO investigation included the Congo deal as well as a whistleblower's allegations of corrupt practices at ENRC's Kazakh subsidiary where the SFO was investigating hundreds of millions of dollars in illicit payments made through a small "farm" owned by an ENRC subsidiary.  More details about the Kazakh prong of the SFO inquiry came to light in the spring of 2012, when it was revealed that cash had been siphoned off from a workers' education fund run by ENRC and used to pay expenses of high ranking Kazakh public

---

[20]  The Telegraph, *ENRC in Talks With SFO Over Corruption Allegations*, Dec. 11, 2011 (Exh. 3).
[21]  ENRC's Circular to Shareholders dated Dec. 7, 2012, at p. 14 (Exh. 15).

officials. Once again, documents related to this bribery had been destroyed and electronic data falsified by ENRC employees.[22]

21.    ENRC also admitted that its actions were under investigation by the UK Financial Services Authority which oversees compliance by UK listed companies with the rule of the London Stock Exchange. ENRC advised its shareholders that this investigation could lead to further sanctions against the group.

22.    On April 25, 2013, the SFO announced a criminal investigation (still on-going) into ENRC: "the focus of the investigation will be allegations of fraud, bribery and corruption relating to the activities of the company or its subsidiaries in Kazakhstan and Africa." The SFO announcement followed the news that ENRC's outside counsel investigating allegations of fraud, bribery and corruption abruptly quit its engagement, and several long-time directors of ENRC, including its Chairman, departed as well.

23.    The Trio-controlled ENRC companies went to extraordinary lengths to conceal their fraudulent activities, not only by erasing computer data and falsifying financial statements, but even constructing a fake office in order to deceive ENRC's own outside counsel investigating fraud allegations.[23]

---

[22] The Telegraph, *ENRC Cash 'Used to Pay University Fees of Official's Son,'* Apr. 19, 2012 (Exh. 8).

[23] The Guardian, *ENRC: Serious Fraud Office Launches Criminal Investigation,* Apr. 25, 2013 (Exh. 2).

24.     The US Department of Justice was also reportedly investigating "transnational corruption" at ENRC at the time, with the former ENRC chief of compliance providing information to the US authorities.[24]

### D.    Massive leaks

25.     ENRC scandals have left many senior insiders unhappy and disgruntled, and leaking the Trio's and ENRC's inside information to the press. Thus, after the ouster of independent directors in 2011 described above, more high-profile departures followed in 2013. In April 2013, British press reported on "the sudden departure of chief commercial officer Jim Cochrane, who had been part of the management team for a decade.  In addition ENRC's chairman Mehmet Dalman, who is overseeing an internal probe into the company's business in Kazakhstan and Africa, has threatened to resign over unspecified 'issues of principle,' according to one person familiar with the matter."[25]

26.     A senior ENRC corporate investigator received death threats and subsequently lost his job: "Alex Gaft, a former senior ENRC corporate investigator, received an email while working at the company warning him to stay away from ENRC's Kazakhstan business.  'You

---

[24]   Just Anti-Corruption, *U.S. Joins Probe of Kazakh Miner ENRC, Already Under Investigation in London*, Aug. 26, 2013 (Exh. 16).

[25]   Financial Times, *Three ENRC Founders Weigh Buy-out Offer*, Apr. 19, 2013 (Exh. 9).

have touched matters where a lot of money is involved and you will be torn into pieces,' it read. 'You and all your relatives.'  Mr. Graft this month lost his job."[26]

27.    ENRC's Chairman and its outside counsel retained to investigate the whistleblower's allegations also resigned at that time:  "ENRC has suffered a series of high-profile departures, including the resignation this week of its chairman, Mehmet Dalman, who had been leading the internal investigation.  On Monday Dalman, who had staked his reputation on clearing up the ENRC mess, admitted:  'I believe I have achieved all that I can as chairman of ENRC.'  The company's law firm, Dechert, which had been hired by the company to conduct its investigation, has also parted company with the mining group, a move that prompted the SFO to demand that the law firm hand over documents relating to the case."[27]

28.    One of the consequences of ENRC's unsavory business practices were substantial leaks by insiders of ENRC's documents to third parties, including the press.  Thus, in *ENRC v. Sir Paul Judge*, a case brought by ENRC against its former independent director for leaking the company's confidential information to a journalist, the court found that "[i]t is clear that, in 2010, [ENRC] became concerned that confidential information about the company was being leaked to third party sources, in particular the press."[28]  *ENRC v. Sir Paul Judge*, 2014 WL

---

[26]  *Id.*

[27]  The Guardian, *ENRC: Serious Fraud Office Launches Criminal Investigation*, Apr. 25, 2013 (Exh. 2).

[28]  *ENRC v. Sir Paul Judge*, 2014 WL 5483609, at ¶ 12 (Oct. 31, 2014) (Exh. 17).

5483609, at ¶ 12.  The "astonishing list of alleged leaks" was later published in the U.K. press.[29]
As noted above, the former independent director of ENRC Mr. Olisa referred to the "leaks
within" ENRC in his June 2011 letter to the board.

29.     And in ENRC's lawsuit against its former outside counsel Dechert LLP, the High
Court of Justice in a published decision referred to "the whistleblower report" and the
"allegations about ENRC in a letter from Dechert to ENRC" having been leaked to the press.[30]

30.     Compared to ENRC, another part of the Trio's business empire -- IMR --
remained a privately held company shielded from market scrutiny, with little information about it
available to the public.  S&R, however, suspected that the Trio's *modus operandi* at ENRC was
similar to that at IMR and, in June 2012, in contemplation of filing an action against IMR, S&R
retained Mr. Akhmetshin, an expert in Kazakh business and politics with a wide network of
connections in those circles as well as in the media, to assist in researching factual information
and conducting pre-filing due diligence on IMR.  Critically, by that time confidential information
from ENRC had already been leaked and continued to be leaked to the public by directors and
senior officers of ENRC from at least 2010 until now, and was widely available to journalists,

---

[29]  The Independent, *Exclusive:  ENRC Turns up Heat in Medial Leaks Claim Against City Grandee Leaking*, Mar.
29, 2014 (Exh. 18).

[30]  *Eurasian Natural Resources Corporation Ltd. v. Dechert LLP*, [2014] EWHC 3389, ¶¶ 4, 68 (Oct. 24, 2014)
(Exh. 19).

nongovernmental "watchdog" organizations, governmental investigators and well-informed people like Mr. Akhmetshin without the need for any hacking.

### E.    The Foreign Proceedings:  Swiss and ICC Arbitrations and Dutch Action

31.    Since 2012, S&R has been the primary counsel to ECVK in the on-going international arbitration proceedings against ShS and Rossal 126 (Pty) Limited (ShS' corporate predecessor) before the Swiss Chambers Arbitration Institute (Case No. 600318-2012) (the "Swiss Arbitration") and the International Chambers of Commerce (Case No. 18990/GZ/MHM) (the "ICC Arbitration").

32.    ECVK alleges in the arbitration proceedings that Shaft Sinkers fraudulently induced it to enter into a $350 million mine shaft construction contract that it knew it would not be able to complete; utterly failed to construct the shaft; committed massive procurement fraud in the process; and bribed ECVK's Chief of the Mine Construction Division who was overseeing their work (paying him more than $400,000 in cash bribes while the work was ongoing).  ECVK seeks approximately $1 billion in damages for wasted costs and lost profits.

33.    The hearing in the Swiss Arbitration has been completed.  ECVK fully expects to prevail and the Tribunal has informed the parties that an award will be issued by July 2015.[31]

---

[31]  The ICC Arbitration is stayed until completion of the Swiss Arbitration.

34.     Early in the Swiss Arbitration it became apparent that ECVK's fraud claims – approximately $282 million in wasted costs and $700 million in lost profits, far exceeded ShS' available resources and that ShS would be unable to satisfy the expected judgment. Moreover, it became apparent that ShS' controlling parent might also be responsible for the fraud which occurred.

35.     At the time S&R did not know, however, the specific organizational structure of the ShS group. S&R understood that control of ShS ultimately rested with entities controlled by the Trio. S&R also understood that the Trio were engaged in extensive business activities in Kazakhstan, but we did not know which of their many entities owned and controlled Shaft Sinkers.

36.     As discussed below, S&R eventually learned that ShS was controlled and managed by IMR, a privately held Dutch company owned by the Trio, and that IMR was, in the view of ECVK'S Dutch counsel Houthoff Buruma and Baker McKenzie, leading Dutch law firms, liable under Dutch law for the fraud committed by ECVK.

37.     Based on this, ECVK brought an action against IMR, the corporate parent of ShS, now pending in the Court of Appeal in the Netherlands (the "Dutch Action"). ECVK alleges in the Dutch Action that IMR orchestrated and directed the fraud committed by ShS and is liable to ECVK both directly and as a controlling shareholder of ShS.

38.     In July 2013, after an extensive evidentiary hearing with numerous witnesses from both parties, the Dutch District Court granted ECVK's request for a prejudgment attachment of IMR's assets in the amount of $1.2 billion, one of the largest pre-judgment attachments in Dutch history.

39.     Despite this, on 25 June 2014, the Dutch District Court dismissed ECVK's claims stating that "ECVK has put forward insufficiently concreate facts and circumstances from which it may be inferred that IMR is liable for unlawful acts executed by [Shaft Sinkers]".  Critically, however, the Dutch District Court decision was entered *before* the hearing in the Swiss Arbitration.  The Dutch District Court thus did not have the benefit of the numerous documents and witness testimony later submitted in the Swiss Arbitration or other evidence that IMR withheld.

40.     On 18 September 2014, ECVK appealed the Dutch District Court decision. Unlike in the U.S., a Dutch District Court decision is always reviewed entirely *de novo* by the Dutch Court of Appeal and new evidence and witnesses may be presented.  Accordingly, ECVK's appeal includes the evidence withheld from the Dutch District Court but later produced in the Swiss Arbitration, together with other evidence withheld by IMR but obtained by ECVK after the Dutch District Court decision (none of which came, directly or indirectly, from Mr. Akhmetshin).  This evidence includes extensive documentation of the underlying fraud, proof that IMR's representatives controlled Shaft Sinkers and participated in such fraud and clear

evidence that IMR intentionally withheld critical documents from the Dutch District Court that directly contradicted sworn witness statements submitted by IMR's CEO and others.

41.    On 19 September 2014, the Dutch District Court upheld the prejudgment attachment previously granted to ECVK in the amount of $1.2 billion against IMR despite the Court's dismissal of ECVK's claims.

42.    On March 16, 2015, ECVK submitted its initial brief in the Dutch Appeal together with the previously unavailable documentary evidence and written testimony.

43.    IMR's initial brief is due June 23, 2015.

44.    The Dutch Court of Appeals has stated that both parties will be allowed to file an additional brief after the Swiss Arbitration Award is issued.  Further, under Dutch law, additional evidence may be presented at any time up to two weeks before the oral argument (which is not yet scheduled).

F.    **IMR's Claim**

45.    IMR claimed in its original Section 1782 application that documents supplied by Mr. Akhmetshin were improperly used by ECVK in the Dutch Action.  Critically, however, IMR does not — and cannot — point to a single exhibit or factual statement submitted or made in the Dutch Action of doubtful provenance, let alone to any document that could have been improperly obtained by Mr. Akhmetshin through the supposed hacking of IMR's computers.

17

Similarly, IMR does not now contend that any of the new evidence submitted by ECVK in the Dutch appeal came from Mr. Akhmetshin or any supposed hacking.  The same holds true for the Swiss Arbitration where none of the thousands of pages of evidence came from IMR, a fact which IMR does not contest.

46.    In December 2013, IMR filed a discovery request in the Dutch Action, which was denied by the Dutch District court.  IMR has not filed any other discovery requests in the Dutch Action since.

47.    IMR never claimed in the Dutch Action that ECVK had obtained, let alone used, any documents improperly obtained from Mr. Akhmetshin or any other source.  None of the filings by IMR in the Dutch Court ever mentioned any supposed hacking or any data theft, even though filings were made after IMR says it learned of alleged hacking by Mr. Akhmetshin.

### G.    S&R Retained Mr. Akhmentshin as a Non-Testifying Consulting Expert

48.    As discussed above, ECVK initially did not have sufficient information concerning the ownership and control of Shaft Sinkers to determine which specific corporate entities within the Trio's large organization might be responsible for the fraud committed by ShS.

49.    In order to obtain further information concerning the business activities and organization of the Trio and the entities they controlled in Kazakhstan and elsewhere, with a focus on understanding the structure of legal ownership and control of ShS for purposes of

pursuing financially responsible parties which had engaged in and directed ShS' misconduct, S&R determined that further research into these issues was required in Kazakhstan and other areas where the Trio's businesses operated.

50.     Kazakhstan's business environment is substantially less transparent than those of Western countries, and research concerning ownership interests and business relationships is accordingly more difficult.  Thus, we needed to turn to a resource with roots in the region who could obtain and understand relevant information.

51.     S&R had previous working experience with Rinat Akhmetshin, formerly a Russian citizen based in Moscow, who had substantial experience in researching the business relationships of former Soviet citizens who had amassed great wealth in the Soviet privatization period, and also in understanding business relationships and activities in Kazakhstan.

52.     Mr. Akhmetshin, now a U.S. citizen residing in Washington D.C., is the CEO and founder of the International Eurasia Institute for Economic and Political Research (the "Institute") and provides research for use in litigation in the U.S. and the U.K. involving business disputes with Russian and Kazakhstan entities.

53.     S&R accordingly engaged Mr. Akhmetshin to research and report concerning ownership of Shaft Sinkers, and the business operations of its parent entities (and at the same time, to understand the Trio's relationship to this shareholder).   S&R did not identify Mr. Akhmetshin as a testifying expert in the Dutch Action or the Swiss or ICC Arbitrations.  Nor was

Mr. Akhmetshin called to testify or to act in any other capacity in the Dutch Action or the arbitrations. Additionally, Mr. Akhmetshin never communicated with any other expert retained by S&R. And S&R never shared any information that it received from Mr. Akhmetshin with any other expert that it retained. Mr. Akhmetshin had no involvement in the underlying disputes between ECVK and IMR and Shaft Sinkers and never previously worked on any matter for ECVK or its affiliates.

54.    Mr. Akhmetshin is a recognized expert on business and political matters in Kazakhstan, Russia, and other former Soviet countries. In his 2007 book "The Oil and the Glory", a study of the oil and gas industry in the former Soviet Union including Kazakhstan, Steven Levine – a reporter for the Washington Post, New York Times, Wall Street Journal, and Newsweek, described Mr. Akhmetshin as well-connected with "Washington reporters, think tank experts, administration bureaucrats and key political figures" and "armed with inside information" from those sources about Kazakhstan and Russian business and political affairs.[32]

55.    S&R and other U.S. and U.K. law firms have engaged Mr. Akhmetshin as an expert in litigation matters involving major transactions in Kazakhstan and Russia. Mr. Akhmetshin has listed a few of these matters in his previous declaration in this case, including his work for a former Soviet country on a matter involving relocation of U.S. military bases

---

[32] See Steve Levine, *The Oil and the Glory: The Pursuit of Empire and Fortune on the Caspian Sea*, pp. 366, 375 (Random House 2007).

within that country requiring him to work closely with the U.S. Departments of Defense, State and Justice. Dkt. 10-1 ¶ 5.

56.    I first came to know Mr. Akhmetshin when he was retained by a client of S&R in a complex multi-country litigation pending in Russia, the U.K., and the U.S. about five years ago where he evidenced a deep knowledge about business matters in the former Soviet Union countries.

57.    Mr. Akhmetshin had a deep knowledge of Kazakh business entities and their owners and access to third-party sources (international journalists, governmental, and non-governmental agencies and the like) with additional information.  Mr. Akhmetshin was thus ideally suited to assist S&R in understanding the relevant entities controlled by the Trio which might have been involved in the Shaft Sinkers' fraud. Mr. Akhmetshin was retained to assist S&R in understanding the structure of the group companies and precisely which entities within the group controlled Shaft Sinkers in order that S&R could determine which entity was the proper defendant and related matters.  This was standard pre-litigation due diligence in what was to become a major multi-country legal proceeding by ECVK with hundreds of millions of dollars in damages at issue.

### H.    Mr. Akhmetshin's Engagement

58.    As litigation counsel, S&R had the authority to hire testifying experts and consultants without advance notice to Mr. Sidnev or anyone else at ECVK and without prior

approval. That is precisely what occurred here as S&R retained Mr. Akhmetshin without any involvement or knowledge of ECVK.

59.     Indeed, ECVK never had any direct involvement with Mr. Akhmetshin and spoke with him only to arrange and then hold a brief meeting in September 2012 where he proposed providing additional services which ECVK rejected.

60.     Mr. Akhmetshin was engaged by us, as counsel to ECVK, pursuant to a written engagement agreement dated July 26, 2012. (Exh. 20). The engagement agreement provides that Mr. Akhmetshin:

"will provide the Client with assistance in the Client's investigation of claims it may have against companies relating to a mining project being built by the Client in Russia which has encountered delays. You will assist in such endeavors by researching and providing information concerning the relevant parties and other requested information. You confirm that all services provided by you will be made in full compliance with all applicable laws of the U.S. and other relevant jurisdictions."

61.     At no time did EuroChem or ECVK control or direct Mr. Akhmetshin. Mr. Akhmetshin reported to me and I reported to the CEO and General Counsel of the client. EuroChem's security department had no involvement in, or control over, the litigation, as this was solely the responsibility of EuroChem legal department headed up by their General Counsel Valery Sidnev (formerly with the U.S. law firm Baker Botts L.L.P.)

62.     By the time Mr. Akhmetshin was engaged, the Trio and their various business interests had come under massive scrutiny in the U.K. and U.S., resulting in disclosure of substantial information concerning their activities both to governmental regulators and, inevitably, to journalists and others with an interest in exposing the corruption in which they believed members of the Trio and their business interests were engaged. Numerous press articles were issued in major publications in London and New York describing in detail the fraud of which they were accused. *See* ¶¶ 11-31 above.

63.     Moreover, the independent directors of ENRC and many senior employees were "fleeing the ship" and offering information to governmental agencies, journalists, and others in an attempt to distance themselves from the wrongdoing and avoid being caught up in the criminal indictments and lawsuits that would inevitably follow. This information quickly began to circulate in London where ENRC was based.  While much of this information was not available publicly, it was increasingly available through a variety of private sources (including journalists and nongovernmental "watchdog" organizations), on what Mr. Akhmetshin told us was informally referred to by the participants, including Mr. Akhmetshin as the "London information bazaar."

64.     S&R understood that Mr. Akhmetshin had a number of private sources of information concerning IMR and the Trio, and that Akhmetshin might obtain information lawfully from these sources to provide research and analysis relevant to the litigation against IMR. S&R understood and believed then, and has continuously understood and believed since,

that Mr. Akhmetshin obtained this information consistent with local law, and not through any unauthorized intrusion into anyone's computer system. S&R has a specific basis for belief that each document identified on the privilege log that has been submitted on behalf of ECVK with these papers was obtained lawfully from a specific source other than IMR or any affiliate. S&R is prepared to describe these sources *in camera* should the Court determine that such review is necessary to explore any privilege questions raised by the instant motion.

65.    In the course of his consulting relationship with S&R, Akhmetshin provided information and analysis concerning business relationships and activities that linked Shaft Sinkers, through intermediate entities including IMR, to the Trio. Mr. Akhmetshin indicated that he received this information from a network of sources he had developed over the years of his work and that, while he did not disclose all of them to S&R in order to protect the proprietary character of his relationships, all were providing information they had obtained on the "London information bazaar."

66.    EuroChem and ECVK personnel, including General Counsel Valery Sidnev and Director of Security Vladmir Krakmalnyy, met Mr. Akhmetshin only once, at a short meeting attended by members of EuroChem's Legal and Public Relations departments and an attorney from Salisbury & Ryan in September 2012. This meeting was held to allow Mr. Akhmetshin to propose a strategic communications campaign engagement for ECVK – which ECVK declined to pursue. ECVK did not know Mr. Akhmetshin before that meeting, and had no further contact with him after the meeting. The meeting did not include discussion of any documents or

24

information Akhmetshin might have, or might have obtained, concerning any confidential business activity of Shaft Sinkers, IMR or the Trio – and certainly did not involve any discussion of obtaining information from any person by any improper means.

67.     Neither ECVK nor S&R ever initiated any "strategic communications campaign" in furtherance of its litigation efforts against Shaft Sinkers or IMR.  On a very limited basis, I authorized Mr. Akhmetshin to supply limited information concerning the Dutch litigation to specific journalists or others with an interest in covering ENRC and the Trio, but only under two conditions: (a) that Mr. Akhmetshin believed this would assist his effort to obtain relevant information in exchange, and (b) that the information he disclosed was already in the public domain (though in some cases, difficult for interested parties to obtain).  The only document he was authorized to supply was a copy of the complaint filed by ECVK in the Dutch Court after it was filed.  This document could have been obtained by the press or others independently as it was public but they would have had to use Dutch counsel or some other agency to obtain copies.

68.     At no point during the course of Mr. Akhmetshin's engagement or afterward, has S&R, or to my knowledge ECVK, formed any belief or learned any basis for belief that Mr. Akhmetshin obtained information for ECVK's benefit, or for direct or indirect use relevant to any litigation or other activity involving IMR, through any unlawful means.

I.     **Mr. Akhmetshin Services were Terminated in May 2013**

69.     Mr. Akhmetshin provided expert services from July 2012 through the end of May 2013. Since his work ended in May 2013, Mr. Akhmetshin has not provided any services to S&R or ECVK.

70.     As discussed above, ECVK was not aware of Mr. Akhmetshin's retention when it occurred and had virtually no direct contact with Mr. Akhmetshin having only met him once at the meeting in September 2012 described above where his expert work was not discussed.

71.     In May 2013, Mr. Patokh Chodiev, one of the "Trio" of oligarchs who own IMR, contacted Andrey Melnichenko, then Chairman of EuroChem, the parent company of ECVK, and objected to ECVK's use of Mr. Akhmetshin as an expert here because Mr. Akhmetshin also represented clients unrelated to EuroChem who were opponents of the political regime in Kazakhstan. Mr. Chodiev did not claim that Mr. Akhmetshin had engaged in any improper activities but merely objected to his other clients' political affiliations.

72.     Mr. Melnichenko then contacted me, asked me who Mr. Akhmetshin was as he was not aware of his retention, and directed me to terminate the services of Mr. Akhmetshin because of Mr. Chodiev's objections and in order to avoid damage to EuroChem's business relationships in Kazakhstan.

73.    I met with Mr. Akhmetshin on May 27, 2013 in person to notify him of the termination of any further services, followed by a written notice to the same effect to him. Mr. Akhmetshin acknowledged his termination in writing on May 29, 2013.

74.    Since May 27, 2013 – nearly two years ago – Mr. Akhmetshin has not provided further expert services to S&R or ECVK. I had minimal contacts with Mr. Akhmetshin after his termination, mostly to arrange final payment for the consulting services that Mr. Akhmetshin had provided before his termination.  On one occasion in the fall of 2013, I called Mr. Akhmetshin to ask him about his concerns over intrusion into his telephone system and theft of his computer that he expressed during his engagement.

75.    Mr. Akhmetshin did not meet with me or anyone else acting on ECVK's behalf after the coffee shop meeting to discuss that meeting or provide additional information.  Indeed, by that time Mr. Akhmetshin was long gone from any involvement in the legal matters we were handling for ECVK.

76.    IMR's claim that Mr. Akhmetshin was hired to hack its computers is ludicrous.  I have known Mr. Akhmetshin for about five years and to my knowledge he has no computer hacking expertise or any staff or outside contacts with such expertise.  Moreover, in accordance with our standard practice in international matters of this sort I specifically directed Mr. Akhmetshin that all work he performed be done in full compliance with U.S. and any applicable foreign law exactly as provided in the engagement agreement. He confirmed his understanding of, and agreement to adhere to, that requirement before the engagement began.

27

77.    I have observed Mr. Akhmetshin's services to other clients and have never seen or heard of his involvement in any improper data gathering such as hacking.  He has never told me or to my knowledge any of our clients that he can hack or arrange hacking of any information systems.  Rather he told me – and I personally observed – that Mr. Akhmetshin has deep contacts with journalists at major international organizations such as the Wall Street Journal, the London Financial Times and The Guardian based in the U.K., and highly respected Non-Governmental Organizations such as Global Witness,[33] a renowned anti-corruption watch dog group (co-nominated for a Nobel Peace Prize in 2003) based in London funded by George Soros and others to expose international business corruption, international agencies and others through which Mr. Akhmetshin obtains research information.

78.    Mr. Akhmetshin informed me here that he could provide information relevant to the Swiss Arbitration and the Dutch Action through those same sources and it is my understanding based on my personal involvement in the matter and the facts told me by Mr. Akhmetshin that is what he did here.

79.    I believe I know the source of every document on the Privilege Log based on information provided to me by Mr. Akhmetshin and none of these documents were obtained from IMR.  Rather, all were obtained from identifiable third party sources outside of IMR.  Thus, none were obtained by Mr. Akhmetshin through hacking, as IMR now claims.

---

[33] See Financial Times, June 18, 2015. (Exh. 21)

80.    Should the Court decide that an *in camera* review of the privileged documents is required and that such review will not, itself, constitute any waiver of privilege, I will identify the sources of these documents to demonstrate my understanding that Mr. Akhmetshin obtained them through appropriate means and not through hacking.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 18, 2015
New York, NY

_____
Patrick P. Salisbury